**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AXG ROOFING, LLC, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | |
| v. | CLASS ACTION COMPLAINT |
| RB GLOBAL, INC.; ROUSE SERVICES LLC; UNITED RENTALS, INC.; SUNBELT RENTALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT SERVICES, INC., and SUNSTATE EQUIPMENT CO., LLC, | JURY TRIAL DEMAND |
| *Defendants*. | |

**TABLE OF CONTENTS**

I. INTRODUCTION ......................................................................................................... 1

II. PARTIES AND UNNAMED CO-CONSPIRATORS ..................................................... 6

III. JURISDICTION AND VENUE ................................................................................... 11

IV. FACTUAL BACKGROUND ....................................................................................... 11

    A. The Construction Equipment Rental Industry ....................................................... 11

    B. Rental Companies Previously Set Prices Independently, Based on Their Costs, Inventory, and Demand......................................................................................... 13

    C. The Evolution of Rouse's Business—From Equipment Auctions to Rental Price-Fixing ................................................................................................................. 14

       i. Rouse Begins as an Auction House................................................................14

       ii. Rouse's Equipment Rental Pricing Service Goes Live ......................................15

    D. Rouse's Reach Expands Under Acquisition of Ritchie Brothers......................... 16

    E. Rouse Provides Collective Pricing Using Pooled CSI........................................... 18

    F. Rental Companies Use the RRI Price to Set Rental Prices.................................... 19

    G. Rouse Provides Tools and Guidance to Its Clients to Enforce the RRI Price ...... 21

V. DEFENDANTS' ANTICOMPETITIVE SCHEME........................................................ 25

    A. Certain Rental Company Defendants Engaged Rouse to Create an Industry Pricing Service and Rouse Invited Others to Collude ........................................... 26

    B. Why Other Rental Companies Accept Rouse's Invitation to Collude.................. 28

    C. The Rouse Cartel's Scheme Pays Off.................................................................... 29

VI. DIRECT AND INDIRECT EVIDENCE OF THE ROUSE CARTEL EXISTS............. 34

    A. Direct Evidence of the Rouse Cartel .................................................................... 34

       i. Rouse's Contracts with Rental Equipment Companies......................................34

       ii. Statements by Rouse, the Rental Companies, and Other Industry Participants...35

       iii. Private Communications Between Rouse and Members of the Cartel.................37

    B. Indirect Evidence of the Rouse Cartel .................................................................. 38

       i. Rental Companies Engage in Actions That, Absent Concerted Conduct, Would Be Against Their Individual Economic Interest....................................................38

       ii. Defendants' Parallel Conduct and Abrupt Change in Behavior..........................39

       iii. The Market for Rental of Construction Equipment is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel.............................................40

VII. THE RELEVANT MARKET....................................................................................... 42

VIII. DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET ....................... 44

IX. ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE ... 45

X. CLASS ACTION ALLEGATIONS .............................................................................. 46

i

XI.     CAUSES OF ACTION ....................................................................................... 48

XII.    PETITION FOR RELIEF ................................................................................... 50

XIII.   JURY DEMAND .............................................................................................. 50

Plaintiff AXG Roofing, LLC ("Plaintiff" or "AXG Roofing") brings this action on behalf of a proposed class of individuals and entities that rent construction equipment in the U.S. Plaintiff seeks relief from Defendant RB Global, Inc. and its wholly owned subsidiary Rouse Services LLC ("Rouse"), as well as the major construction equipment rental companies in the nation—United Rentals, Inc., Sunbelt Rentals, Inc., HERC Rentals Inc., HERC Holdings Inc., H&E Equipment Services, Inc., and Sunstate Equipment Co., LLC (collectively, the "Rental Company Defendants" and, with Defendant RB Global, the "Defendants")—who conspired to artificially increase construction equipment rental prices nationwide in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## I.     INTRODUCTION

1.      This case seeks to hold Defendants accountable for designing and implementing an unlawful cartel to increase the price of construction equipment rentals across the nation (the "Rouse Cartel"). The equipment at issue—lifts, dozers, excavators, hoes, steers, compaction equipment, loaders, and the like—is used in residential and commercial construction and has many industrial applications. This equipment is commonly rented rather than purchased. Defendants' conspiracy—a price-fixing scheme orchestrated by Rouse—has artificially inflated the cost of renting construction equipment to individuals and entities like Plaintiff.

2.      Before 2011, the construction equipment rental industry was fragmented and characterized by price competition. Each rental company's unilateral interest in competing for rental volume led to lower prices, resulting in periods of broad price declines.

3.      Over time, however, the industry became increasingly concentrated. Between 2011 and the present, the Rental Company Defendants'—the largest construction equipment rental companies in the nation—collective market share increased from approximately a quarter of the industry to the majority of the industry.

4.     The Rental Company Defendants recognized that, together, they had the power to increase prices, but they were faced with a collective action problem. To achieve the collective goal of increasing overall industry profitability, rental companies had to work together to increase prices. Setting aside legality under the antitrust laws, such coordination remained both (a) logistically complex, given the many types of equipment, varying rental durations, and number of rental companies involved; and (b) difficult to enforce, given each rental company's individual incentive to undermine the competition by offering lower pricing to gain sales.

5.     In 2010, a former HERC President and the "Iconic Father of the Modern Rental Industry" issued a call to arms:

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it. . . . I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. . . . Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management. . . . *Right now*, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.

6.     Enter the Rouse Cartel. The Rouse Cartel allows equipment rental companies to overcome their collective action problem, albeit in violation of the antitrust laws. Defendants United, HERC, and H&E were founding members of the Rouse Cartel, which they joined in approximately 2011. By 2015, Sunstate Equipment—along with more than 40 other rental equipment companies—had joined. Sunbelt joined shortly thereafter. Today, rather than setting their equipment rental rates independently, Defendants and their Co-Conspirators rely on Rouse to set rates.

7.     The Rouse Cartel consists of a continuing horizontal agreement between and among the Rental Company Defendants to limit price competition and raise prices, with a reciprocal

exchange of competitively sensitive information ("CSI") serving as a facilitating practice in furtherance of their *per se* unlawful cartel.

8.      To join the Rouse Cartel, equipment rental companies must agree to provide Rouse with their CSI, including—in the words of Rouse executives—their "most commercially sensitive" and granular information, covering their entire fleet and "every line item of every rental invoice that they write." Rouse uses the pooled CSI data—which it collects on a daily basis from hundreds of rental companies, including the largest rental companies by market share, the Rental Company Defendants—to provide Rouse's clients with the same electronic, real-time Rouse Rental Insights price ("RRI Price"), for each piece of rental equipment.

9.      Rouse uses a proprietary, common formula to calculate the RRI Price for its rental company clients. The formula includes the clients' pooled CSI data, Rouse's assessment of seasonality of demand, and Rouse's view of market conditions. Rouse also describes the RRI Price as a "trend line."

10.     Rouse facilitates its clients setting their prices at or above the reported RRI Price, discouraging price competition and encouraging steady, coordinated upward pressure on rental prices across all of its rental company clients.

11.     The Rental Company Defendants joined the Rouse Cartel knowing that Rouse would pool their CSI to establish supracompetitive rental rates in the construction equipment rental market. It would not be in any individual Rental Company Defendant's unilateral economic self-interest to contribute its "most commercially sensitive" information to Rouse's database, unless it knew that it would benefit from its horizontal competitors doing the same. Put another way, each Rental Company Defendant contributing its CSI for Rouse to use to set prices for competitors was in each Rental Company Defendant's economic self-interest if and only if it

3

knew that, in return, each Rental Company Defendant would receive the benefit of its competitors' CSI in pricing its own equipment.

12.     Rouse attempts to obscure the true nature of its conduct by describing its RRI Price as a "benchmark," as opposed to what it actually is (and what the Rental Company Defendants are paying for)—a mechanism that allows rental companies to engage in price-fixing mediated by a third party. Benchmarks, traditionally, are used as a tool for an industry to gauge market conditions. Most notably, they do not advise their participants on a particular going forward price, or range of prices, that they should adopt. Here, by contrast, the Rouse Cartel facilitates an agreement among participating rental companies to price within the medium to high of the RRI Price and thus avoid competition based on price.

13.     Rouse advertises its revenue management software (including its RRI Price) to construction equipment rental companies as a means of increasing prices above those available in a competitive market and avoiding the risk of relying "solely on limited data and anecdotal information" and salespeople in making rental-rate and fleet utilization decisions. This is code for facilitating price-fixing through the pooling of competitors' CSI.

14.     Indeed, existing rental company clients publicly tout the success of Rouse's efforts to increase rental rates, the benefits of not having to guess at market conditions or to offer concessions/specials, and the elimination of concerns that they would be underbid, implicitly inviting other rental companies to sign up and enjoy the same benefits. Rouse regularly announced how many rental companies were part of its scheme and pitched its product to rental companies by emphasizing to them that competitors "around you are using us, [so] you should use us [too]." As new clients joined, they accepted the advertised invitation to trade their CSI for the ability to charge increased rental rates without fear of being undercut by their competitors and deprioritized

high utilization in favor of collective pricing.

15.     Rouse regularly meets with and advises clients—including Defendant Rental Companies—on how to use the RRI Price and other tools provided by Rouse to achieve higher prices. For example, Rouse provides its clients with a "[s]ide-by-side rate comparison of Rouse data with your book rates" and offers the "[a]bility to adjust rates at the quote level" to "[a]ssures that your pricing is in line with your competition."

16.     Rental equipment companies report that they value the collective RRI Price because it offers a "cheat code in the equipment rental world" and a "safety net when their sales reps claim that prices are falling." Members of the Rouse Cartel admit that they set prices within the recommended range of RRI Price approximately 90% of the time. Rouse utilization data also gives construction rental equipment companies "the ability to see 'who's renting what.'"

17.     The formation of the Rouse Cartel enabled a distinctive and unprecedented shift in the pricing and utilization strategies of the Rental Company Defendants, the largest construction equipment rental companies in the nation. In the words of a former CEO of a large construction equipment rental company that was acquired by Defendant Sunbelt, the industry has become "much more disciplined" on pricing, "knowing that going to the lowest price was not the best strategy," because everyone "used Rouse." He went on to explain:

> I don't believe we're in a race to the bottom, not anymore at least. Rouse has essentially standardized a lot of price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices.

18.     Another former employee of a large construction equipment rental company similarly described Rouse as a "game changer":

> So there's a company out there called Rouse that provides data. So this way you can see where the market rate is that the top providers in the market subscribe to. So this way, you're not putting equipment out there too cheap, you're maximizing

5

your return on your rate there. . . . Rouse has just been a game changer. . . . [E]verybody is effectively pricing their equipment at the market rate.

19.     According to another industry source, the Rental Company Defendants now "all kind of read from the same bible."

20.     The Rouse Cartel has paid off for its members, who are reporting record profits in recent years, to the detriment of Plaintiff and other renters of construction equipment.

21.     Rouse and the Rental Company Defendants have violated and continue to violate U.S. antitrust laws. Instead of setting their rental rates independently, the Rental Company Defendants, who control much of the nation's construction equipment rental market, outsource rate-setting to a common entity—Rouse. By acting collectively through Rouse, the Rental Company Defendants eliminate competition between themselves.

22.     Plaintiff brings this action to recover damages, trebled, as well as injunctive and other appropriate relief, detailed infra, on behalf of itself and all others similarly situated.

## II.     PARTIES AND UNNAMED CO-CONSPIRATORS

23.     Plaintiff AXG Roofing, LLC is a construction company incorporated and headquartered in Illinois, doing business as "Zags Roofing." AXG Roofing provides homeowners across the Midwest with construction services to build or repair their homes' roofing, siding, and gutters. AXG Roofing also restores homes that have been damaged by storms. AXG Roofing regularly rents construction equipment from several large construction equipment rental companies, including one or more Defendants.

24.     Defendant RB Global, Inc. ("RB Global") is a public company, traded on the Toronto and New York Stock Exchanges, that is legally domiciled in Canada with headquarters at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154. It describes itself as "a leading global marketplace that provides value-added insights, services, and transaction

6

solutions for buyers and sellers of commercial assets and vehicles worldwide." In 2022, the company reported $6 billion in Gross Transactional Value.

25.     Defendant Rouse Services LLC ("Rouse") is a wholly-owned subsidiary of RB Global, and is headquartered at 8383 Wilshire Boulevard, Suite 900l, Beverly Hills, California 90211. RB Global acquired Rouse in 2020 for $275 million. According to the public filings of its parent, Rouse is "the leading provider" of "construction equipment market intelligence" and "rental metrics benchmarks, and construction equipment valuations to lenders, rental companies, contractors and dealers." Its "business model is built upon an extensive data ecosystem, proprietary analytics, data science techniques, and trusted consumer relationships rooted in service and confidentiality" and "provides complete end-to-end asset management, data-driven intelligence, and performance benchmarking system." According to Rouse's website, its Rental Insights ("RRI") product "provides Cat-Class level comparisons of rental rates, utilization, and other key performance metrics" for rental companies.

26.     Defendant United Rentals, Inc. ("United Rentals") is a public company incorporated in Delaware with its principal place of business at 100 First Stamford Place, Suite 700, Stamford, CT 06902.

27.     United Rentals is the largest equipment rental company in the world, with over 1,400 retail locations across North America. United Rentals controls around 20% of the market for equipment rentals nationwide.

28.     United Rentals has enjoyed record-setting profits year after year. For the full year 2024, United Rentals reported total revenue of $15.345 billion, a 7.1% increase from 2023. In 2024, the company also achieved an annual gross profit of $6.15 billion, marking a 5.8% increase

from $5.813 billion in 2023. The below chart shows United Rental's profit growth from
12/31/2009 to 01/01/2025 in billions:



29.     United Rentals acquired Ahern Rentals in 2022 for approximately $2 billion. At
that time, Ahern was the largest independently owned rental company in North America, and had
a fleet of 60,000 across 106 locations. United Rentals is also currently seeking to acquire
Defendant H&E, as discussed below. These are only the latest in a long series of acquisitions by
United Rentals. In 2017, United Rentals acquired two of the top ten rental companies in the U.S.,
both of which had been members of the Rouse Cartel since its creation in 2011: NES Rental
Holdings II, Inc., acquired for $965 million, and NEFF Corporation, acquired for $1.3 billion.

30.     Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is incorporated in North
Carolina and maintains its principal place of business at 1799 Innovation Point, Fort Mill, North
Carolina 29715. As the country's second largest equipment rental company, Sunbelt Rentals has
1,186 locations in the U.S. and offers over 14,000 types of equipment for rent.

31.     Sunbelt Rentals is publicly traded on the London Stock Exchange under the name
Ashtead Group. Ashtead does business in Canada and the United Kingdom as well.

32.     In 2024, Sunbelt Rentals reported $9.3 billion in revenue from its U.S. business alone. Its U.S. fleet is worth over $15 billion.

33.     Sunbelt Rentals, like United Rentals has also been active in acquiring other equipment rental companies. Over the last six years, Sunbelt Rentals has made ~150 acquisitions.

34.     Defendants HERC Rentals Inc. and HERC Holdings Inc. (together, "HERC Rentals" or "HERC") are public companies incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. The majority of HERC Rentals' business is in equipment rental, but the company also engages in sales of used rental equipment and new equipment, parts, and supplies.

35.     HERC Rentals has over 451 locations in the U.S. and Canada. Its fleet represents a total original equipment cost of $7 billion.

36.     In 2023, HERC Rentals reported a total revenue of $3.3 billion. Its revenue from equipment rental had grown 46% from 2021. And in 2024, its total revenue again jumped, to a record $3.6 billion.

37.     HERC Rentals has focused on M&A and new greenfield development in recent years. It has completed 42 strategic acquisitions since December 2020. HERC has also recently become involved in a bidding war for Defendant H&E, as discussed below.

38.     Defendant H&E Equipment Services, Inc. ("H&E") is a publicly traded company incorporated in Delaware with its principal place of business at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E is over sixty years old and concentrates its business on four categories of rentals: (1) hi-lift or aerial work platform equipment; (2) cranes; (3) earthmoving equipment; and (4) industrial lift trucks. The company provides rental, sales, parts, repair and maintenance functions for these equipment categories.

39. H&E has 160 locations across the U.S. As of December 31, 2024, H&E owned 63,630 pieces of equipment with an original acquisition cost of approximately $2.9 billion.

40. In 2023, H&E reported a revenue of $1.47 billion, with equipment rentals making up over half of its gross profit.

41. In January 2025, H&E entered into an Agreement and Plan of Merger with United Rentals. In February 2025, HERC made what H&E's board determined to be a "Superior Offer"— valued at $5.3 billion. H&E terminated its Agreement with United Rentals and entered into a new Agreement to merge with HERC. The proposed merger is currently under regulatory review.

42. Defendant Sunstate Equipment Co., LLC ("Sunstate") is incorporated in Delaware and has its principal place of business at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is a wholly-owned company of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

43. Founded in 1977, Sunstate is now among the largest rental equipment companies in the U.S. The company has approximately 100 branches in sixteen states. Like the other Defendants, Sunstate has made a series of acquisitions of other rental companies over the years, and its profits and revenues have grown over time.

44. Various co-conspirators also participated in the Rouse Cartel with Defendants. The co-conspirators are persons and entities, including rental equipment companies and other industry participants, known and unknown to Plaintiff at this time and not named as defendants in this action. They have participated as co-conspirators with Rouse and the other Defendants in the offenses alleged and have performed acts and made statements in furtherance of the Cartel.

### III. JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

46.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

47.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in this state, including through the rental of construction equipment products.

48.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of construction equipment products.

49.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

### IV. FACTUAL BACKGROUND

#### A.     The Construction Equipment Rental Industry

50.     Construction equipment rental is a significant segment of the construction industry in the U.S. This is largely due to demand for machinery and equipment without the upfront capital investment.

51.     Construction equipment may be used in residential, commercial, and industrial sectors, and includes, but is not limited to lifts, dozers, excavators, hoes, steers, compaction equipment, cranes, and loaders. "Construction equipment" is ordinarily used in the industry to refer to large, heavy equipment and components of such equipment, rather than smaller tools.

52.     Demand for rental equipment is significant and continuous. Rental companies purchase approximately one-third of all construction equipment sold in North America.

53.     Individuals and entities often rent rather than purchase the equipment they need for construction projects because renting is usually more affordable, especially for smaller companies or for projects that require equipment for a short period of time. Buying equipment necessitates a significant up-front investment, as well as ongoing storage and maintenance costs, while renting requires paying a reduced price only during the duration the equipment is actually used, freeing up capital for other needs.

54.     The construction rental market has become increasingly concentrated. What was "[o]nce a niche, highly fragmented and locally oriented industry" has become dominated by a few major players. Industry analysts have called this transition a "race to scale."

55.     This concentration is largely due to aggressive acquisition practices. For example, United Rentals made approximately 300 acquisitions over the past 20 years. Sunbelt Rentals completed over 100 acquisitions since 2015. Currently, HERC and United Rentals are in a bidding war to acquire H&E.

56.     The below graphic comes from an investor presentation by Ashtead Group, which owns Sunbelt. This graphic shows that the industry substantially consolidated between 2010 and 2022. Note that United Rentals now owns RSC.



57.     Today, the Rental Company Defendants account for the majority of construction equipment rental activity in the U.S., which is the world's most consolidated construction equipment rental market.

**B.     Rental Companies Previously Set Prices Independently, Based on Their Costs, Inventory, and Demand**

58.     Before Rouse became ubiquitous in the industry, rental companies used cost and demand driven factors to independently determine construction equipment rental pricing.

59.     Rental companies, including the Rental Company Defendants, traditionally set prices by calculating the costs of owning and operating equipment, including purchase price, maintenance, and insurance, and then adding a markup for profit. This markup could vary depending on the type of equipment, but it was typically a standard percentage applied across all rental items. Rental companies would also take inventory and demand into account.

60.     Pricing models generally were simple, with fixed daily, weekly, and monthly rental rates. Daily rates were the highest, while weekly and monthly rates offered discounts for longer rental periods. Overall, however, prices remained relatively static, though prices could and did

experience periods of substantial decline.

61.     The rise of Rouse transformed this landscape by giving competitor rental companies pooled CSI to set higher prices across the industry.

**C.      The Evolution of Rouse's Business—From Equipment Auctions to Rental Price-Fixing**

62.     Rouse was founded in 1920 when Max Rouse opened an auction and liquidation firm for construction equipment after World War I. For the first 80 years of its corporate history, Rouse was an auctioneer for construction equipment.

### i.   Rouse Begins as an Auction House

63.     In the late 1990s, Ritchie Brothers, a Canadian company, entered the U.S. construction equipment auction market. Rouse decided in or around 2000 to get out of the auction business, which had become saturated, and become an information services company, with a focus on construction equipment appraisals and fleet valuations. Through its work in the appraisal and fleet valuation space, Rouse began to build a database of equipment prices for sales of used construction equipment. Some of Rouse's customers in this space included construction equipment rental companies.

### ii.   Rouse Turns its Attention to Rental Pricing

64.     In approximately 2008 and 2009, several of Rouse's rental company clients—including Defendants HERC, Sunbelt Rentals, and United Rentals—approached Rouse, asking the company to create a service for a new market sector: construction equipment rentals. These rental company clients believed that such a service would allow the industry to pool CSI in a way that would increase "visibility" for all. In the words of a Rouse Senior Vice President:

> It was really in the 2008/2009 time frame that we talked with a number of the different rental companies and we saw an opportunity to do something like the valuation benchmarking that we were doing on used equipment but on their core rental business and give them measurable benchmarks for rental rates and

14

utilization.

65.     In 2010, an industry leader and former HERC President published a piece in the industry-facing publication, the Rental Equipment Register, titled "The Clock Is Ticking on Rate Discipline." He asserted that rental companies were engaged in aggressive competition resulting in a race to the bottom. He wrote, "[T]he entire industry must accept rate responsibility together."

66.     In a response to this article, another industry leader agreed that a lack of price "discipline" and aggressive competition were hurting the industry as a whole, stating that "continually slashing rates and using rate discounting as a method to sell your business means selling the industry short."

67.     In 2011, the American Rental Association ("ARA"), the trade group for the equipment rental industry, published—in collaboration with Rouse and other major rental companies—standardized metrics for the industry, dubbed the ARA Rental Market Metrics. These metrics codified, for the first time, industry standards for such measurements as physical utilization, dollar utilization, and fleet age. The metrics were developed so that "rental businesses [could] assess their performance relative to their peers." That is, Defendants were laying the groundwork for collusion that would prevent price competition and maintain high rental prices.

68.     Just one month after the ARA Rental Market Metrics went live, Rouse responded to rental companies' requests—including Defendants HERC, Sunbelt Rentals, and United Rentals—to create a common system that could be used to compare and align their prices for equipment rentals. Thus, the RRI Price was created.

### iii. Rouse's Equipment Rental Pricing Service Goes Live

69.     Rouse's equipment rental pricing service including the RRI Price went live by the end of 2011. Rouse referred to its new service offering as "Rouse Analytics" and later, as "Rouse Rental Insights."

70.     Rouse Analytics launched with Defendants HERC Rentals, H&E, and United Rentals as members. The other three initial members of the conspiracy, Ahern Rentals, NES Rentals, and NEFF Rentals, have since been acquired by United Rentals. By the end of 2011, Rouse became integrated into these initial co-conspirators' data systems, and these Defendants began pooling their CSI.

71.     By 2015, Rouse had over 50 rental equipment company clients participating in its "Rental Metrics Benchmark Service," which included the collective RRI Price created through the exchange of the Rental Company Defendants' and other rental companies' CSI. To increase the number of participating rental companies and the amount of data it obtained, Rouse initially offered a "free" tier of membership where it gave participants monthly updates on local market conditions in exchange for their granular data. Rouse noted at the time:

> The rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies, and we're looking forward to additional growth here in the U.S. and internationally.
>
> Through its Rental Metrics Benchmark Service, Rouse Analytics collects invoice level transaction data and nightly fleet snapshots from participating rental companies and reports industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age and other key performance metrics at a local market level. Participating rental companies receive a summary level comparison of their rental rates and other key performance metrics to local market benchmarks every month at no charge and then have the option to purchase more detailed reporting.

72.     By 2020, Rouse's RRI Price had become "ubiquitous" within the industry. In the words of the former CEO of a large construction equipment company that was acquired by Defendant Sunbelt: "If you're a mid-size or larger company, you're using Rouse." This growth became a virtuous feedback loop: as more companies sent their CSI to Rouse, Rouse's pricing recommendations became more appealing and more important to rental companies.

**D.     Rouse's Reach Expands Under Acquisition of Ritchie Brothers**

73.     In December 2020, Ritchie Brothers, a global leader in the sales of heavy

equipment, acquired Rouse.[1] Ritchie Brothers, known in the equipment industry for its vast marketplace, operates both physical and online auctions, connecting buyers and sellers of used equipment in industries such as construction, agriculture, mining, and transportation.

74.     As Ritchie Brothers expanded its service offerings over the years, the company recognized that the construction equipment market was changing, with more businesses choosing to rent equipment rather than own it. This shift led to an increased focus on rental companies and their requirements for better price-optimization and fleet-management tools. To capitalize on this trend, Ritchie Brothers sought to enhance its capabilities in the growing equipment-rental sector, which led to its 2020 acquisition of Rouse.

75.     Joining Ritchie Brothers allowed Rouse to integrate its advanced data analytics capabilities into Ritchie Brothers' existing data services and thereby supercharge its RRI program. By capitalizing on Ritchie Brothers' existing global reach and asset-management expertise, Rouse could offer equipment rental companies more comprehensive solutions and thus become more powerful and ubiquitous.

76.     Ritchie Brothers also sought to expand its customer base with this acquisition. Rental companies, which rely heavily on market insights and pricing tools, were already using Rouse to improve their fleet management and pricing strategies. By acquiring Rouse, Ritchie Brothers gained access to this large customer segment, allowing it to offer rental companies a broader set of tools to enhance both their rental operations and their ability to buy and sell equipment through Ritchie Brothers' network.

77.     In 2022, Rouse clients (which may include those that use services other than its analytics offerings) made up 90% of the total revenue earned by the top 100 companies in the

---

[1] In 2023, Richie Brothers changed the name of its corporate entity to RB Global.

Rental Equipment Register ("RER"). By 2024, over 400 rental equipment companies across North America used RRI. This includes all 10 of the top 10 rental companies, and 70 of the top 100, as measured by RER. Rouse has stated that its database covers at least 60% of the North American rental equipment market, meaning market participants covering more than 60% of the entire industry use Rouse's RRI Price and contribute their CSI to Rouse.

78.     Defendant RB Global touts that its subsidiary, Rouse, provides its rental equipment company clients with "rental rate and utilization benchmarking intelligence" in order to improve their clients' "profitability."

**E.     Rouse Provides Collective Pricing Using Pooled CSI**

79.     Rouse's RRI Price has become "ubiquitous" within the construction equipment rentals industry.

80.     To create the RRI Price, Rouse requires its clients—most of the construction equipment rental companies in the country—to agree to submit every line item of every invoice they charge their customers every day, along with real-time utilization information on their entire fleet. Rouse interfaces with the Rental Company Defendants' software to automatically collect actual rental invoices and real-time inventory data on a daily basis—ensuring that data is constantly up-to-date and never stale. In a confidential interview, an employee of Sunbelt Rentals stated that Rouse's data is updated in "pretty close to real time."

81.     Rental invoices reflect CSI including utilization, fleet age and value, duration terms, and, most importantly, pricing, all of which is all non-public information.

82.     Rouse collects this data, collates and "conforms" it to ARA Metrics. Rouse then uses a proprietary, common formula to calculate the RRI Price for its rental company clients. The formula includes the pooled CSI data, Rouse's assessment of seasonality of demand, and Rouse's view of market conditions. Rouse provides users with the same RRI Prices based on the

competitors' pooled CSI and Rouse's common formula.

83.    Rouse offers its RRI Prices by "Cat Class" (*i.e.*, category and class of equipment) and specific to the client's local market. Rouse also provides information on where a company's rental rates stand in relation to its competitors on monthly, weekly, and daily rates. In setting rental rates, Rouse considers granular details of CSI, such as the precise age of a piece of equipment. Rouse also provides clients with "benchmarks" in "ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus [their] competition."

84.    The RRI Prices are continuously updated, as new CSI flows into Rouse. Rouse customers are provided with a High, Medium, and Low RRI Price for each rental. Rouse customers are also shown where their prices measure up to the RRI Price.

85.    As stated by an SVP at Rouse: "So everybody gets to see all of their own data through a set of analytical tools that we've built specifically to meet the needs of rental companies to help them evaluate their pricing and Fleet performance they see all their own data through that tool set compared to a benchmark range for the industry that we calculate based on the data we're getting from everybody else."

86.    A Former Chief Digital Officer at Ritchie Brothers explained the circular flow of data:

> Rouse is integrated into their system. Rouse feeds, on a nightly basis, every piece of equipment these rental companies have, the make, the model, configuration of that equipment, how much it's being utilized, at what price it's being utilized. This information flows through Rouse on a nightly basis. . . . Basically, Rouse is looking at the data every night, and these companies are looking at Rouse data. It's very easy.

### F.    Rental Companies Use the RRI Price to Set Rental Prices

87.    The Rental Companies use the RRI Price to set their prices. Rental companies

19

select prices based on the RRI Price as applied to the context of their contract. For example, a rental company employee might pick Rouse's "Medium" or "Low" pricing when competing inventory is high, but might pick the "High" range if competing inventory is low. Confidential interviews confirm that it is rare for a rental company to deviate from the RRI Price that Rouse Reports. For instance, when one Rouse co-conspirator attempted to use the RRI Price data to undercut its larger competitors on price, it resulted in "annoyance among larger and regional rental companies" and, on information and belief, was quickly curtailed.

88.     A former employee of HERC explained that sales managers consulted the RRI Price as "standard operating procedure" that was used "every day" to set rental prices to its customers, like Plaintiff. This former employee confirmed that employees at HERC used the pricing information RRI provided to them, which was derived from information from HERC's competitors, "to see where we were at versus the competition as far as pricing" to "see if you can go up or down." This former employee further confirmed that HERC employees complied with the RRI Price to ensure that they were getting "the most return on investment for the pieces of equipment."

89.     A VP of Sales Analytics at Sunbelt explained: "We leverage Rouse in a number of ways really[,] rate and utilization are the most important ways . . . . [T]he most valuable thing Rouse helps us with understanding where we sit in the marketplace[,] whether we are overperforming or underperforming to allow us to make adjustments."

90.     A former Senior Rental Consultant at Caterpillar described how rental companies collude on price:

> So there's a company out there called Rouse that provides data. So this way you can see where the market rate is that the top providers in the market subscribe to. So this way, you're not putting equipment out there too cheap, you're maximizing your return on your rate there.

91.     This Senior Rental Consultant described how Rouse "provides the market rate" for equipment rentals to ensure that each rental company that colludes with Rouse by using the RRI Price is not "leaving money on the table." As the Consultant explained: "[C]ompetitors within the equipment rental market are reporting their sales so they can come up with a fair market value. So in this way, every[ rental company] is effectively pricing their equipment at the market rate."

92.     An interview with a former employee of a large construction rental company is revealing: "Q: On Rouse Analytics, are you saying that the rental industry, the equipment rental industry uses it to monitor market pricing? A: Yes, For your rental rates, that's the number one thing they're looking at."

93.     In a confidential interview, a former employee of a Rental Company Defendant admitted that the Rental Company Defendant set prices at or above the RRI Price approximately 90% of the time.

### G.     Rouse Provides Tools and Guidance to Its Clients to Enforce the RRI Price

94.     In addition to the RRI Price itself, the Rouse software provides mechanisms to facilitate and enforce implementation of the RRI pricing, thus maximizing compliance and thereby profitability for the industry.

95.     To ensure its prices hold, Rouse has integrated its software directly into the most common software systems used in the industry. To make it easier for hundreds of small independent construction rental companies to use the RRI Price, Rouse has created a "plug-and-play interface" that integrates with over 35 different enterprise resource planning (ERP) software vendors that specialize in creating business software for rental equipment companies. According to the Director of Client Services at Rouse: "We work and integrate with almost all of them, so

21

you know 40+ rental softwares we can flip a switch, turn on that datafeed, and start getting you the reporting right away."

96.    Rouse has also developed tools to help further automate the imposition of the RRI Price including alerts and self-populating fields built into the software. Rouse's interface design encourages adherence to its RRI Price, as demonstrated in the screen shown below. The numerical ranges on left side of the chart representing rental rates (in dollars) and the blue bars represent the number of rental transactions conducted by a Rouse client within that price range. The RRI Price for a given category of equipment is the thin grey line dividing the red and green zones. The green zone represents the price range between this RRI Price and the "top quartile" price; the red zone represents the range between the RRI Price and the "bottom quartile" price. By designing its interface to encourage clients to conduct more of their transactions within the green zone, that is, at or above the RRI Price, Rouse is able to discourage price competition and encourage steady, coordinated upward pressure on rental prices across all of its rental company clients.



97.     Rouse allows Rental Company Defendants to set their pricing dynamically in accordance with Rouse's RRI Price. Rouse also enables Rental Companies to view RRI Pricing within the context of their own pre-existing data warehouse.

98.     Members of the Rouse Cartel get substantial visibility into the operations of their market. Rouse provides members of the Rouse Cartel with reporting on seven key metrics based on the pooled CSI: (1) rental rates, (2) rental rate change, (3) physical utilization, (4) financial utilization, (5) fleet age, (6) revenue distribution, and (7) rental growth. Rouse provides these for each class of rental equipment a rental company offers.

99.     And Rouse provides additional tools to help further automate the imposition of the RRI Price, such as a mobile app, pricing-related alerts, and self-populating fields built into the

software. According to the Director of Client Services at Rouse: "A lot of the features we've rolled out, development we've done has really been based on customer feedback."

100.    Rouse also enables and encourages methods of policing the Cartel. For example, Rouse provides monthly trainings and other tools to rental companies to ensure the RRI Prices are followed.

101.    Rental Company Defendants have sophisticated sales operations managed by sales analytics teams with oversight of price-setting, salesperson compensation, and sales territories. These teams utilize Rouse and the RRI Price on a daily basis.

102.    A Former VP at Ritchie Brothers (Rouse's parent company) explained that Rouse lets salespeople "know where to play ball." The Director of Client Services at Rouse noted that the RRI Price "help[s] train their salespeople to you know not always listen to their customers and listen to the data and the market around them."

103.    Rouse also provides reporting on which salespeople at the Rental Company Defendants are failing to meet Rouse's pricing. Rouse trains and encourages its clients to utilize this individual salesperson reporting and other methods to ensure that the RRI Price holds. Here is an example of the type of individual salespeople reports offered by Rouse:



104.    In this instance, a sales representative from a rental company using RRI is averaging 15.9% below Rouse's price, leading to an alleged loss of revenue. In sales presentations, Rouse directs clients to look at this metric to determine if a particular salesperson was underperforming the RRI Price.

105.    For many of Rouse's rental company clients, salesperson compensation is based on whether that salesperson has met or exceeded the RRI Prices, incentivizing adherence to Rouse's price determinations. Rouse encourages using its RRI as a "management and monitoring tool for [clients'] salesforce."

106.    Rental company customers also interact with Rouse to ensure that the RRI Prices are being followed. Rouse "business analysts" manage customer relationships, answering questions about using RRI to improve profitability. Rouse also assists clients with implementing and updating Rouse.

## V.    DEFENDANTS' ANTICOMPETITIVE SCHEME

107.    A cartel is a group of rivals that conspire to fix prices, allocate markets, or

otherwise illegally limit competition. Cartels can be organized by competing sellers of goods or services (who seek to raise prices to increase their revenues) or by buyers (who seek to suppress prices to reduce their costs). Either way, the goal of cartel members is the same: to act (collectively) like a monopolist.

108.    The Rouse Cartel dates back to at least 2011 and is designed to increase construction equipment rental rates. To achieve this outcome, Cartel members agree (among themselves and with Rouse, which orchestrates the scheme) to: (1) outsource their pricing decisions for construction equipment rentals to a common decisionmaker, Rouse, and use its RRI Price; (2) exchange among themselves and Rouse all of their CSI regarding their pricing and utilization; and (3) have Rouse coordinate pricing as well as implementation and enforcement strategies amongst the co-conspirators. This joint delegation and anticompetitive information exchange allows Rouse to coordinate construction equipment rental behavior and maximize industry-wide pricing.

### A.    Certain Rental Company Defendants Engaged Rouse to Create an Industry Pricing Service and Rouse Invited Others to Collude

109.    Rouse's RRI Price was a direct result of industry demand in the late 2000s. In the words of a Rouse Senior Vice President: "[W]e talked with a number of the different rental companies and we saw an opportunity to do something like the valuation benchmarking that we were doing on used equipment but on their core rental business and give them measurable benchmarks for rental rates and utilization."

110.    Defendants United Rentals, HERC, and H&E have been involved in Rouse's rental pricing since its founding. Indeed, it was a former HERC executive that issued the 2010 call to arms for the industry:

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate

26

management can stop it. . . . I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. . . . Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management. . . . *Right now*, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.

111.    Rouse invited and required its founding clients to participate in the anticompetitive sharing of CSI. Each rental company had to submit non-public pricing and inventory information to the Rouse database. As stated by the Rouse SVP: "We realize that the data we [] require[] to deliver our service is the most commercially sensitive data most companies have, again we are getting all their information about their fleet and all of the information about their entire invoices."

112.    As stated by Rouse's Director of Client Services: "We keep the data very private to only the participants sharing it."

113.    After Rouse went live with its RRI Price in 2011, it invited additional construction equipment rental companies—including Defendants Sunstate and Sunbelt—to join the Cartel and begin sharing their CSI.

114.    Per a Rouse advertisement from 2020:

Making critical decisions about rental rates and fleet management can be risky when you rely solely on limited data and anecdotal information from your customers and sales reps. They can't help you see the complete picture and understand what is happening in the market, but we can. We're Rouse Analytics and we use actual rental invoices and daily fleet snapshots to provide rental business managers with the most accurate benchmark data available on rental rates and utilization by product and market. Easy to set up and simple to use. Our actionable intelligence is based on nightly fleet snapshots for over $45B worth of equipment and $20B in rental revenue. Our online portal is intuitive and designed for speedy analysis. And with automatic alerts and email notifications, it works for you even when you are not actively using it. . . . When you sign up with Rouse Analytics, we give you a 60 day free benchmark trial with access to all available subscription and benchmark reporting, including detailed local market level rate comparisons by product. . . . Contact us now to schedule a demo!

115.    To attract new Cartel members (and ensure the ongoing participation of existing members), Rouse also regularly announces how many rental companies are part of its scheme. In a confidential interview, a former Rouse employee noted that Rouse pitches its product to rental companies by emphasizing that "[t]hese people [specific equipment rental companies] around you are using us, [so] you should use us [too]." Rouse uses this as an "enticement" to get new clients interested in the RRI Price. Such marketing contemplates and invites concerted action among rental companies to fix and increase prices. Rouse and Defendant Rental Companies know that increased profits for the entire industry and successful price setting are only possible if there is a collective shift towards participation in the Rouse Cartel. Rental companies use Rouse only because they know that (1) their competitors are doing the same, and (2) only through coordination with their competitors can they raise rental prices to supracompetitive levels without suffering corresponding competitive harms.

### B.    Why Other Rental Companies Accept Rouse's Invitation to Collude

116.    Other rental companies accepted Rouse's advertised invitation to trade their CSI for the ability to charge increased rental rates without fear of being undercut by their competitors.

117.    As Rouse regularly boasts, over 400 of the nation's equipment rental companies have accepted Rouse's invitation to participate in concerted action with respect to rental prices.

118.    Defendants United, HERC, and H&E were founding members of the Rouse Cartel, joining in 2011. Sunstate joined in 2015; Sunbelt joined shortly thereafter.

119.    Rental companies accept Rouse's invitation to collude by providing Rouse with copious amounts of CSI, as described above. As Rouse states on its website, "[w]e pull data directly from our clients' systems to ensure our rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates." Rouse also admits to "provid[ing] clients with comparisons of the rental rates, utilization, and other key performance metrics to

industry benchmarks by Cat Class specific to each market they operate in." According to one Rouse executive, the company has "essentially standardized a lot of the price competition in the industry" and "since their involvement, rate[s] have significantly increased."

120.    It would be against a rental company's unilateral self-interest to share this CSI unless that company knew that (1) its competitors were doing the same, and (2) its competitors would not use the non-public information to undercut one another's prices.

121.    Rental companies share this data with Rouse because they know that Rouse will use it to help them and their co-conspirators fix and raise prices. They share CSI so they can benefit from the data their competitors likewise provide to Rouse.

122.    Rental companies also demonstrate their acceptance of Rouse's invitation to participate in the Cartel by adhering to RRI Price determinations.

123.    A current employee of Defendant Sunbelt Rentals said that 90% of their rentals stayed within Rouse's RRI Price, most of which represent Rouse's High or Medium pricing.

124.    A former CEO of a construction equipment company that was acquired by Defendant Sunbelt stated: "In most cases, they aim to stay within the band. I'm not sure if that's a standard deviation or Rouse's band, but they strive to stay within it. They usually have goals to remain above or at the average, depending on their position."

125.    Rental companies further demonstrate their acceptance of Rouse's invitation to collude by tracking and rewarding their sales representatives who comply with Rouse's RRI Price.

### C.    The Rouse Cartel's Scheme Pays Off

126.    The use of Rouse has had a transformative impact on the construction equipment rental market. As industry participants—including Rouse and the Rental Company Defendants— admit, Rouse's RRI Pricing has caused anticompetitive effects in the form of higher prices and reduced output.

127.     Rouse advertises that its services help rental companies raise prices and improve profitability. An example of such an advertisement is below:



*Excerpt from Rouse ad in the March 2015 issue of* International Rental News

128.     As rental companies have aligned their prices with the collective prices provided by Rouse, prices across the industry have converged, reducing the natural variability of pricing. This stifles competitive pricing strategies and limits differentiation among rental companies.

129.     One of Rouse's ERP software vendor partners went so far as to state that Rouse provides a "cheat code in the equipment rental world."

130.     A Former VP at United Rentals stated: "[T]he Rouse data that we were able to gain around rental rates was incredibly powerful because Rouse gather[ed] all the top 10 rental companies and actually g[o]t that data shared."

131.     A Former VP at the ARA said:

They've [rental companies] become more professional, using more data tools. They have shareholders who care about keeping the price higher. Both United and Sunbelt have consistently led in saying, 'We're going to raise prices, we're going to get prices higher.' So, everyone knows what United is doing.

132.     The CFO of HERC similarly stated in May 2023: "You have sort of 50% to 60% of North American rental companies reporting into Rouse . . . . And that certainly goes to the discipline in the overall marketplace in the industry . . . . I think it's invaluable."

133.     A former Senior Rental Consultant at Caterpillar described Rouse as having "been a game changer" in the post-COVID world, noting that: "Everything that I see is they've been able to last three, four years to improve their pricing sequentially." This Consultant reported that the equipment rental companies were "doing a very good job increasing their rates for the last three years." And, they noted, the price increases over competitive levels are probably higher than that analysis shows, since the rental companies' annual reports are comparing price increases to *their own* prior year or quarter, "[s]o they're comparing to themselves[;] [t]hey're not really comparing to the market."

134.     A senior employee at the ARA similarly explained Rouse's role in allowing rental companies to collude to collectively raise equipment rental prices: "I think that a lot of the rental companies led by United have gone on their quarterly reports and said we're raising prices." Rental companies are looking at "the other rental companies around them" and "going, okay, yes, they are raising prices. And so maybe I should raise prices too."

135.     This senior employee at the ARA attributed the raising of rental equipment prices to Rouse Analytics:

> I think there's also the greater adoption of a product called Rouse Analytics, which is now owned by Ritchie Bros., which does rental rate pricing based on actual invoice receipts in specific markets . . . that gave a lot of rental companies a better window into more efficient pricing.
>
> And so, instead of it being kind of decisions from the head of the sales rep who always wants the price lower because they just want to get the fleet out on rent, I think you saw rental companies making better pricing decisions on that. And Rouse actually claims that they are part of the reason that that happened.

136.    In 2022, 93% of respondents to an ARA rental industry survey said that they had increased their rates that year. Said one employee of a construction equipment rental company: "We have followed suit with most of the national chains systematically raising prices 5 to 7 percent."

137.    Representatives from rental companies, including the Defendant Rental Companies, regularly tout Rouse as the means by which they can ensure they are "maximizing [their] return on [their] rate," acting in concert with the market, and ensuring that the rental companies are not "leaving money on the table."

138.    In short, Rouse provides RRI Prices based on the application of a proprietary, common formula to real-time pooled CSI from the Rental Company Defendants, as well as Rouse's assessment of seasonality of demand, and Rouse's view of the market.  This leads to standardized, higher pricing across the industry. As rental companies widely adopted these Rouse prices, they set prices at similar, higher levels, limiting competition and generating supercompetitive profits for Cartel members.

139.    The use of RRI Prices suppresses competition by encouraging rental companies to follow a common pricing structure, rather than setting rates based on their own specific market conditions, customer base, or operational costs. This prevents rental companies from undercutting or aggressively pricing their equipment in ways that would typically foster competition, resulting in artificially high prices.

140.    Rental companies are reporting record profits in recent years, thanks to the Rouse Cartel. Rouse reported that the revenue of the top 10 companies on the RER—all of whom are Rouse customers—rose by almost $5 billion dollars from 2022 to 2023.

141.    As one example, United Rentals' revenue increased 7.1% from 2023 to 2024.

142.    Like United Rentals, Sunbelt Rentals has also seen substantial profit growth in recent years and has acknowledged the role of "rate discipline" in its success. As stated by Ashtead Group Chief Executive Brendan Horgan:

> Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years. This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years.

143.    HERC Rentals' revenue from its equipment rental segment grew 46% between 2021 and 2023.

144.    The graphic below shows the rapid growth in revenue in the market.



Source: S&P Global Market Intelligence, ARA Rentalytics

145.    Rouse was able to help rental companies achieve these record profits despite simultaneous reductions in output. For instance, during the economic downturn caused by COVID-19, industry analysts were surprised to see that the equipment rental sector (unlike equipment retail, and the construction industry generally) continued to thrive.

146.    In the years since 2020, major equipment rental companies have managed to maintain their elevated rates even through supply ebbs. On earnings calls, executives explained

that the industry had been transformed by data and "discipline." They stated that after the wide adoption of RRI Pricing, national rental companies like Defendants "were willing, at least in the short term, to endure lower time utilization rather than go too low on dollar utilization." Industry executives also talked about "time utilization being down, but their rate being up," which "wouldn't have happened 15 years ago" before the Rouse Cartel was formed.

147. At a Bank of America conference in May 2022, CEO of Defendant HERC, Lawrence Silber, was asked by an analyst, "What gives you confidence and the ability to kind of normalize at these higher levels versus kind of seeing the fall that you might have seen in the past?" He responded in part, "The difference between a company today and what it was maybe 10 years ago or even five years ago is we're technology enabled. We're really at the forefront and leadership level of having all the equipment be telematically enabled . . . . In fact Rouse Analytics, which is a key tool that we use to help us price in the marketplace, helps us manage a level of fleet that's in the market, understand what competition – it has over 60% of the market participating, now putting data into that."

148. As explained below, it would be against the economic self-interest of any individual rental company to share its most competitively sensitive information with rivals, and to keep its rental rates high and its utilization rates low, absent an understanding that its competitors had adopted the same strategies.

## VI. DIRECT AND INDIRECT EVIDENCE OF THE ROUSE CARTEL EXISTS

### A. Direct Evidence of the Rouse Cartel

#### i. Rouse's Contracts with Rental Equipment Companies

149. On information and belief, Rouse has entered into similar contracts with hundreds of construction equipment rental companies, including each of the Rental Company Defendants. These agreements directly evidence the conspiracy alleged herein.

150. These agreements all expressly contemplate that the rental company will (1) share CSI with its rivals through Rouse; (2) have access to Rouse's database and RRI Pricing, which pools CSI from rivals; and (3) use Rouse's RRI Pricing.

## ii. Statements by Rouse, the Rental Companies, and Other Industry Participants

151. Rouse and the Rental Company Defendants have admitted publicly to the existence of the alleged conspiracy among rental equipment companies to fix and increase prices for rental construction equipment through Rouse.

152. Rouse advertises that its pricing information is based on data from over 400 companies, representing over $115 billion of fleet value and $49 billion of rental revenue. Rouse highlights that this data is made up of "actual real rental invoices sent to customers—not quoted or list rates," which enables companies to make the "most profitable decisions" possible. According to Rouse, it offers the *only* system that enables this level of accuracy in "benchmarking" in the equipment rental industry. Rouse claims to be the "[e]xclusive [s]ource for [b]enchmark [r]ate and [u]tilization [d]ata" for the industry.

153. In 2024, Rouse bragged that 74 of the RER top 100 companies used Rouse to "make better business decisions"[2] and "maximize their return on assets."

154. A November 22, 2024 podcast interview with Brad Spitzer, Director of Client Services at Rouse, including the following exchange: "Q: It's impressive when you say that you have the data of all, not some, but all of the national rental companies. . . . A: I think it helps out the entire industry really by allowing people to have more visibility into their performance and their market and react and make better decisions. And then also help train their salespeople to you know not always listen to their customers and listen to the data and the market around them."

---

[2] https://www.rouseservices.com/category/uncategorized/

155. Rouse has historic relationships with the ARA and the RER and uses those relationships to extend its public outreach and advertising. Rouse also appears regularly at industry conferences, advertising that its tools increase revenue and improve efficiency.

156. Using Rouse has allowed the equipment rental industry to be "much more disciplined" on pricing. As a former industry CEO noted, "since [Rouse's] involvement, rates have significantly increased." For example, 93% of the industry said that they raised their rates in 2022.

157. A Former VP at the ARA said:

They've [rental companies] become more professional, using more data tools. They have shareholders who care about keeping the price higher. Both United and Sunbelt have consistently led in saying, 'We're going to raise prices, we're going to get prices higher.' So, everyone knows what United is doing.

158. A Former VP at United Rentals noted that: "[T]he Rouse data that we were able to gain around rental rates was incredibly powerful" because Rouse "gather[ed] all the top 10 rental companies and actually g[o]t that data shared."

159. A former Director of Operations at United Rental stated in May 2022: Rouse aggregates everybody's rates and they're renting daily, weekly, monthly and they put it into a nice package. So you can see where the market is and you can see where you are in the market, so you can see where your rates are to the market. The interviewer then asked him: "Is that a good thing?" He replied, "It's a great thing."

160. The CFO of HERC stated in May 2023 that Rouse was "invaluable" for creating "discipline in the overall marketplace in the industry."

161. A former CEO of a construction equipment rental company that was acquired by Sunbelt stated: "Rouse provide[s] them [the largest equipment rental companies] with a safety net when their sales reps claim that prices are falling." He went on to say that: "Both United and

Sunbelt have consistently led in saying, 'We're going to raise prices, we're going to get prices higher."

162.    Ashtead Group Chief Executive Brendan Horgan stated:

Importantly, rental rates have continued to progress year-on-year, doing so despite industry utilization levels still lagging highs reached in previous years. This is again affirmation of the ongoing good rate discipline in the industry as a result of the ever-clear structural progression that we've experienced over the years.

163.    An employee of another construction equipment rental company stated:

On the rental side, Rouse also measures the day, week, and month rates of equipment, and they get that because other rental companies subscribe to it. And the reason why I say that this way, you make sure you're renting equipment as close as you can to your market rate. You're not undercutting the market. And number two is you're maximizing your return, your dollar or financial utilization on that piece of equipment. This is where that subscription to Rouse is very valuable to have.

164.    An employee of another construction equipment rental company stated:

One of the things that's good about Rouse is they do not sell equipment. So actually, they go out to individual marketplaces and basically they're selling subscription. So competitors within that marketplace are reporting their sales so they can come up with a fair market value. So in this way, everybody is effectively pricing their equipment at the market rate.

165.    An employee of the American Rental Associated stated in February 2023:

I think there's also the greater adoption of a product called Rouse Analytics, which is now owned by Ritchie Bros. . . . that gave a lot of rental companies a better window into more efficient pricing. And so instead of it being kind of decisions from the head of the sales rep who always wants the price lower because they just want to get the fleet out on rent, I think you saw rental companies making better pricing decisions on that. And Rouse actually claims that they are part of the reason that that happened.

### iii.  Private Communications Between Rouse and Members of the Cartel

166.    Rouse's private statements to rental companies also confirm that concerted action is the point of the RRI business model. As described above, not only does Rouse collect CSI from all its rental company clients—which it uses to set RRI Prices across rental companies—it

37

also acts as a go-between for its clients, explicitly telling them who else is part of the Cartel and which pricing/utilization strategies they are employing, all so that Rouse can instruct each rental company to implement similar strategies and moves.

167.     Rouse also engages in ongoing marketing efforts and training with its clients, including the Rental Company Defendants, on a regular basis. For example, a Former VP of National Accounts at United Rentals stated that Gary McArdle, the President of Rouse, had been their "key point of contact with Rouse" and was "the messenger to our team to bring us new analytic options."

168.     Rouse also frequently updates rental companies on new developments and trains their sales and analytics staff to use Rouse and the RRI Price. This includes encouraging the use of tools that ensure sales representatives are complying with the RRI Price. Rouse also maintains a private online portal for customers, through which it can communicate and advise rental companies on RRI implementation.

### B.     Indirect Evidence of the Rouse Cartel

#### i.     Rental Companies Engage in Actions That, Absent Concerted Conduct, Would Be Against Their Individual Economic Interest

169.     As part of the Rouse Cartel, each Rental Company Defendant (who are horizontal competitors to each other) engages in actions that, in the absence of concerted action, would be against its individual economic self-interest, but that, in the context of the scheme, maximize collective profits. These "actions against self-interest" are strong circumstantial evidence of a horizontal agreement to fix prices.

170.     First, it is against the unilateral economic interest of any individual rental company to share its CSI (e.g., competitively sensitive and proprietary pricing data and strategies) with other rental companies through a common third party unless each Rental Company Defendant knew that

all competitors had agreed to do the same. In the absence of an agreement to conspire, companies would not share this information because competitors could use it to make lower bids and seize market share.

171. Second, it is against Rental Company Defendants' economic self-interest to continually increase rental rates without negotiating or offering discounts. In the absence of collusion, rental companies would offer competitive rates to achieve greater customer satisfaction and avoid losing business and market share. The Rouse Cartel enables companies to avoid this type of price erosion.

172. Third, it is against the economic self-interest of Rental Company Defendants to increase rates while keeping utilization rates steady or even lowering them. Raising rental rates while simultaneously reducing utilization rates is an action against self-interest if undertaken unilaterally, because it would ordinarily cause an erosion of that rental company's market share.

### ii.   Defendants' Parallel Conduct and Abrupt Change in Behavior

173. When Rouse introduced its rental pricing service in 2011, it had five participants. Today, it boasts over 400 members. From 2019 to 2024, its membership grew 150%.



174.    This widespread adoption of Rouse's tool, and resultant adoption of RRI Prices, have had a sizeable impact on rental rates and resultant revenue, as detailed above. Rental companies' pricing was not a product of independent decision-making or competitive forces, but rather of their collusion, which Rouse facilitated.

### iii. The Market for Rental of Construction Equipment is Susceptible to the Formation, Maintenance, and Efficacy of a Cartel

175.    The market for the rental of construction equipment is characterized by numerous features, referred to as "plus factors," that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a cartel is more likely. These include (1) high barriers to entry, (2) high barriers to exit, (3) inelastic consumer demand, (4) market concentration, (5) relative fungibility of construction rental equipment, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at events and through trade associations.

176.    First, as noted previously, establishing a business that rents construction equipment

40

requires substantial capital and clearing a variety of other significant entry barriers including, for example, developing a customer base. Thus, new entrants into the construction equipment rental market are unlikely to discipline cartel pricing.

177. Second, companies that rent construction equipment face high exit barriers. Renters would incur substantial costs switching equipment providers mid-project, and where price escalation is occurring, they might not have a lower priced option in reasonable proximity to their current project. As such, renters cannot easily turn to alternatives to the rental companies in the Rouse Cartel to discipline cartel pricing.

178. Third, the demand for rentals of construction equipment is relatively inelastic. The only realistic alternative to renting is buying, and as explained previously, that is not a financially feasible option for most contractors. Thus, no reasonable substitutes exist to discipline cartel pricing.

179. Fourth, the market for construction equipment rentals is highly concentrated. Given the high barriers to entry, there are only a limited number of rental companies that exist, and the market is dominated by the ten largest companies, all of which are in the Rouse Cartel.

180. Fifth, construction equipment is relatively fungible. One 2020 Caterpillar bulldozer is largely the same as another. Rental company customers rarely have any additional information that would distinguish one piece of equipment from another when making spending decisions. This fungibility is what enables Rouse to present its pricing by "Cat Class."

181. Sixth, Rouse's participating rental companies share competitively sensitive information with one another, both directly and by using RRI as a conduit. As described above, this would be against their independent self-interest absent a conspiracy to collude.

182. Seventh, Rouse and participating rental companies have had ample opportunities to

collude. Rouse regularly sponsors industry conferences. Recently, a VP at Rouse Rental Insights was on a panel called "Leveraging Data and Technology to Increase Revenue and Improve Efficiency." At that conference, Rouse said that RRI "enables equipment rental companies to outperform competitors by optimizing fleet management, pricing strategies, and maintenance processes."

183.    Finally, industry trade associations offer Rouse and participating rental companies additional opportunities to conspire. For example, Rouse and the Rental Company Defendants are all members of the ARA, which offers training, consumer research, and myriad networking opportunities. There are a number of other trade associations and groups that the Rental Company Defendants, Ritchie Bros., and Rouse participate in.

## VII.    THE RELEVANT MARKET

184.    This case concerns a horizontal price-fixing arrangement which is per se illegal and thus alleging market power is unnecessary. The purpose of Defendants' arrangement (which Rouse orchestrates) is to facilitate coordination between horizontal competitors, including the Rental Company Defendants, to fix and raise the prices of rental equipment.

185.    To the extent a market definition is needed, the relevant product market is the market for construction equipment rentals. There are no economic substitutes for renting construction equipment. Companies cannot simply purchase the necessary equipment in lieu of renting, given the enormous capital outlay required to purchase a single piece of construction equipment. Further, construction projects require multiple diverse pieces of construction equipment. Renting provides companies the flexibility to access different types of equipment that they might need for their projects while avoiding the expense and logistics of buying and housing a varied fleet. Even a small amount of construction equipment would require monetary outlays of millions of dollars to acquire. Renting also allows companies to access newer, more up-to-date

equipment models instead of using dated equipment from the time of an initial purchase.

186.     Additionally, rental companies typically handle maintenance and repairs, which is a significant cost incurred by construction companies that own their equipment. Construction equipment rental payments are often considered tax-deductible operating expenses, which can potentially reduce a construction company's tax liabilities. Contractors can also avoid the costs associated equipment depreciation, which can be substantial for expensive construction equipment. By renting rather than purchasing, contractors can also avoid taking out long-term and costly insurance policies to insure the equipment against theft or damage because the rental companies typically handle that. Finally, renting equipment allows customers to avoid size-intensive and costly storage.

187.     The relevant geographic market is the United States. The Rental Company Defendants are the dominant sellers of construction equipment rentals nationally moving equipment across the country on a regular basis.

188.     The U.S. construction rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined and does not encompass sufficient economic substitutes.

189.     Here, the SSNIP test is satisfied, and the market is properly defined. Pursuant to the rental companies' agreement not to compete on price, rental companies can increase prices

"year over year, between 5% and 12%" in the U.S., yet those increases have not driven enough renters out of the market such that the SSNIP has become unprofitable to rental companies.

190.    The relevant market for construction equipment rentals can be corroborated by practical indicia of the contours of competition. With regard to industry or public recognition of the market, there is widespread recognition in the industry that construction equipment rental is a distinct market from construction equipment sales. Moreover, there is widespread recognition within the industry that the Rental Company Defendants dominate the national market for construction equipment rentals. With regard to distinct prices, construction equipment rentals has its own pricing system separate from construction equipment sales, and driven by the RRI Price.

## VIII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

191.    To the extent proof of market power is needed under a rule of reason analysis, the Cartel members' collective power can be established through direct evidence (like their collective ability to control prices and profitably push them above competitive levels), obviating the need for a market definition. To the extent necessary, the Cartel members' collective power can also be established through indirect evidence (such as their collective share of the relevant market). Rouse executives have stated that rental companies using RRI—i.e., the member of the Rouse Cartel—collectively possess at least 60% of the North American construction equipment rental market.

192.    Rental company members of the Cartel would not have been able to profitably increase their pricing—well in excess of the SSNIP of a hypothetical monopolist—unless they collectively possessed market power over customers. Absent the conspiracy, rental companies would face competitive harms for their supracompetitive prices making such behavior unprofitable.

193.    Rouse advertises that that 74 of the RER Top 100, and all 10 of the top 10, use Rouse to set their rental prices. With the vast amount of the rental equipment market controlled by

44

companies that use Rouse, customers have no real alternatives in terms of the companies from whom they can rent equipment. This is also direct evidence of Cartel members' collective market power.

194.    Defendants Sunbelt and United Rentals are the two largest equipment rental firms in the U.S. with a combined market share of over 30%. The Rental Company Defendants collectively have a combined market share that is the majority of the market.

## IX.    ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

195.    The Rouse Cartel directly damages Plaintiff's business and property and restrains competition in the relevant market. Plaintiff has sustained and continue to sustain economic losses—the full amount of which Plaintiff will calculate after discovery and prove at trial—due to Defendants' price-fixing conspiracy.

196.    But for Defendants' conspiracy, Plaintiff and members of the proposed Class would have paid less for construction equipment rentals. Paying inflated prices caused by an unlawful agreement is a quintessential antitrust injury.

197.    While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

198.    The antitrust laws aim to prevent injuries such as those alleged herein that stem from a conspiracy among sellers to systematically raise the price paid for a good or service, such as equipment rentals. Agreements to reduce price competition or fix prices violate the antitrust laws.

199.    By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S., and caused antitrust injury to Plaintiff and members of the proposed Class.

## X.    CLASS ACTION ALLEGATIONS

200.    Plaintiff bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

201.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

202.    Plaintiff's claims are typical of those of the Class because Plaintiff presses the same legal theories, and seeks to redress the same injury, for themselves as for all members of the proposed Class.

203.    Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent construction equipment than they otherwise would have in a competitive market.

204.    Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class.

205.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

206.    Questions of law and fact common to the Class include:

a.      Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate

price and/or artificially suppress supply of construction equipment rentals

from competitive levels;

b.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

c.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of construction equipment from competitive levels;

d.    The proper measure of damages; and

e.    The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

207.    Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

208.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## XI.    CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade in Violation of
Section 1 of the Sherman Act, 15 U.S.C. §1**

209.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

210.    Plaintiff seeks monetary and injunctive relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

211.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting construction equipment to Plaintiff and the Class.

212.    Beginning in or around 2011, Defendants and their co-conspirators entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

213.    Specifically, Defendants have formed a cartel to artificially inflate the price and/or decrease the supply of construction equipment rentals from competitive levels.

214.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

215.    Defendants have committed various acts in furtherance of this conspiracy, including, but not limited, to the following:

- Rouse created its RRI Price tool at the behest of Defendants United Rentals, HERC, and H&E;

- Rouse advertised and sold its pricing tool to additional rental companies as a means to raise prices and achieve greater profits;

- The Rental Company Defendants agreed to provide real-time, non-public, confidential, competitively sensitive, and detailed internal data to Rouse for use in Rouse's collective pricing;

- The Rental Company Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

- The Rental Company Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and

- Rouse empowered the Rental Company Defendants to enforce the collective Rouse prices.

216.    The Rouse Cartel has caused Plaintiff and the Class to suffer overcharge damages.

217.    There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

218.    The Defendants' cartel is unlawful under a per se mode of analysis. In the alternative, the Defendants' cartel is unlawful under either a quick look or rule of reason mode of analysis.

219.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and be deprived of the benefit of free and fair competition unless Defendants' conduct is enjoined.

220.    Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

221.    Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## XII.    PETITION FOR RELIEF

222.    Plaintiff petitions for the following relief:

A.      A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

B.      A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis;

C.      A judgment enjoining Defendants from engaging in further unlawful conduct;

D.      An award of attorneys' fees and costs;

E.      An award of pre- and post-judgment interest on all amounts awarded; and

F.      Such other relief as the Court deems just and equitable.

## XIII.   JURY DEMAND

223.    Plaintiff requests a trial by jury of all issues so triable.


Dated: April 1, 2025                    Respectfully submitted,

                                        */s/ Abby Lemert*
                                        **EDELSON PC**
                                        Natasha J. Fernández-Silber (*pro hac vice forthcoming*)*
                                        Abby Lemert
                                        350 North LaSalle Street, 14th Floor
                                        Chicago, Illinois 60654 81
                                        Tel: (312) 589-6370
                                        Fax: (312) 589-6378

nfernandezsilber@edelson.com
alemert@edelson.com
*Admitted in New York and Michigan

Sarah R. LaFreniere (*pro hac vice forthcoming*)
1255 Union St. NE, Suite 850
Washington, DC 20002
Tel: (202) 270-4777
Fax: (312) 589-6378
slafreniere@edelson.com

**BERGER MONTAGUE PC**
Eric L. Cramer (*pro hac vice forthcoming*)
Michaela Wallin (*pro hac vice forthcoming*)
Zachary D. Caplan (*pro hac vice forthcoming*)
Sarah Zimmerman (*pro hac vice forthcoming*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bm.net
mwallin@bm.net
zcaplan@bm.net
szimmerman@bm.net

Daniel J. Walker (*pro hac vice forthcoming*)
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
dwalker@bm.net

**HAUSFELD LLP**
Gary I. Smith, Jr. (*pro hac vice forthcoming*)
580 California Street, 12th Floor
San Francisco, CA 94101
Tel: (415) 633-1908
gsmith@hausfeld.com

Swathi Bojedla (*pro hac vice forthcoming*)
1200 17th Street N.W., Suite 600
Washington, DC 20036
Tel: (202) 540-7200
sbojedla@hausfeld.com

*Counsel for Plaintiff AXG Roofing, LLC and the
Proposed Class*