**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: CONSTRUCTION EQUIPMENT RENTAL ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 1:25-cv-3487<br>MDL No. 3152<br><br>Hon. Sara L. Ellis<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT WITH JURY DEMAND |

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................................1

II.     PARTIES AND UNNAMED CO-CONSPIRATORS..................................................6

        A.      Plaintiffs ...........................................................................................................6

        B.      Defendants .......................................................................................................7

III.    JURISDICTION AND VENUE ................................................................................13

IV.     FACTUAL BACKGROUND ....................................................................................14

        A.      The Construction Equipment Rental Industry ......................................14

        B.      The Industry's Pricing Practices Before Rouse Implemented
                "Rate Discipline"..........................................................................................15

        C.      Rouse's Evolution from Equipment Appraiser to Industry Hub...........16

        D.      Rouse's Shared Pricing and Analytics Platform ...................................19

        E.      Rental Companies Use Rouse to Fix, Raise, and Maintain Prices.........22

        F.      Rouse Enforces Pricing Discipline .........................................................24

        G.      The Effects of the Rouse Cartel ................................................................31

V.      DEFENDANTS' PRICE-FIXING AND INFORMATION EXCHANGE SCHEME.......32

        A       Overview of the Agreement .......................................................................32

        B.      Rouse's Role as the Industry's Central Coordination Platform ...........33

        C.      Operation of the Rouse Cartel...................................................................36

        D.      The Effects of the Rouse Cartel ................................................................39

VI.     DIRECT AND INDIRECT EVIDENCE OF THE ROUSE CARTEL EXISTS ..............45

        A.      Direct Evidence of the Rouse Cartel.......................................................45

                1.      Rouse's Contracts with Rental Equipment Companies .............45

                2.      Public Admissions by Rouse and Industry Participants.............46

        B.      Indirect Evidence of the Rouse Cartel ....................................................48

                1.      Rental Companies Engage in Actions That, Absent Concerted Conduct,
                        Would Be Against Their Individual Economic Interest ............48

                2.      Parallel Conduct and Abrupt Change in Behavior....................50

i

      3.     Government Recognition of the Anticompetitive Nature of Such Conduct ........................................................................51

      4.     The Market for Rental of Construction Equipment Is Susceptible to Collusion ..........................................................52

VII.    THE RELEVANT MARKET ...............................................................54

    A.    The Relevant Product Market .............................................54

    B.    Economic and Practical Indicia .........................................56

    C.    The Relevant Geographic Market ......................................57

VIII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET .........................59

IX.    ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE .....60

X.     TOLLING OF THE STATUTE OF LIMITATIONS ..........................................61

XI.    CLASS ACTION ALLEGATIONS ...............................................................62

XII.   CAUSES OF ACTION ...............................................................................64

COUNT ONE
Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ..........................................................................................64

COUNT TWO

Information Exchange in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ..........................................................................................67

XIII.  PRAYER FOR RELIEF ...............................................................................68

XIV.  JURY DEMAND ..........................................................................................69

Plaintiffs Haxton Masonry, Inc., Van Horst General Contractors, LLC, Enterprise Lodging of Huntsville, LLC, IPCS Corporation, AXG Roofing, LLC, and McGinnis Construction Co., Inc. bring this action on behalf of a proposed class of individuals and entities that rent Construction Equipment (as defined below, ¶ 54) in the United States. Plaintiffs seek relief from Defendant RB Global, Inc. ("RB Global") and its wholly owned subsidiaries Rouse Analytics LLC and Rouse Services LLC (together, "Rouse"), together with the largest Construction Equipment rental companies in the nation—United Rentals, Inc. and United Rentals (North America), Inc. (together, "United"); Sunbelt Rentals, Inc. ("Sunbelt"); HERC Rentals Inc. and HERC Holdings Inc. (together, "HERC"); H&E Equipment Services, Inc. ("H&E"); Sunstate Equipment Co., LLC ("Sunstate"); The Home Depot U.S.A., Inc. ("Home Depot"); and EquipmentShare.com, Inc. ("EquipmentShare") (collectively, the "Rental Company Defendants," and together with RB Global and Rouse, the "Defendants")—that engaged in a continuing agreement, combination, and conspiracy to fix, raise, and maintain rental prices for Construction Equipment in violation of Section 1 of the Sherman Act.

## I.    INTRODUCTION

1.      This antitrust MDL challenges illegal price-fixing and information exchange that strike at the foundation of the nation's housing, commercial, and infrastructure sectors. Plaintiffs allege that construction equipment rental companies in the United States—including the Rental Company Defendants—conspired with and through Rouse, a wholly owned subsidiary of RB Global, to fix, stabilize, and maintain rental prices industry-wide using a shared pricing and analytics platform known as Rouse Rental Insights ("RRI").

2.      Through Rouse, the Rental Company Defendants joined with nearly every major rental company (the "Co-Conspirators," and together with Rouse and the Rental Company

1

Defendants, the "Rouse Cartel") to utilize a common platform that aggregates and redistributes competitively sensitive data from participating companies, producing benchmark prices and analytics that replaced unilateral decision-making and competition on the merits with coordinated, algorithm-driven pricing.

3.      The Rouse Cartel inflated the cost of renting essential construction machinery nationwide. Businesses and professionals—including Plaintiffs—have been forced to pay supracompetitive prices for the equipment needed to build homes, commercial centers, and public infrastructure. The Construction Equipment at issue—including aerial work platforms, forklifts, telehandlers, trailers, dozers, excavators, skid steers, compaction machines, lighting towers, generators, backhoes, and loaders—comprises medium-to-large machinery integral to residential, commercial, and industrial projects.

4.      By 2011, as what was once a fragmented and competitive industry became increasingly concentrated, the Construction Equipment rental industry faced a collective-action problem: how to raise and maintain rates without losing share to defectors. The solution came via Rouse, which provided a technological hub that pooled competitors' transaction-level data, calculated uniform "RRI Prices" and other metrics, and fed those outputs directly into Rental Company Defendants' internal revenue-management systems.

5.      The shift to Rouse in 2011 traces to at least 2010, when former HERC President Dan Kaplan—the self-styled "Father of the Modern Rental Industry"—urged adoption of "proper rate management" through technology: "The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it…. I am challenging the entire rental industry to show leadership on rates…. Fortunately, there is a wealth of technology available today to help manage

2

rental rates…. If utilized properly … these software programs can bring genuine discipline to rate management." Kaplan insisted that "the entire industry must accept rate responsibility together."

6.      Soon after, the American Rental Association ("ARA") launched standardized "Rental Market Metrics" for utilization,[1] fleet age, and rate performance, crediting Kaplan as its inspiration and acknowledging input and participation by HERC, Sunbelt, and United. The ARA explained: "The development of rental performance metrics marks a new chapter in the equipment rental industry. This document is the result of the work and creative effort of many rental industry professionals. The first among those is Dan Kaplan … [who] provided the initial inspiration to ARA for this project."

7.      Building on that framework, in 2011 Rouse—then best known as the industry's trusted appraiser of used-equipment values—made a decisive move into the rental sector through a formal collaboration with the ARA. This was not a mere data service; it was a structural shift in how competitors shared and acted on pricing information. Rouse launched what it described as a shared "rental metrics" platform, based on actual invoice data, that would allow companies to "see how [their] rental rates and other key metrics stack up to those of competitors" and improve "discipline" in rate management.

8.      Rouse's promotional materials were explicit about the competitive significance of this system, heralding it as "a groundbreaking innovation in business intelligence … giving participants the exclusive ability to compare rental rates and utilization to competitors in their local markets and across the country." The company emphasized that its reported rates "are based on actual invoices and represent rates paid by customers in the market," providing rental firms with a common reference point for "decision-making on this most important lever for improving

---

[1] "Utilization" refers to the percentage of a rental fleet currently on rent.

performance."

9.      Rouse marketed itself as the "exclusive source for cat-class level comparisons of rental rates and key performance metrics," declaring that "Companies of all sizes can now compare their performance to peers." As Rouse explained, it "gathers data from participants on a nightly basis and conforms it to the ARA Rental Market Metrics standard so that all companies are measured on a level playing field. This enables participating rental companies to drive fleet management and pricing decisions with real market data to improve profitability." Rouse further touted that it was "fully integrated" with participating rental companies' internal systems "to allow direct transmission of data," ensuring the continuous, automatic exchange of competitively sensitive information across the industry.

10.     By 2013, Rouse reported "exponential growth," tracking almost $10 billion per year in rental revenue through its database of competitor information. By 2015, Sunstate and more than forty other rental companies had joined. And by 2020, all or nearly all of the major national rental companies were active participants. In a 2024 document, Rouse identified the Rental Company Defendants as the "Large General Rental" members of the Rouse Cartel.

11.     Rental company executives publicly praised Rouse for enforcing "rate discipline." H&E's CEO told analysts in 2022: "We use a lot of information that's supported by Rouse … we are comfortable that our pricing is well aligned … [and] the amount of discipline we continue to see … is very encouraging." HERC's CEO likewise described Rouse as "a key tool we use to help us price in the marketplace."

12.     Participation in Rouse's analytics services required transmitting each company's "most commercially sensitive" data—covering "every line item of every rental invoice that they write," along with nightly feeds on utilization, fleet age, and turnover—to Rouse. Rouse's

algorithm aggregated this massive amount of competitor data to calculate forward-looking "RRI Prices" and other analytics, which were integrated directly into Rental Company Defendants' quoting and revenue-management systems, leaving little room for deviation.

13.     Rouse portrays its outputs as "aggregated" or "anonymized," but in this market such data reveals rival pricing and capacity decisions. By converting pooled data into standardized benchmark prices, Rouse gives competitors a mechanism to align rates and utilization to maintain elevated prices across regions and product types.

14.     Employees have described Rouse's benchmarks as "a cheat code in the equipment rental world" and "a safety net when sales reps claim that prices are falling." Participants admit they price within the RRI pricing range roughly 90 percent of the time. A former CEO of a company acquired by Sunbelt explained that the industry had become "much more disciplined on pricing … because everyone used Rouse," adding: "Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices." An industry executive told an analyst in February 2024: "Over the last few years, its use has become pretty ubiquitous," referring to Rouse, and "[i]f you're a mid-size or larger company, you're using Rouse."

15.     This industry-wide reliance on Rouse represents a fundamental change from prior practice. Previously, firms set rates unilaterally, based on utilization and regional demand, primarily looking to the inventory in their own yard and relying on feedback from customers to gauge competitors' pricing. With the advent of Rouse and its widespread adoption, the Rental Company Defendants and their Co-Conspirators now coordinate pricing through Rouse's pricing benchmarks, with salespeople assessing the equipment available in the yard only to determine

which RRI Price to apply. This coordination among would-be rivals limits flexibility in pricing, enforces "rate discipline," and allows the Rouse Cartel to collectively maintain elevated rates even when utilization declines.

16.     Rouse and the Rental Company Defendants pressure adherence to the RRI Price through dashboards, training, and quote-level controls that require managerial approval for deviations. Rouse advertises "side-by-side rate comparisons" and the "ability to adjust rates at the quote level … to assure that your pricing is in line with your competition."

17.     This conduct fits the definition of a "common pricing algorithm" prohibited under California's newly enacted AB 325, which forbids the use or distribution of algorithms that "use[] competitor data to recommend, align, stabilize, set, or otherwise influence a price or commercial term," or that "coerce[] another person to set or adopt a recommended price." Legislators and federal enforcers have recognized that such shared pricing systems facilitate algorithmic collusion and vendor-driven coordination, which violate Section 1 of the Sherman Act. Rouse's platform exemplifies that danger.

18.     The Rouse Cartel has generated record profits for its participants while limiting competition nationwide to the detriment of Plaintiffs and other renters of Construction Equipment. Plaintiffs seek treble damages, injunctive relief, and all other appropriate remedies to restore competition to the U.S. Construction Equipment rental market.

## II.    PARTIES AND UNNAMED CO-CONSPIRATORS

### A.  Plaintiffs

19.     Plaintiff Haxton Masonry, Inc. is a commercial masonry and concrete contracting company with operations in Arizona, California, and Nevada. Haxton regularly rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

6

20.     Plaintiff Van Horst General Contractors, LLC is a construction contracting company with operations in Connecticut and Florida. Van Horst regularly rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

21.     Plaintiff Enterprise Lodging of Huntsville, L.L.C. is an Alabama company with its principal place of business in Huntsville, Alabama. Enterprise regularly rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

22.     Plaintiff IPCS Corporation, doing business as Lunna Designs, is a design and manufacturing company with operations in New York. IPCS rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

23.     Plaintiff AXG Roofing, LLC is a construction company with operations in Illinois, doing business as "Zags Roofing." AXG regularly rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

24.     Plaintiff McGinnis Construction Co., Inc. is a construction and general contracting company with operations in Michigan. McGinnis regularly rents Construction Equipment directly from large Construction Equipment rental companies, including one or more Rental Company Defendants during the Class Period.

### B. Defendants

25.     Defendant RB Global, Inc. is a public company traded on the Toronto and New York Stock Exchanges. It is legally domiciled in Canada with its U.S. headquarters at 2 Westbrook Corporate Center, Suite 1000, Westchester, Illinois 60154. RB Global describes itself as "a leading

global marketplace that provides value-added insights, services, and transaction solutions for buyers and sellers of commercial assets and vehicles worldwide." In 2022, the company reported $6 billion in Gross Transactional Value. RB Global is the parent company of Defendants Rouse Services LLC and Rouse Analytics LLC (collectively, "Rouse").

26.     RB Global wholly owns, controls, and directs Rouse's operations and profits from its shared pricing and analytics business. Its public filings treat Rouse as a distinct reporting unit and tracks its goodwill. RB Global's website promotes Rouse Rental Insights as providing "benchmark data that is based on actual real rental invoices sent to customers." Through this ownership, control, and participation, RB Global directed, facilitated, and benefited from the unlawful collection and redistribution of competitors' confidential data and the resulting coordination of rental-equipment pricing. The 2020 acquisition of Rouse marked a strategic inflection point for RB Global: By acquiring Rouse for roughly $275 million in cash and stock, RB Global gained ownership of a firm deeply embedded in rental-equipment data analytics and benchmarking, and thereby assumed direct control over the analytics platform through which the Rouse Cartel's coordination is alleged to operate.

27.     Defendants Rouse Services LLC and Rouse Analytics LLC are wholly owned subsidiaries of RB Global and are headquartered at 8383 Wilshire Boulevard, Suite 900, Beverly Hills, California 90211. According to the public filings of their parent, Rouse is "the leading provider" of "construction equipment market intelligence," "rental metrics benchmarks, and construction equipment valuations to lenders, rental companies, contractors and dealers." Its "business model is built upon an extensive data ecosystem, proprietary analytics, data-science techniques, and trusted customer relationships rooted in service and confidentiality," and it "provides complete end-to-end asset management, data-driven intelligence, and performance

benchmarking." According to Rouse's website, its RRI product "provides Cat-Class-level comparisons of rental rates, utilization, and other key performance metrics" for rental companies.

28. Defendants United Rentals, Inc. and United Rentals (North America), Inc. are public companies incorporated in Delaware with their principal place of business located at 100 First Stamford Place, Suite 700, Stamford, CT 06902.

29. United is the largest equipment rental company in the world, with over 1,500 retail locations across North America. The company controls around 20% of the market for Construction Equipment rentals nationwide. United rents Construction Equipment to Class members in this District.

30. United has enjoyed record-setting profits year after year. For the full year 2024, United reported total revenue of $15.345 billion, a 7.1% increase from 2023. In 2024, the company also achieved an annual gross profit of $6.15 billion, marking a 5.8% increase from $5.813 billion in 2023. United acquired Ahern Rentals in 2022 for approximately $2 billion. At that time, Ahern was the largest independently owned rental company in North America. This is only the latest in a long series of acquisitions by United. In 2017, United acquired two of the top ten rental companies in the U.S.: NES Rental, acquired for $965 million, and NEFF Corporation, acquired for $1.3 billion. The below chart shows United's profit growth from December 31, 2009, to January 1, 2025, in billions:

**FIGURE 1: United's Profit Growth ($ Billions)**



31.     Defendant Sunbelt Rentals, Inc. is incorporated in North Carolina and maintains its principal place of business at 1799 Innovation Point, Fort Mill, North Carolina 29715. As the country's second largest equipment rental company, Sunbelt has 1,186 locations in the U.S. and offers over 14,000 types of equipment for rent. Sunbelt rents Construction Equipment to Class members in this District.

32.     Sunbelt is publicly traded on the London Stock Exchange under the name Ashtead Group. Ashtead does business in Canada and the United Kingdom as well.

33.     In 2024, Sunbelt reported $9.3 billion in revenue from its U.S. business alone. Its U.S. fleet is valued at over $15 billion.

34.     Sunbelt, like United, has also been active in acquiring other equipment rental companies. Over the last six years, Sunbelt has made about 150 acquisitions. During the three fiscal quarters preceding January 31, 2024, Sunbelt made 26 acquisitions.

35.     Defendants HERC Rentals Inc. and HERC Holdings Inc. are public companies

incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. The majority of HERC's business is in equipment rentals. HERC rents Construction Equipment to Class members in this District.

36.     HERC has over 450 locations in the U.S. and Canada. Its fleet represents a total original equipment cost of $7 billion.

37.     In 2023, HERC reported a total revenue of $3.3 billion. Its revenue from equipment rental had grown 46% from 2021. And, in 2024, its total revenue again jumped, to a record $3.6 billion.

38.     HERC has focused on M&A and new greenfield development in recent years. A self-described "market consolidator," HERC completed 51 acquisitions during the period from September 30, 2020 to September 30, 2024, adding 115 locations. HERC has also recently completed its acquisition of H&E, as discussed below.

39.     Defendant H&E Equipment Services, Inc. was a publicly traded company incorporated in Delaware with its principal place of business at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E was founded in 1961 and described itself as "one of the largest equipment rental companies in the nation." In 2024, H&E had 160 locations across 31 states. As of December 31, 2024, H&E owned 63,630 units of equipment with an original acquisition cost of approximately $2.9 billion. H&E rented Construction Equipment to Class members in this District. In 2023, H&E reported a total revenue of $1.47 billion, with equipment rentals making up over half of its gross profit.

40.     In January 2025, H&E entered into an Agreement and Plan of Merger with United. In February 2025, HERC made what H&E's board determined to be a "Superior Offer," valued at $5.3 billion. H&E terminated its Agreement with United and entered into a new Agreement to

11

merge with HERC. The acquisition of H&E by HERC was completed in June 2025.

41.     Defendant Sunstate Equipment Co., LLC is incorporated in Delaware and has its principal place of business at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is a wholly owned subsidiary of Sumitomo Corporation Group, which is publicly traded on the Tokyo Stock Exchange and listed through an American Depositary Receipt on the New York Stock Exchange.

42.     Founded in 1977, Sunstate is now among the ten largest rental equipment companies in the United States. The company has approximately 100 branches in sixteen states. Like the other Rental Company Defendants, Sunstate has made a series of acquisitions of other rental companies over the years, and its profits and revenues have grown over time. Sunstate rents Construction Equipment to Class members in this District.

43.     Defendant The Home Depot U.S.A., Inc. is a publicly traded company incorporated in Delaware. Its principal place of business is located at 2455 Paces Ferry Road, N.W., Atlanta, Georgia 30339.

44.     Founded in 1978, Home Depot now has more than 2,300 stores across North America. Home Depot is the world's largest home improvement retailer. The company both sells and rents an enormous selection of equipment, from hand tools used by fabled "weekend warriors" to Construction Equipment rented by large, multistate contractors. Home Depot reported an estimated $1.4 billion in rental revenues in 2024.

45.     Home Depot's rental business has seen rapid growth in recent years. In the first three months of 2023, Home Depot opened 37 new rental centers offering Construction Equipment rentals. With 1,300 locations offering rental services, Home Depot has described its network as "the largest equipment rental network in the U.S." and is actively expanding infrastructure to

support rental dispatch of large-scale construction equipment. The company is consistently ranked as one of the top five Construction Equipment rental companies by revenue in the United States. Home Depot rents Construction Equipment to Class members in this District.

46.     Defendant EquipmentShare.com, Inc. is incorporated in Texas and headquartered at 5710 Bull Run Dr., Columbia, Missouri 65201.

47.     EquipmentShare was founded in 2015 and is the fastest-growing equipment solutions provider in the U.S. It has over 340 locations, with 60 new locations launched in 2024 alone. EquipmentShare reported $3.9 billion in revenue for the twelve months preceding March 31, 2025, rendering it the fourth largest construction equipment rental company by revenue in the United States. Its fleet represents a total original equipment cost of $7 billion. EquipmentShare rents Construction Equipment to Class members in this District.

48.     Various Co-Conspirators also participated in the Rouse Cartel with Defendants. The Co-Conspirators are persons and entities, including Construction Equipment rental companies and other industry participants, known and unknown to Plaintiffs at this time and not named as defendants in this action. They have participated as Co-Conspirators with Rouse and the other Defendants in the offenses alleged and have performed acts and made statements in furtherance of the Rouse Cartel.

### III.     JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

50.     This Court has personal jurisdiction over Defendants because they, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and

transact business in this state and this District, including through the rental of Construction Equipment.

51.     Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of Construction Equipment.

52.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.     FACTUAL BACKGROUND

### A.  The Construction Equipment Rental Industry

53.     Construction Equipment rental is a core segment of the U.S. economy. Rental services allow professional contractors, builders, and infrastructure firms to access essential machinery without the substantial initial capital investment and recurring maintenance expenses required for ownership.

54.     The term "Construction Equipment," as used in this Complaint, refers to medium-to-large machinery, such as aerial lifts (e.g., boom lifts, scissor lifts, forklifts, and telehandlers), excavators, dozers, skid steers, compaction machines, lighting towers, generators, backhoes, loaders, and others. These machines differ from small hand tools or light equipment that could fit in a car, as they may require specialized transport, maintenance, and capital management. The ARA, Rouse Analytics, and *Rental Equipment Register* ("*RER*"), an industry publication, all treat "construction and industrial equipment rentals" as a distinct sector separate from light-tool or homeowner rentals.

55.     Construction Equipment rental demand is steady and significant. Rental represents the dominant channel through which professionals access Construction Equipment for temporary

or project-based use. Renting Construction Equipment, rather than owning it, enables companies to manage cash flow, adapt to project fluctuations, and utilize newer models that meet evolving emissions and safety standards. As a result, the rental segment is critical to the nation's residential, commercial, and infrastructure industries.

56.     Before Rouse entered the rental market in 2011, the industry was more fragmented and competitive. Local and regional firms competed vigorously on price and service, and rates were determined primarily by each company's own utilization levels, fleet costs, and local demand conditions. Prices fluctuated with market cycles and frequently fell during downturns as companies sought to maintain high utilization.

57.     Over the last 20 years, however, the industry has undergone rapid consolidation. What industry analysts once described as a "niche, highly fragmented" sector has become dominated by a smaller number of firms.

58.     For example, United has acquired more than 300 regional competitors since its founding, including significant former competitors Ahern, BlueLine, NES, and NEFF. Sunbelt (under the Ashtead name as parent company) has completed over 100 acquisitions since 2015. HERC and H&E completed their merger in 2025.

59.     This concentration has reduced independent competition and created conditions ripe for coordination. As one industry analyst observed, the leading rental companies now emphasize "rate discipline" and "rate progression" over market share, signaling a shared understanding that higher rental rates benefit the industry as a whole.

### B.  The Industry's Pricing Practices Before Rouse Implemented "Rate Discipline"

60.     Before Rouse's analytics platform became dominant, rental companies set prices independently. Firms established base rates according to their own costs, historical experience,

client relationships, utilization goals, and local competitive dynamics.

61.     Each company typically applied a markup to its ownership and maintenance costs, adjusting only for demand in particular regions or project types. Prices fluctuated with utilization—when fleets were underused, companies discounted to rent out inventory; when utilization rose, rates increased modestly, if at all.

62.     The result was price competition and rate volatility, particularly during downturns when there was excess idle equipment. Competitive intelligence was limited and anecdotal: A rental company that wanted to learn a rival's pricing generally had to rely on what customers reported while comparison-shopping, what sales representatives heard in the field, or what could be gleaned from public bid proposals or trade publications. No centralized or real-time pricing data existed, and rental executives frequently complained that the lack of reliable comparative information made "rate management" difficult.

63.     Those frustrations were precisely what former HERC President Dan Kaplan identified in 2010 when he blamed the industry's "pricing pain" on "poor rate management" and urged rental firms to adopt technology to "bring genuine discipline to rate management." In the early 2010s, leading rental companies responded by seeking tools to standardize and stabilize pricing across markets.

64.     Rouse provided the first system capable of aggregating transaction-level data from multiple competitors and redistributing it as common analytics—transforming Kaplan's call for coordinated "rate responsibility" into an industry-wide mechanism for alignment.

### C. Rouse's Evolution from Equipment Appraiser to Industry Hub

65.     Rouse offered the technological means of coordination for the Rouse Cartel. Rouse traces its origins to 1920, when founder Max Rouse began an auction and liquidation business specializing in heavy construction equipment. Over the next century, Rouse expanded into

16

valuation, appraisal, and asset-management services for equipment owners and lenders. By the 2000s, Rouse had developed large proprietary datasets on resale values and fleet performance, which it leveraged to advise clients on unit valuation and disposition.

66.     In 2010, as the industry debated "rate discipline," trade publications began urging rental firms to act collectively to end what they called "a race to the bottom." Former HERC President Dan Kaplan warned that "poor rate management" was self-inflicted and that the industry must "accept rate responsibility together."

67.     Rouse's position as an appraiser gave it unique credibility as a trusted third-party data intermediary. According to a former Rouse executive, major rental companies—including United, HERC, and H&E—approached Rouse seeking "an authoritative benchmark that could bring pricing discipline to an otherwise fragmented market."

68.     In 2011, Rouse—then known for used-equipment valuations and auction benchmarks—partnered with the ARA to launch a rental-benchmarking service that pooled invoice-level pricing and utilization data from participating companies and returned standardized rate benchmarks.

69.     Rouse promoted its benchmarks as "based on actual invoices" and enabling "data-driven, fact-based decisions on rental rate—the most important lever for improving performance." In practice, these benchmarks became the de facto pricing system for the national rental market.

70.     When Rouse introduced its benchmarking service in 2011, the companies that had advocated for its development were among the first to participate, as reflected in ARA contemporaneous materials and Rouse's early client rosters. Over the following years, membership widened—by 2015, Sunstate and more than forty other rental companies had joined—and by 2020, participation encompassed almost every leading national rental company.

71.     The ARA, which counts thousands of equipment-rental operators and their suppliers among its membership, holds annual trade shows (e.g., the "ARA Show") and other industry networking events, providing regular opportunities for major rental companies—including the Defendants—to interact, collaborate, exchange industry intelligence, and coordinate their strategic responses to pricing pressures.

72.     At the same time that Rouse was developing its benchmarking service in 2011, the ARA introduced standardized "ARA Rental Market Metrics" to define key performance measures such as utilization, fleet age, and dollar utilization. Rouse collaborated with the ARA and major rental companies to adopt these metrics into its developing benchmarking platform. The ARA credited Kaplan as its inspiration and acknowledged participation by HERC, Sunbelt, and United.

73.     Upon launch of Rouse's Rental Metrics Benchmark Service, Rouse reported collecting detailed rental-invoice data and nightly utilization feeds from participating companies. Rouse soon rebranded the product as Rouse Analytics, and later Rouse Rental Insights, providing "Rouse Rates" and RRI Prices back to participants through integrated dashboards and pricing tools.

74.     *RER* described the Rouse service as enabling companies to see, for example, that "their lowest rates on a high-reach forklift were nearly ten percent lower than the lowest rates of any of its competitors in that market" and to "make the adjustments it needed."

75.     In December 2020, Rouse was acquired by Ritchie Bros.—the world's largest equipment-auction company—for approximately $275 million. Around the time of the acquisition, Ritchie Bros. CEO Ann Fandozzi said the combination was "complementary" and acknowledged it would "accelerate both of our growth efforts by providing customers more robust data."

76.     Joining Ritchie Bros. allowed Rouse to integrate its advanced data-analytics

18

capabilities into Ritchie Bros.' existing data-services and thereby to supercharge its RRI program. By capitalizing on Ritchie Bros.' global reach and asset-management expertise, Rouse could offer Construction Equipment companies more comprehensive solutions and thus become more powerful and ubiquitous. As Ritchie Bros. publicized in a May 2022 presentation to investors, "Ritchie Bros. has essentially become one of Rouse's largest data providers."

77.     In May 2023, Ritchie Bros. changed its corporate name to RB Global following the acquisition of IAA, Inc., a digital marketplace for buying and selling vehicles.

### D. Rouse's Shared Pricing and Analytics Platform

78.     By centralizing competitors' invoice-level data and redistributing uniform "RRI Prices" and other analytics, Rouse created a common analytics hub that harmonized pricing decisions across the industry, eliminating the independent rate variation that once characterized the market.

79.     Rouse aggregates the most competitively sensitive data in the Construction Equipment rental industry: every line item of every rental invoice issued by participating firms, together with nightly feeds on fleet utilization, equipment turnover, and availability.

80.     Participating companies, including the Rental Company Defendants, authorize Rouse to interface directly with their enterprise systems to extract this data automatically with guaranteed accuracy. Rouse markets itself as "the rental industry's exclusive source for benchmark rate and utilization data," emphasizing that its benchmarks derive from "actual invoices" and "current fleet-performance metrics."

81.     Rouse leveraged the ARA network to expand participation and data coverage. Each of the Rental Company Defendants is an ARA member, and Rouse regularly presented at ARA trade shows and industry conferences attended by those firms. Through these events, Rouse promoted its analytics hub as an "industry standard" and encouraged competitors to contribute

their data, assuring that "competitors around you are using us, so you should use us too."

82. Rouse's former Senior Vice President described the information that the Rental Company Defendants provide to Rouse as "the most commercially sensitive data" rental companies possess and confirmed that the platform collects nightly data feeds across all participating fleets.

83. Although Rouse claims its analytics rely on pricing data "at least 90 days old," that safeguard, to the extent Rouse's claim is accurate, only applies to pricing data. The underlying operational data—utilization, fleet turnover, and pricing trends—are updated nightly and without a 90-day lag, allowing near-real-time visibility into competitors' market conditions. Industry participants also recognize a "workaround" to any delay on competitor pricing data: Rouse applies a seasonally adjusted trend line that projects current market conditions from the lagged data, effectively neutralizing the 90-day delay and allowing firms to coordinate in practice.

84. Executives across Rental Company Defendants' firms have publicly credited Rouse for instilling "pricing discipline" and stabilizing rates. Rouse itself boasted of "collaborating with hundreds of companies" and serving as "the hub of construction-equipment data, analytics, and insights." Any reliance that Rouse or Rental Company Defendants may place on outdated "regulatory guidelines" from the Department of Justice or Federal Trade Commission as immunizing their illegal price-fixing and information exchange is misplaced. In recent years, the agencies have clarified that even anonymized or delayed data sharing violates Section 1 when it enables competitors to align pricing and other decision-making through a common platform.

85. Consistent with that concern, legislators have explicitly targeted such conduct. In 2025, California's AB 325 outlawed "common pricing algorithms" that use competitor data to align or coerce pricing decisions. Rouse's system embodies precisely that danger: an industry-

wide hub through which dominant rental companies exchange their most sensitive information, align prices, and maintain artificially high rates—while presenting the process as neutral analytics.

86.     On a nightly basis, Rouse processes the most competitively sensitive data that the Rental Company Defendants possess through Rouse's proprietary algorithms to generate benchmark prices for each Construction Equipment category and by differing geographies (e.g., "Cat Class" and ZIP-code level). These "RRI Prices," expressed as high, medium, and low ranges, are distributed back to participants through online dashboards and software integrations that feed directly into their quoting and revenue-management systems. The below slide is from an internal Rouse presentation and describes the process. "ERP" refers to a type of software that rental companies use to manage day-to-day business activities.

**FIGURE 2: Process for Determining the RRI Price**



87.     Rouse markets the platform as a tool to "drive higher rates and profitability" and to

"train salespeople not to discount." It explicitly assures clients that its analytics will "ensure your pricing is in line with your competition." The continuous flow of detailed pricing and utilization information through Rouse allows competitors to monitor and adjust to one another's rates and utilization with minimal lag, reinforcing industry-wide "discipline."

88. By pooling this data and redistributing it in standardized form, Rouse and the Rental Company Defendants created a mechanism for exchanging confidential, forward-looking information that no firm would have shared absent an understanding that its competitors were doing the same.

89. The result is a stable, supra-competitive pricing regime. Rental companies rarely deviate from the RRI Price, which insiders describe as "a cheat code in the equipment-rental world."

### E. Rental Companies Use Rouse to Fix, Raise, and Maintain Prices

90. The Rental Company Defendants use Rouse's RRI Price as the primary reference point for setting and adjusting rental rates nationwide. Multiple executives have confirmed that Rouse is central to maintaining what they call "pricing discipline." In a 2022 earnings call, H&E's CEO stated, "We use a lot of information that's supported by Rouse … our pricing is well aligned … the amount of discipline we continue to see is very encouraging." HERC's CEO similarly described Rouse as "a key tool that we use to help us price in the marketplace." A Sunbelt executive referred to Rouse as a "pricing discipline tool," underscoring that Rouse's purpose was to constrain discounting and enforce alignment among large rental companies.

91. Before Rouse, firms learned about competitors' prices only indirectly—through customers seeking competing bids, sales staff comparing notes from the field, or contractors who shared what they were paying other rental companies for the same equipment. This information was anecdotal, sporadic, and typically stale, forcing companies to adjust prices dynamically based

on utilization, fleet availability, and local demand. Rouse eliminated that competitive uncertainty. By supplying nightly updates derived from every major firm's invoice-level data, Rouse gave the Rental Company Defendants and the Rouse Cartel a continuous, standardized view of "market" pricing and other analytics without the need to solicit or respond to competitive intelligence from customers.

92.     For example, sales representatives at United access a database pre-populated with Rouse's high, medium, and low RRI Prices. Company policy limits deviation from those ranges; even the "low" benchmark reflects elevated pricing compared to competitive levels.

93.     At HERC Rentals, managers use the RRI Price as "standard operating procedure" in daily pricing decisions, checking Rouse data "to see where we were at versus the competition" and adjusting accordingly. HERC salespeople do not generally have authority to quote a customer a lower price.

94.     Sunbelt Rentals' Vice President of Sales Analytics stated that Rouse helps the company "understand where we sit in the marketplace" and "make adjustments," underscoring that Rouse data dictates pricing behavior rather than internal demand metrics. Sunbelt salespeople were required to adhere to the Rouse benchmarks, which served as their pricing "guidebook."

95.     The Rental Company Defendants price within the range of RRI Prices approximately ninety percent of the time. Companies rarely discount below the RRI Price. Employees across multiple Rental Company Defendants describe Rouse as providing the market rate and ensuring that rental companies are pricing their equipment at the market rate.

96.     This industry-wide reliance on Rouse represents a fundamental change from prior practice. Previously, firms set rates based on utilization and regional demand, primarily looking to the inventory in their own yard and relying on feedback from customers to gauge competitors'

pricing. With the advent of Rouse and its wide adoption, the Rental Company Defendants and their Co-Conspirators began coordinating pricing through Rouse's benchmarks, with salespeople assessing the equipment available in the yard only to determine which Rouse Price to apply. This coordination limits flexibility in pricing, enforces "rate discipline," and allows the Rouse Cartel to collectively maintain elevated rates even when utilization declines.

### F. Rouse Enforces Pricing Discipline

97.     Rouse not only disseminates analytics and pricing but also provides tools and oversight mechanisms to ensure adherence—functioning as an enforcement arm of the conspiracy.

98.     Rouse integrates directly with more than forty enterprise software systems used by rental companies, offering "plug-and-play" data feeds that synchronize pricing and utilization information with ease. This integration allows Rouse's benchmark ranges to be pre-populated into the Rental Company Defendants' internal pricing systems. If a salesperson attempts to enter a rate below the Rouse-approved floor, the system automatically flags or prevents the transaction.

99.     Rouse's software interface uses visual prompts to reinforce compliance, displaying "green zones" for prices at or above the benchmark and "red zones" for lower rates, discouraging deviation. The FIGURE below is an example of how the RRI Price ranges appear in Rouse's system for a particular type of equipment. The RRI Price range is depicted by the green and red lines below.

**FIGURE 3: Rouse Price Ranges**



**FIGURE 4: Rouse Price Ranges**



100.     The Rental Company Defendants also use layered internal approval systems to deter underpricing. At United, for example, sales representatives must obtain multiple managerial approvals to quote below Rouse's low rate—such requests are almost always denied. At least Sunbelt and HERC are also known to employ the same practice, whereby pricing deviations below the RRI Price are subject to supervisor approval by branch managers, regional managers, or both.

101.     Rouse further reinforces compliance through alerts, dashboards, and individualized performance reports tracking how each salesperson's rentals compare to RRI benchmarks.

102.     The below is an example of a Rouse rental company "Performance Dashboard" showing where the rental company is "below the market on rental rates" and specifically where "discounting" is occurring "by branch, category & rate type."

**FIGURE 5: Rouse Company Performance Dashboard**

103.    The below is an example of a Rouse rental company "Cat-Class Performance Dashboard showing where the company is "below the market on rental rates" by "Cat-Class" and specifically where "discounting" is occurring "by rep, customer & rate type."

**FIGURE 6: Rouse Cat-Class Performance Dashboard**



104.    The below is an example of a Rouse rental company "Transaction-Level Rate Performance" dashboard showing the client's performance on a monthly, weekly, and daily basis and how it compares to Rouse's RRI pricing depicted in green and red bands below showing the "Market Invoice Range":

**FIGURE 7: Rouse Transaction-Level Rate Performance Dashboard**



105.    Rouse also generates monthly reports identifying sales employees whose average rates fall below Rouse's analytics. These reports are used to evaluate employee performance, commissions, and overall compensation, with many companies tying commissions and bonuses to adherence to Rouse's targets. As succinctly stated by an insider, sales employees are "held accountable for not being above the Rouse rates."

106.    The below is an example of a Rouse rental company "Sales Rep Performance Dashboard" showing performance by "specific sales rep," "[r]ep discounting by customer, product, and type," and whether or not the sales rep is hitting RRI pricing:

**FIGURE 8: Rouse Sales Rep Performance Dashboard**



107. The below is another example of such a report for a specific sales representative at a rental company. The report provides a detailed breakdown of how the sales representative is performing compared to Rouse analytics.

**FIGURE 9: Rouse Sales Rep Performance Report**



108.     Rouse representatives also conduct ongoing trainings and meetings with clients—including Rental Company Defendants—to "help train their salespeople not to listen to customers" and instead "listen to the data and the market around them." During these trainings and meetings with the Rental Company Defendants, Rouse representatives and the Rental Company Defendants discussed overall strategies including as to pricing.

109.     Rouse also enables cross-firm monitoring that deters "cheating" within the Rouse Cartel. Because Rouse continuously aggregates participants' transaction-level data, utilization rates, and turnover metrics, it can detect and display when any company begins discounting. Even if Rouse does not identify the specific firm by name, competitors can infer who is responsible from Rouse's localized "Cat Class" and ZIP-level data. Such deviations trigger instant visibility and pressure to return to the coordinated benchmark. For example, when Defendant EquipmentShare

30

first began using Rouse, multiple other Rental Company Defendants complained that EquipmentShare brought down prices, but it did not take long for EquipmentShare to fall in line with the Rouse Cartel.

110. Through these same mechanisms, the Rouse Cartel can punish noncompliance. Participants that withhold data or underreport transactions lose access to the RRI benchmark database and are effectively excluded from the information flows on which their competitors rely.

111. The combination of data sharing, analytics dissemination, and enforcement mechanisms constitutes a functioning price-fixing apparatus—one that uses algorithmic analytics to replace competition.

### G. The Effects of the Rouse Cartel

112. Since the adoption of Rouse, Construction Equipment rental rates across the United States have risen persistently, even during periods of declining utilization and stable fleet costs. Publicly available data show that industry rental indices have increased year-over-year for more than a decade, despite cyclical slowdowns in construction activity.

113. Industry participants—including executives from United, H&E, and Sunbelt—explicitly link this "pricing discipline" to Rouse. As one CEO explained, "the market is accepting price increases that are being put forth … and [Rouse] certainly goes to the discipline in the overall marketplace." Rouse itself has acknowledged that its system "helps train salespeople not to listen to customers and instead listen to the data and the market around them."

114. Defendants' public statements repeatedly emphasize "price discipline," "rate progression," and "consistent yield improvement," while internal practices show that pricing decisions are now detached from utilization, demand fluctuations, or regional competition.

115. The coordinated reliance on Rouse's pricing and enforcement tools has suppressed price competition, stabilized rental rates at supracompetitive levels, and inflated costs for

construction firms, contractors, and public projects nationwide. Through Rouse, Rental Company Defendants have achieved durable parallel pricing without any need for direct communication—an algorithmic cartel that continues to extract supracompetitive profits from the nation's essential construction markets.

## V. DEFENDANTS' PRICE-FIXING AND INFORMATION EXCHANGE SCHEME

### A. Overview of the Agreement

116.    Defendants engaged in a continuing horizontal agreement to fix, stabilize, and maintain rental rates for Construction Equipment across the United States.

117.    Beginning in or around 2011, certain Rental Company Defendants—including at least United, HERC, and H&E—delegated core aspects of their pricing and operational decision-making to Rouse, which served as the hub of a *per se* unlawful price-fixing and information-exchange cartel. Through Rouse, the Rental Company Defendants exchanged competitively sensitive information, adopted common benchmarks and algorithms, and jointly enforced adherence to uniform pricing and performance norms across the Construction Equipment rental market. The remaining Rental Company Defendants joined the conspiracy in the years that followed.

118.    A cartel is a group of rivals that conspire to restrict competition by fixing prices, exchanging non-public information, allocating markets, or coordinating output. Acting collectively through Rouse, the Rouse Cartel replaced independent decision-making with a shared analytical platform designed to function like a monopolist's pricing control system.

119.    The Rouse Cartel operated through three interlocking mechanisms: (1) delegating pricing and related commercial decisions to Rouse and adopting its RRI Price and other benchmark outputs as market standards; (2) continuously exchanging sensitive, current, transaction-level data—including rates, utilization, fleet mix, and equipment-level demand data—through Rouse;

32

and (3) using Rouse's predictive analytics and enforcement tools to coordinate pricing, supply, and strategic adjustments across competitors. This structure restricted independent pricing and planning and replaced it with coordinated, algorithm-driven decision-making.

### B. Rouse's Role as the Industry's Central Coordination Platform

120.    Rouse served as the central hub through which Rental Company Defendants exchanged competitively sensitive information and aligned pricing, fleet, and utilization decisions. Rouse's platform continuously ingested nightly feeds of invoice-level transactions, equipment identifiers, regional demand, and fleet composition from participating rental companies. It transformed this data into a suite of analytics—including "rate opportunity" indices, market price-dispersion reports, utilization-versus-availability curves, fleet-optimization tools, and profitability rankings by product and geography.

121.    The industry's move toward coordinated rate management was openly encouraged by the former HERC executive, Dan Kaplan, who in 2010 issued a public "call to arms" for the entire rental sector:

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it … I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management.

122.    This appeal set the stage for Rouse to become the industry's shared instrument for "rate discipline."

123.    Rouse invited—and required—its clients to submit their most sensitive commercial data to the Rouse database. Each participant had to transmit non-public invoice, pricing, and inventory information as a condition of membership. As one Rouse senior vice president admitted:

"We realize that the data we require to deliver our service is the most commercially sensitive data most companies have—again we are getting all their information about their fleet and all of the information about their entire invoices." Rouse's Director of Client Services further acknowledged that this data was shared among participants: "We keep the data very private to only the participants sharing it."

124.     Defendants United, HERC, and H&E were involved in Rouse's rental-pricing program from its inception. Once Rouse went live with its RRI Price in 2011, it expanded membership to additional rental companies—including Sunstate, Sunbelt, Home Depot, and EquipmentShare—and encouraged them to begin sharing their competitively sensitive data with the Rouse Cartel. A 2020 Rouse advertisement illustrated the pitch:

> Making critical decisions about rental rates and fleet management can be risky when you rely solely on limited data and anecdotal information from your customers and sales reps.… We're Rouse Analytics and we use actual rental invoices and daily fleet snapshots to provide rental business managers with the most accurate benchmark data available on rental rates and utilization by product and market.… Our actionable intelligence is based on nightly fleet snapshots for over $45 billion worth of equipment and $20 billion in rental revenue.… When you sign up with Rouse Analytics, we give you a 60-day free benchmark trial with access to detailed local market level rate comparisons by product.

125.     Rouse touted how many competitors had already joined its system and urged others to follow: "[T]hese people around you are using us, [so] you should use us too." This marketing explicitly invited collective action to raise prices.

126.     Rouse and the Rental Company Defendants understood that industry-wide profitability required collective participation. Each knew that only through coordinated pricing via Rouse could they raise rates to supracompetitive levels without losing customers to lower-priced rivals.

127.     Gary McCardle, then Rouse's Executive Vice President and COO, explained how

companies could use Rouse benchmarks to fix prices: "Let's say in the Sacramento market, Company X is doing $3.9 million in revenue on transactions Rouse can compare and it looks like Company X could have earned $4.02 million just by reaching the benchmark.… Physical utilization is 72 percent but the benchmark in the market is 75 percent.… You can measure this per month, per year or any time period you want."

128.    Industry participants understood Rouse's role the same way. Josh Nickell, a former executive who sold his business to Sunbelt, stated that with Rouse the "larger rental companies … have become more stable in their pricing and show a desire to increase prices." He added that national rental companies "usually have goals to remain above or at the average, depending on their position."

129.    By 2023, Rouse boasted that over 400 U.S. rental companies participated in its benchmark program, covering roughly $20 billion in rental revenue. Rouse regularly publicized its subscriber count to signal the breadth of industry participation and pressure non-participants to join.

130.    Rouse highlighted public endorsements from industry leaders, including:

- **Bradley Barber**, CEO of H&E: "The services offered by Rouse, and more specifically the data they supply for our equipment rental business, are invaluable to our company.… They provide clean, accurate, actionable data in ways our business can use it."

- **Matt Flannery**, CEO of United: "Rouse has long been an important partner for United Rentals and the broader equipment rental industry, helping us leverage critical data to make better tactical and strategic decisions."

- **Doug Dougherty**, CEO of Cooper Equipment Rentals: "The access to aggregated competitive data to benchmark our performance has enabled [us] to maximize

opportunities in each market."

- **John Johnson**, Vice President of Holt of California: "Rouse Services has been a game changer for the rental industry.… Their software has enabled us to make better informed decisions to drive profitable revenue growth."

- **Adam Berry**, COO of Berry Companies: "The Rouse Analytics dashboard … has unearthed the insights we have needed to navigate the increasingly unpredictable environment."

131.    To generate its benchmarks, Rouse "pull[s] data directly from clients' systems to ensure rate benchmarks are based on actual rental invoices billed to customers, not list rates or quoted rates." An industry executive admitted that the company had "essentially standardized a lot of the price competition in the industry," and that "since their involvement, rates have significantly increased."

132.    It would have been against any firm's unilateral interest to share such data absent assurance that competitors were doing the same and would not use the information to undercut them. Participants joined Rouse precisely because they understood that it would facilitate collective price increases.

### C. Operation of the Rouse Cartel

133.    Rouse aggregated competitors' sensitive data, computed analytics, and issued recommendations and reports showing how each company's realized prices, utilization, fleet size, and product mix compared to those of its rivals. Rouse told participants exactly how much revenue they could gain by raising rates to the benchmark average. Its dashboards and alerts directed companies not only as to what prices to charge but how much equipment to deploy and where to deploy it, effectively synchronizing pricing and supply decisions across competitors.

134.    Industry employees confirmed that rental companies used Rouse analytics to align

36

behavior. A Sunbelt employee reported that 90 percent of rentals stay within Rouse's RRI Price—most at its High or Medium levels. A former CEO of a company later acquired by Sunbelt confirmed: "In most cases, they aim to stay within the band … and since [Rouse's] involvement, rates have significantly increased." Sales representatives were tracked and rewarded—for example, through bonuses and commissions—for not deviating from price and utilization targets, and adhering to Rouse benchmarks.

135.    Rouse would also provide training and enforcement for the Rouse Cartel. For example, during a 2020 webinar, Phil Mause, then the Managing Director of Rouse Analytics, walked through how Rouse's customers can use its benchmarks to fix prices. During the webinar, Mause gave a demonstration that revealed the granular data points that Rouse uses to compare the rates its customers charge versus their competitors. Mause used a hypothetical equipment rental company for the demonstration.

136.    Mause showed how the hypothetical company could have made approximately $33,342 more in December 2019 had it charged the Rouse benchmark rates across all of its equipment categories, which were calculated based on competitors' confidential, non-public data.

**FIGURE 10: Rouse Comparison of Client Rate with Benchmark Rates**



137.     Later, Mause showed how the company compared to its competitors across the various geographies. In the New Orleans-Baton Rouge market, for instance, Rouse calculated that the company's revenue rate was 2.2% below its competition:

**FIGURE 11: Rouse Price for Region**

| Regions | Districts | Branches | | |
|---|---|---|---|---|
| | | | Client Compared Revenue | Client Rate vs Benchmark |
| New Orleans-Bat... | | | $931,063 | ($20,731) / -2.2% |
| Houston-Port Art... | | | $861,911 | ($68,802) / -7.4% |
| Michigan | | | $380,505 | ($57,963) / -13.2% |
| Southern Alabama | | | $308,988 | ($15,084) / -4.7% |
| Oklahoma City-T... | | | $288,085 | $17,261 / 6.4% |
| Western Kentuck... | | | $266,567 | $5,356 / 2.1% |
| Dallas-Ft Worth | | | $252,102 | $25,334 / 11.2% |
| Birmingham | | | $208,624 | $4,318 / 2.1% |
| Gulfport-Mobile | | | $194,786 | $18,625 / 10.6% |
| Kansas City-Tope... | | | $170,950 | $12,172 / 7.7% |
| All Branches » | | | | |

138.     Finally, Mause showed that the customer could drill down by each product to see how its prices for that product compared to its competition. For 50-54 Ton Rough Terrain Cranes, the hypothetical company's revenues were 1.2% (-$161,730) below its competitors:

**FIGURE 12: Rouse Pricing for Product**



139.     In 2024, discussing the industry's pricing trends, United's CEO stated: "Consolidation at the top and public information has been part of it. Rouse Analytics has been part of it." H&E's CEO echoed the same theme in 2022: "We use a lot of information that's supported by Rouse … we are very comfortable that our pricing is well aligned … This is a disciplined environment." HERC's CEO described Rouse as "a key tool that we use to help us price in the marketplace."

### D.  The Effects of the Rouse Cartel

140.     Rouse's impact was immediate. In December 2012, Rouse reported that rental rates for its clients rose seven percent over 2011—the year of Rouse's launch. A subsequent Rouse advertisement (set forth below) boasted that participants had achieved rates "26.4 percent above

January 2011, when Rouse first started tracking this data," and promoted Rouse as a tool to "raise prices and improve profitability." As prices aligned to Rouse's collective rates, variability shrank and price competition eroded.

**FIGURE 13: Rouse Reporting 26 Percent Increase in Rates**



*Excerpt from Rouse ad in the March 2015 issue of International Rental News*

141. Rouse celebrated these results in marketing materials that promised its analytics would help "raise prices and improve profitability." Rental Company Defendants and their executives echoed the message, publicly crediting Rouse for fostering "pricing discipline" and "well-aligned pricing" across the marketplace.

142. A former ARA vice president observed: "Both United and Sunbelt have consistently led in saying, 'We're going to raise prices.…' So everyone knows what United is doing." As Rouse gained wider adoption, its access to detailed invoice-level data gave companies a clearer view of prevailing market prices and "efficient" pricing strategies. Rouse itself has taken credit for driving this shift toward higher, more uniform pricing across the industry.

143. Rouse and ARA surveys confirm this result. In 2022, 93 percent of ARA

respondents reported raising rates, with one explaining: "We have followed suit with most of the national chains systematically raising prices 5 to 7 percent." A former Caterpillar and Alta Equipment manager likewise observed: "Between 2021 and 2023, there were double-digit rate increases almost across the board."

144.    The industry's alignment around Rouse's benchmarks produced a consistent pattern of rising prices and shrinking variability. Where firms once set rates based on their own costs and demand, Rouse Cartel members now price within Rouse's ranges.

145.    Indeed, prices for Construction Equipment rentals have risen markedly during the Class Period. As shown below, the FRED (Federal Reserve Economic Data)-published Produce Price Index for Construction Equipment Rental and Leasing reveals significant price increases during the Class Period. This index measures changes in revenue by companies that rent and lease Construction Equipment.

**FIGURE 14: Produce Price Index of Heavy Rental Equipment Reflects Rate Hikes**



146. The structure of Rouse's analytics reinforced this uniformity. Its dashboards aggregated competitors' invoice data, utilization rates, fleet sizes, and product-level margins, producing a single "Rouse benchmark" that functioned as a shared target. Rouse's "rate opportunity" reports showed each participant precisely how much additional revenue it could earn by matching the benchmark average. The company's software converted competitors' private data into algorithmic guidance that harmonized decision-making across the industry.

147. In an April 2022 earnings call, H&E's CEO stated: "We use a lot of information that's supported by Rouse … we are very comfortable that our pricing is well aligned … [This] is a disciplined environment … we are all looking to pass on cost increases … across the board." HERC's CEO likewise said: "Rouse Analytics, which is a key tool that we use to help us price in the marketplace, helps us … over 60% of the market participating, now putting data into that." United's CEO acknowledged in 2024 that "Rouse Analytics has been part of it."

148. Other industry participants recognized the same pattern. A VP of a Construction Equipment rental company called Rouse "a game changer for the rental industry." The impact of Rouse extended beyond pricing to utilization and capacity decisions. Executives began to boast that they were "comfortable maintaining lower utilization rather than go too low on dollar utilization," a dynamic one noted "wouldn't have happened 15 years ago." In other words, companies willingly accepted idle fleets to preserve collectively high rental rates—behavior rational only under conditions of coordinated conduct.

149. Rouse's analytics also altered fleet-management decisions. Its reports compared physical utilization against the "market benchmark," prompting firms to adjust inventory levels and capital expenditures in ways that paralleled the actions of competitors. Rouse thus provided a means not only to fix prices but to align output—a defining feature of a horizontal cartel.

150.    The coordinated behavior yielded record profits for all Rental Company Defendants. United's rental revenue rose 9.7 percent from 2023 to 2024. During that same period, Sunbelt's rental revenue grew by 11 percent and HERC's by 12 percent. For the first six months of 2024, before combining with HERC, H&E posted a 9.8 percent increase in rental revenue. In 2023 alone, EquipmentShare's rental revenue jumped from $1.09 billion to $1.9 billion, representing a whopping increase of over 74 percent. Finally, Home Depot's rental revenue was estimated to have increased nearly 40 percent between 2020 and 2024.

151.    These increases occurred during a period of industry consolidation and stagnant or declining utilization, confirming that they could not be explained by normal market dynamics. Even during the COVID-19 downturn, Rouse participants "continued to thrive." The Federal Reserve's Producer Price Index for Construction Equipment Rental and Leasing confirms persistent, industry-wide price escalation through the Class Period.

152.    Between 2021 and 2024, U.S. Construction Equipment rental prices climbed sharply year over year—typically five to ten percent annually—mirroring the pattern reported by Rouse clients and ARA surveys.

153.    Rental Company Defendants themselves no longer concealed the connection between their record profits and the Rouse platform. HERC's CFO told investors in May 2023: "You have sort of 50% to 60% of North American rental companies reporting into Rouse … and that certainly goes to the discipline in the overall marketplace."

154.    The uniform price increases demonstrate that Defendants' conduct suppressed competition and stabilized prices at supracompetitive levels. Industry representatives now routinely describe Rouse as the tool that ensures no company is leaving money on the table, and that enables each to "maximize return on rate."

155.    The incentives and outcomes make clear that this was not an innocuous benchmarking exercise. It would be economically irrational for competing firms to share in real time their invoice-level pricing, utilization, and fleet data—absent confidence that competitors would reciprocate, and that Rouse would use the data to enforce collective pricing.

156.    Rouse's system "standardized a lot of the price competition in the industry," according to its own executives, and "since [Rouse's] involvement, rates have significantly increased." The system's algorithmic analytics thus replaced independent decision-making with an information-exchange framework designed to coordinate conduct across horizontal rivals.

157.    The Rouse Cartel remains ongoing. Rental Company Defendants continue to share competitively sensitive, non-public data with Rouse, to receive and act upon its benchmark analytics, and to use those outputs to fix and stabilize prices across geographic and product markets for Construction Equipment rentals.

158.    The sustained profitability of Rouse Cartel participants, the uniformity of pricing behavior, and Defendants' own admissions all confirm that Rouse's analytics function as the hub of a continuing price-fixing and information-exchange agreement.

159.    In sum, the Rental Company Defendants conspired to exchange current, non-public pricing, utilization, fleet, and performance data and to adopt uniform benchmarks and analytics generated from that shared information. This agreement eliminated independent price setting, replaced competitive uncertainty with coordinated, algorithmic decision-making, and stabilized Construction Equipment rental prices at supracompetitive levels nationwide.

160.    The Rouse Cartel continues to injure Plaintiffs and other renters of Construction Equipment throughout the United States by maintaining inflated rental rates, suppressing price competition, and distorting the allocation of fleet and capital across markets.

## VI. DIRECT AND INDIRECT EVIDENCE OF THE ROUSE CARTEL EXISTS

### A. Direct Evidence of the Rouse Cartel

#### 1. Rouse's Contracts with Rental Equipment Companies

161.    On information and belief, Rouse has entered into substantially similar agreements with Construction Equipment rental companies that make up the Rouse Cartel, including each of the Rental Company Defendants. These contracts directly evidence the existence and operation of the Rouse Cartel.

162.    Under these contracts, each participant: (1) transmits competitively sensitive, transaction-level pricing, utilization, and fleet data to Rouse; (2) gains access to Rouse's pooled database and RRI benchmark pricing derived from competitors' data; and (3) uses those pooled benchmarks to guide its own pricing and utilization decisions. Rouse's contracts therefore formalize the ongoing exchange of current, non-public pricing and performance data among horizontal rivals, and the joint reliance on those shared analytics to determine prices.

163.    Rouse executives have acknowledged the sensitivity of the data it collects. One senior vice president explained: "We realize that the data we require to deliver our service is the most commercially sensitive data most companies have—again we are getting all their information about their fleet and all of the information about their entire invoices." Rouse's Director of Client Services confirmed that this competitively sensitive information is "kept private to only the participants sharing it," confirming that participants in the Rouse Cartel understand that the data they receive comes from direct competitors.

164.    Rouse's own marketing makes clear that coordination is the purpose of the program. Rouse advertises that it "uses actual rental invoices and daily fleet snapshots to provide the most accurate benchmark data available on rental rates and utilization by product and market," touting that its "actionable intelligence" helps participants "raise prices" and "maximize

45

profitability."

165.    As described above, the concept of industry-wide "rate discipline" originated with a 2010 public statement from a HERC executive calling on competitors to impose "proper rate management" through "software programs [that] can bring genuine discipline to rate management." Rouse's 2011 launch, developed in partnership with the ARA, directly implemented that call for collective "rate discipline" across the industry.

166.    These contracts and the mandatory sharing of competitively sensitive information are explicit evidence of a horizontal agreement to fix, stabilize, and maintain rental rates.

### 2. Public Admissions by Rouse and Industry Participants

167.    Rouse and the Rental Company Defendants have publicly and repeatedly acknowledged that Rouse aggregates real-time pricing data from the nation's largest rental companies and uses it to impose "discipline" across the market.

168.    Rouse advertises that it collects data from over 400 companies, representing more than $115 billion in fleet value and $49 billion in rental revenue, and describes itself as the "exclusive source for benchmark rate and utilization data." It emphasizes that its data is composed of "actual rental invoices—not quoted or list rates," and claims that this pooled data enables companies to make "the most profitable decisions possible."

169.    In 2024, Rouse boasted that 74 of the *RER* Top 100 rental companies "use Rouse to make better business decisions and maximize return on assets."

170.    In a November 2024 podcast, Rouse's Director of Client Services, Brad Spitzer, admitted that Rouse collects and redistributes real-time data from all major national competitors:

> We have the data of all, not some, but all of the national rental companies.… It helps the entire industry really by allowing people to have more visibility into their performance and their market … and help train their salespeople to not always listen to their customers and listen to the data and the market around them.

171.    Rouse maintains close ties with the ARA and *RER* and uses those industry platforms to advertise that its analytics increase revenue and "enforce pricing discipline." It regularly appears at ARA conventions and other industry events to promote Rouse Analytics as a tool for "raising rates" and "improving profitability."

172.    These public statements are consistent with the Rental Company Defendants' own admissions that Rouse facilitates collective pricing behavior.

173.    In May 2023, HERC's CFO stated that Rouse was "invaluable" for maintaining "discipline in the overall marketplace." In the same period, H&E's CEO, Bradley Barber, explained: "We use a lot of information that's supported by Rouse…. We are comfortable that our pricing is well aligned…. The amount of discipline we continue to see, particularly among most of our larger public peers, is very encouraging."

174.    Ashtead Group, the parent of Sunbelt, told investors that "rental rates have continued to progress year-on-year, doing so despite utilization [levels still lagging], highs reached in previous years…. This is again affirmation of the ongoing good rate discipline in the industry."

175.    United CEO Matthew Flannery made similar admissions at a September 2024 Morgan Stanley conference: "The industry is so much more disciplined…. Rouse Analytics has been part of it. We have data now that helps."

176.    A former CEO of a company later acquired by Sunbelt stated that Rouse "provides [the large rental companies] with a safety net when their sales reps claim that prices are falling," He observed: "They've become more professional, using more data tools…. Both United and Sunbelt have consistently led in saying, 'We're going to raise prices….' So everyone knows what United is doing."

177.    At a May 2023 Goldman Sachs conference, HERC CEO Larry Silber remarked that

"the market is accepting price increases," and his CFO Mark Humphrey added: "[Rouse] is probably one of the biggest differences.… You have 50 to 60 percent of North American rental companies reporting into Rouse.… We see that data weekly.… That certainly goes to the discipline in the overall marketplace."

178.    These admissions are direct evidence that the Rental Company Defendants knowingly participate in a shared system for fixing, stabilizing, and maintaining rental rates through Rouse's pooled analytics.

179.    Rouse's contracts, its executives' statements, and Defendants' own admissions constitute direct evidence of a continuing horizontal agreement to fix and maintain rental rates for Construction Equipment across the United States. No inference is required: Defendants have acknowledged the sharing of real-time pricing data, the adoption of uniform benchmarks, and the maintenance of "discipline" across the industry through Rouse's centralized analytics platform.

### B.  Indirect Evidence of the Rouse Cartel

#### 1.  Rental Companies Engage in Actions That, Absent Concerted Conduct, Would Be Against Their Individual Economic Interest

180.    Each Rental Company Defendant engages in conduct that—if undertaken unilaterally—would be against its individual economic self-interest, but that makes sense within the context of a horizontal cartel coordinated through Rouse. These "actions against self-interest" strongly corroborate the existence of a continuing agreement among competitors to fix, stabilize, and maintain rental prices for Construction Equipment.

181.    First, it is against the unilateral economic interest of any rental company to share its most competitively sensitive data—including transaction-level prices, utilization, fleet composition, and profitability metrics—with direct competitors through a common third party. In a competitive market, firms guard such data because rivals could use it to undercut them and win

customers. Here, however, Rental Company Defendants collectively agreed to transmit this data daily to Rouse and to permit Rouse to pool and redistribute it among competitors.

182.     Second, it is against each company's self-interest to continually increase rental rates without offering customers discounts or concessions. Ordinarily, price competition drives firms to match or beat lower offers to preserve utilization and customer relationships. Instead, the Rental Company Defendants repeatedly and simultaneously announced price increases, publicly acknowledged "pricing discipline," and stopped the competitive practice of discounting— behaviors that only make sense when firms know rivals will follow suit.

183.     Third, Rental Company Defendants routinely raised prices even when demand and utilization declined. In a competitive market, falling utilization leads to lower prices and promotional discounts. Since Rouse's launch in 2011, however, Rental Company Defendants' executives have repeatedly boasted of maintaining or increasing prices "despite lower utilization." HERC's CEO described this dynamic as a hallmark of a "technology-enabled, disciplined" industry. This deliberate decision to tolerate idle fleets rather than compete on price is economically irrational absent coordination.

184.     Fourth, Rental Company Defendants' participation in Rouse's shared pricing analytics required each to forgo independent decision-making. By agreeing to (a) supply real-time data in a standardized format; (b) permit pooling of that data with horizontal competitors; (c) receive and implement uniform benchmark recommendations; and (d) allow Rouse to monitor compliance, Rental Company Defendants collectively delegated pricing power to a common intermediary. This delegation deprived the market of independent centers of decision-making and replaced competitive uncertainty with algorithmic coordination.

## 2. Parallel Conduct and Abrupt Change in Behavior

185.     When Rouse introduced its rental-pricing service in 2011, only a handful of firms participated. Within two years, participation encompassed nearly all major national chains, and by 2024, Rouse claimed over 400 contributors—representing more than half of all U.S. rental revenue. The rapid, industry-wide adoption of Rouse coincided with an abrupt shift in pricing behavior and market outcomes.

186.     **Change in Pricing Methodology.** Before Rouse, Construction Equipment rental rates closely tracked utilization and local demand; pricing varied by region, season, and equipment type, and discounts were common. After 2011, pricing began to converge around Rouse's "RRI Price" benchmarks. Companies stopped relying on local market conditions and instead used Rouse analytics to "align pricing" with industry averages. Executives at United, Sunbelt, HERC, and H&E all publicly acknowledged using Rouse to guide rates and keep pricing aligned.

187.     **Elimination of Discounts.** Customers and former sales representatives report that, beginning in the early 2010s, sales staff at major rental firms were often prohibited from quoting below Rouse's lowest benchmark price, even when inventory sat idle. This uniform refusal to discount eliminated the price competition that had previously characterized the industry.

188.     **Parallel Rate Increases.** Rental Company Defendants repeatedly raised prices in lockstep. From 2021 through 2024, United, Sunbelt, HERC, and H&E each reported annual rental rate increases between five and ten percent. Rental Company Defendants have increased rates charged, as well as added fees—including environmental fees, rental protection, and heavy equipment surcharges—in order to covertly increase profits for the same services. Industry surveys confirm that more than 90 percent of rental companies increased rates in those years. Executives openly attributed this "discipline" to Rouse's benchmarking and analytics.

50

189. **Industry-Wide Data Integration.** Rental Company Defendants' internal systems are now directly integrated with Rouse through proprietary ERP connections that transmit nightly invoice and utilization feeds. Rouse's CEO has estimated that "a majority of all construction and industrial equipment rental revenue in the U.S. flows through the Rouse system." This technical integration ensures constant parallelism and continuous alignment of pricing decisions across competing firms.

190. Collectively, these changes mark a decisive break from competitive pricing dynamics. Prices no longer fluctuate with utilization or local market demand, but instead move in parallel across firms and regions in response to Rouse benchmarks. This abrupt shift following Rouse's adoption is powerful circumstantial evidence of a coordinated price-fixing agreement.

### 3. Government Recognition of the Anticompetitive Nature of Such Conduct

191. The Department of Justice has recently emphasized that information exchanges—particularly those facilitated by third-party intermediaries—can have the same anticompetitive effects as direct communication among competitors. In 2023, the DOJ withdrew its longstanding "safety zone" policy statements on information sharing, explaining that those statements were "overly permissive" and "no longer serve their intended purpose."

192. Senior DOJ officials have repeatedly warned that data exchanges like those orchestrated by Rouse are presumptively suspect. In February 2023, Principal Deputy Assistant Attorney General Doha Mekki noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchange among competitors" and that algorithms now make even months-old data competitively valuable. Deputy Assistant Attorney General Michael Kades added that when information sharing "appears to be suppressing price competition … that should send red sirens off."

193.    In 2024, the DOJ reiterated this view in a Statement of Interest filed in *In re Pork Antitrust Litigation*, emphasizing that "information sharing alone can violate Section 1, even without proof of an agreement to fix prices," and that even exchanging aggregated data can be unlawful "where the information is not linked to specific competitors."

194.    The DOJ has since reaffirmed this position. In March 2025, Ryan Tansey, Chief of the DOJ Antitrust Division's Washington Criminal Section, stated: "Characterizing conduct as an information exchange shouldn't be thought of as a way to insulate businesses from criminal antitrust scrutiny." That same month, in *In re MultiPlan Health Insurance Provider Litigation* (N.D. Ill.), the DOJ explained that concerted action includes "the joint delegation of decision-making power to a common agent." Rouse serves exactly that role in the Construction Equipment rental industry.

195.    The DOJ's public pronouncements confirm that the conduct alleged here—the ongoing exchange of real-time pricing and utilization data through a centralized intermediary that harmonizes pricing decisions—falls squarely within the types of concerted action that deprive the market of independent decision-making and violate Section 1.

### 4.  The Market for Rental of Construction Equipment Is Susceptible to Collusion

196.    The market for Construction Equipment rentals exhibits structural features that make collusion easier to form, sustain, and enforce. These "plus factors" further support the inference of an unlawful agreement.

197.    **High Barriers to Entry.** Establishing a rental operation requires significant capital investment, specialized staff, and geographic coverage. These barriers limit new entry and prevent competitive discipline on incumbents.

198.    **High Barriers to Exit.** Contractors depend on continuity of supply once projects

are underway and face switching costs that deter moving to alternative providers. As a result, cartel participants can raise prices without losing customers.

199.    **Inelastic Demand.** Renting Construction Equipment is often the only feasible option for contractors; purchasing outright is prohibitively expensive. This inelasticity allows supracompetitive prices to persist.

200.    **Market Concentration.** The industry is dominated by the Rental Company Defendant firms and more than 60% of the industry uses Rouse.

201.    **Fungible Products.** Construction Equipment of the same "Cat Class" is effectively interchangeable across suppliers, meaning customers choose primarily on price—precisely the variable the Rouse Cartel manipulates.

202.    **Frequent Information Exchange.** Rouse integrates directly with participants' ERP systems, transmitting nightly invoice data and utilization metrics. Rouse's CEO has estimated that "a majority of all construction and industrial equipment rental revenue in the U.S. flows through the Rouse system." This real-time exchange of sensitive competitor data eliminates uncertainty and sustains coordination.

203.    **Opportunities to Collude.** Defendants and Rouse executives interact frequently at ARA conferences, investor days, and other industry events. Rouse regularly sponsors conference sessions such as "Leveraging Data and Technology to Increase Revenue and Improve Efficiency," where it promotes RRI as a tool to "outperform competitors by optimizing pricing strategies." Senior executives from United, Sunbelt, HERC, and H&E attend these same events, creating repeated opportunities to reinforce the collusive arrangement.

204.    In combination, these structural factors, behavioral changes, and admissions show that Defendants' parallel conduct is not the product of coincidence or lawful benchmarking, but of

a sustained agreement to fix, stabilize, and maintain Construction Equipment rental prices through Rouse's centralized system.

## VII.    THE RELEVANT MARKET

205.    This case challenges a horizontal conspiracy among the nation's largest rental providers of Construction Equipment—facilitated and enforced by Rouse—to fix, stabilize, and maintain rental prices nationwide. Such conduct constitutes a *per se* unlawful price-fixing agreement under Section 1 of the Sherman Act and therefore does not require proof of market power.

206.    In the alternative, the conduct constitutes a hub-and-spoke conspiracy, in which Rouse serves as the hub and the Rental Company Defendants—horizontal competitors in the rental of Construction Equipment—serve as the spokes, exchanging competitively sensitive information and adhering to Rouse's common RRI Prices and analytics. These same facts also state an unlawful information-exchange agreement, in which Defendants share current, disaggregated, competitively sensitive data through Rouse with the purpose and effect of suppressing price competition.

### A.  The Relevant Product Market

207.    To the extent a market definition is required, the relevant product market is the rental market for Construction Equipment in the United States. This market encompasses equipment such as excavators, backhoes, bulldozers, wheel loaders, aerial work platforms, scissor and boom lifts, forklifts, telehandlers, lighting towers, trenchers, compressors, and other industrial-grade machinery used in commercial, industrial, and infrastructure construction. Per the 2023 Merger Guidelines issued by the DOJ and Federal Trade Commission ("FTC"), it is common for a disparate group of products sold together to be aggregated in a single "cluster market," particularly when it would not make sense for a seller to offer a single product (say, backhoes) for

rent given the disparate needs of its customer base.

208.    This market excludes consumer and light-tool rentals—such as small hand tools, lawn equipment, or homeowner-grade machinery—because: (1) they serve distinct customer segments; (2) they have different pricing structures, distribution channels, and utilization cycles; and (3) they are not reasonably interchangeable with Construction Equipment used for commercial purposes. Contractors and industrial customers require machines capable of earthmoving, lifting, and large-scale site work—functions that consumer-grade equipment cannot perform.

209.    Renting Construction Equipment serves a unique and irreplaceable function for contractors and construction firms. Large projects typically require fleets of diverse machinery that would cost tens of millions of dollars to own. Indeed, each of the Rental Company Defendants own fleets that cost billions of dollars to procure, use specialized storage and transportation, and require significant maintenance and upkeep costs in terms of parts and labor.

210.    Renting provides contractors with flexibility to obtain the exact equipment needed for a project, for the required duration, and without the capital, financing, maintenance, and storage burdens of ownership. Rentals also allow contractors to access newer, lower-emission models that meet evolving regulatory standards and environmental specifications.

211.    Ownership is not a practical or economic substitute for rental. Purchasers incur high up-front costs, depreciation losses, storage expenses, labor, and maintenance obligations. By contrast, rental payments are tax-deductible operating expenses that shift maintenance, insurance, and replacement risk to the rental company. For this reason, both the ARA and industry analysts treat equipment rentals as a discrete sector, economically separate from equipment sales. Accordingly, a hypothetical monopoly provider of rental Construction Equipment could profitably raise prices over competitive rental levels, without fear that a material segment of its customer

base would switch to self-supply.

212.     In *Brown Shoe v. United States*, 370 U.S. 294 (1962), the Supreme Court identified seven factors of "practical indicia" that can be used to define a relevant market: industry recognition of the submarket, peculiar characteristics of the product, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

213.     Within the rental industry itself, pricing, fleet management, and analytics are all oriented around Construction Equipment. Rouse's benchmark categories ("Cat Classes") correspond to this segment and explicitly exclude light tools or consumer rentals. Indeed, Rouse estimates that its customers comprise 60 percent of the segment, implying that industry participants recognize the existence of this market (the first *Brown Shoe* factor). The pricing coordination alleged in this complaint—via Rouse's RRI Price and related analytics—applies only to these Construction Equipment categories.

214.     The competitive dynamics of this market are distinct. Equipment of the same "Cat Class" is highly fungible across brands, so customers choose primarily on price and availability. This fungibility makes the market particularly vulnerable to coordinated pricing through shared analytics.

### B.  Economic and Practical Indicia

215.     The market for Construction Equipment rentals satisfies the **SSNIP** standard (Small but Significant and Non-transitory Increase in Price) used by federal antitrust authorities. Rental Company Defendants have repeatedly implemented rental rate increases of five to ten percent or more, year over year, without losing significant business—demonstrating that customers cannot switch to other products or ownership and that these price increases are profitable.

216.     Industry recognition and pricing behavior corroborate this market definition. The ARA, Rouse Analytics, and *RER* all treat "construction and industrial equipment rentals" as a

distinct sector separate from light-tool or homeowner rentals. The Rental Company Defendants report revenue and market share solely within this Construction Equipment segment, and investors and analysts evaluate them accordingly.

217.   Prices in this market are determined by daily, weekly, and monthly rental rates that correspond to Rouse's RRI Prices. These rates are separate from the purchase prices of equipment, which are driven by manufacturing costs, resale value, and depreciation. The existence of a uniform industry pricing index (RRI) for rentals further underscores that Construction Equipment rentals form a distinct, well-recognized market.

218.   Accordingly, the relevant market for purposes of both the price-fixing and information-exchange claims is the rental market for Construction Equipment in the United States, in which Rental Company Defendants are direct horizontal competitors who, through Rouse, have coordinated pricing and exchanged competitively sensitive information to suppress competition and maintain supracompetitive rental rates.

### C.  The Relevant Geographic Market

219.   The relevant geographic market is the United States, where the Rental Company Defendants compete for customers and coordinate prices for Construction Equipment rentals. The Rouse system itself is designed to facilitate national pricing coordination, with analytics and benchmarks that cover every major geographic region in the country.

220.   Rouse markets its RRI platform as providing "the most accurate benchmark data available on rental rates, utilization, and fleet mix by product and market—locally and nationally." It boasts that its data encompass "over 400 rental companies representing more than $45 billion in equipment and $20 billion in annual rental revenue across North America." These representations confirm that Rouse collects and redistributes pricing and utilization information from all major regions in the United States and that its analytics are applied to Construction Equipment on a

national basis.

221.    Rouse's own materials emphasize nationwide coverage and inter-regional comparability: participants can "see how their rates and performance stack up locally and nationally" and "compare pricing performance across all major equipment categories." By design, Rouse's system standardizes rates across regions rather than allowing prices to diverge according to local demand or utilization—further demonstrating that pricing competition occurs in a single, integrated national market.

222.    The Rental Company Defendants' operations likewise confirm a national scope. Each maintains a nationwide branch network, manages a fungible fleet of Construction Equipment, and moves inventory across regions to match demand. A HERC executive explained that the company moves its fleet "freely to where the demand is, both geographically and by industry." An H&E executive described fleet management as something that's "part of our process, always." HERC has touted its "fungible, expansive product line" and "national account capabilities." United described its ability to "reposition" its "fungible assets" "on a daily basis … moving it to where the customer needs."

223.    These firms also redeploy equipment nationally in response to economic cycles and external shocks. During the 2020 energy downturn, United and HERC shifted inventory out of oil- and gas-focused regions into other markets. When federal infrastructure projects increased regional demand, HERC and H&E redirected assets accordingly. After hurricanes and other natural disasters, HERC executives described moving large fleets across multiple states to supply recovery operations, calling geographic mobility "a big advantage for us."

224.    Rouse's own data architecture reinforces this national integration. Its platform aggregates nightly invoice feeds from participating companies' enterprise systems across the

United States, consolidating them into a unified database from which it generates national, regional, and local benchmarks. This structure both presupposes and perpetuates a nationwide competitive arena, enabling Defendants to align prices across regions and to monitor adherence to those price benchmarks.

225.    Accordingly, the relevant geographic market for both the price-fixing and information-exchange claims is the United States. Defendants compete and coordinate nationally, share competitively sensitive information through a nationwide analytics platform, and rely on Rouse's U.S.-wide benchmarks to fix and maintain supracompetitive rental rates.

## VIII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKET

226.    To the extent proof of market power is required under a rule-of-reason analysis, Defendants' and Rouse participants' collective market power is established through both direct and indirect evidence. The Rouse Cartel's collective ability to control rental prices and sustain supracompetitive margins across the United States constitutes direct evidence of market power. Alternatively, the concentration of market share among Rouse participants constitutes indirect evidence of market power under standard antitrust principles.

227.    **Direct Evidence.** Since the adoption of Rouse's platform, rental rates for Construction Equipment have risen persistently and in lockstep, even during periods of declining utilization. Rental Company Defendants have repeatedly increased prices by 5–12 percent year over year without losing meaningful market share. Executives from United, HERC, H&E, and others have attributed this sustained "pricing discipline" to Rouse's analytics and the "alignment" they provide across competitors. These facts constitute direct evidence that Defendants collectively possess, and exercise, market power sufficient to profitably raise prices above competitive levels.

228.   **Indirect Evidence.** The same conclusion follows from market-structure data. Rouse itself has acknowledged that the rental companies participating in its analytics program—i.e., the members of the Rouse Cartel—collectively control at least 60 percent of the North American Construction Equipment rental market. Rouse advertises that its subscribers include 74 of the *RER* Top 100 rental companies, and all of the Top 10. Through these relationships, Rouse aggregates pricing and utilization data representing more than $45 billion in equipment and over $20 billion in annual rental revenue. These figures demonstrate that the Rouse Cartel members' combined reach easily exceeds the thresholds that courts and economists recognize as conferring market power.

229.   The Rouse Cartel's largest members—the Rental Company Defendants—account for a large portion of the industry according to the ARA's most recent survey. It is likely that the Rental Company Defendants collectively control over half of the Construction Equipment rental market. Because this market excludes small-tool and homeowner rentals, Rental Company Defendants' combined share is higher than they represent in their public filings.

230.   Absent collusion, these firms could not have raised and maintained prices well above competitive levels without losing significant business to rivals. Their ability to do so—simultaneously and persistently—demonstrates that they collectively possess market power over customers and that their agreement through Rouse has suppressed normal price competition in the rental market for Construction Equipment.

## IX.   ANTICOMPETITIVE EFFECTS AND IMPACT ON INTERSTATE COMMERCE

231.   The Rouse Cartel directly damages Plaintiffs' businesses and properties and restrains competition in the relevant market. Plaintiffs have sustained and continue to sustain economic losses—the full amount of which Plaintiffs will calculate after discovery and prove at

trial—due to Defendants' price-fixing conspiracy.

232. But for Defendants' conspiracy, Plaintiffs and members of the proposed Class would have paid less for Construction Equipment rentals. Paying inflated prices caused by an unlawful agreement is a quintessential antitrust injury.

233. While the conspiracy continues, Plaintiffs and proposed Class members will continue to suffer losses.

234. The antitrust laws aim to prevent injuries such as those alleged herein that stem from a conspiracy among sellers to systematically raise the price paid for a good or service, such as Construction Equipment rentals. Agreements to reduce price competition, reduce supply, or fix prices violate the antitrust laws.

235. By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S. and caused antitrust injury to Plaintiffs and members of the proposed Class.

## X.     TOLLING OF THE STATUTE OF LIMITATIONS

236. Plaintiffs' and other proposed Class members' rentals of Construction Equipment within the four years prior to the filing of the first complaint on April 1, 2025 are not barred by the applicable four-year statute of limitations. The statutes are not required to be tolled for these claims to be actionable.

237. Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Rental Company Defendants increased their prices and caused Plaintiffs and other Class members to pay supracompetitive prices because of those increases. Accordingly, Defendants committed overt acts in furtherance of their conspiracy and their antitrust violations within any applicable period of limitations. Therefore, Defendants committed a

continuing violation of the antitrust laws.

238.    As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases, including with new fees on invoices. Furthermore, price-fixing conspiracies like Defendants' conspiracies are inherently self-concealing.

239.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Class, the four-year statutes of limitations governing claims under the Sherman Act were tolled pursuant to the doctrine of fraudulent concealment.

## XI.    CLASS ACTION ALLEGATIONS

240.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented Construction Equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of April 1, 2021 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

241.    **Numerosity.** The Class is so numerous that joinder of all members in this action is impracticable. Upon information and belief, the Class consists of tens of thousands, if not hundreds of thousands, of purchasers of Construction Equipment rental services throughout the United States.

242.    **Typicality.** Plaintiffs' claims are typical of the claims of other Class members because Plaintiffs assert the same legal theories and seek redress for the same injuries—overcharges resulting from Defendants' unlawful agreement to fix prices and exchange competitively sensitive information. Plaintiffs and all members of the Class were injured by the

same course of anticompetitive conduct, which caused them to pay inflated prices for Construction Equipment rentals relative to the prices that would have prevailed in a competitive market.

243. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are fully aligned with those of the Class, and they have retained counsel experienced in the prosecution of complex antitrust and unfair-competition class actions.

244. **Common Questions Predominate.** Common questions of law and fact predominate over any questions affecting only individual Class members because Defendants' conduct was uniform, centralized, and directed toward the market as a whole. Adjudication through a class action will therefore generate common answers apt to drive the resolution of this litigation.

245. Common questions of law and fact include, without limitation:

   a. Whether Defendants entered into a contract, combination, or conspiracy to fix, stabilize, or maintain prices for Construction Equipment rentals;

   b. Whether Defendants agreed to exchange or in fact exchanged confidential, competitively sensitive information through Rouse or otherwise;

   c. Whether the alleged conduct constitutes a *per se* unlawful restraint of trade, or is unlawful under a quick-look or rule-of-reason analysis;

   d. Whether Defendants' conduct artificially inflated rental prices and/or suppressed supply relative to competitive levels;

   e. The duration, scope, and participants in the conspiracy, and the acts taken by Defendants and their Co-Conspirators in furtherance of it;

   f. Whether Defendants' conduct caused Plaintiffs and the Class to pay

supracompetitive prices for Construction Equipment rentals, and the measure of resulting damages; and

g.  The nature and scope of injunctive or other equitable relief necessary to prevent and remedy the ongoing anticompetitive effects of Defendants' conduct.

246.   **Superiority.** Class-action treatment is a superior method for the fair and efficient adjudication of this controversy. It will allow the claims of numerous purchasers to be resolved in a single proceeding, promote consistency of results, and avoid the duplication of effort and expense that would arise from many individual actions. The class mechanism also ensures that injured persons and entities—many of whom would otherwise lack the resources or incentive to litigate individually—can obtain effective redress. The advantages of maintaining this action as a class proceeding substantially outweigh any difficulties that may arise in its management.

## XII.   CAUSES OF ACTION

### COUNT ONE

### Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

247.   Plaintiffs repeat and reallege all previous allegations as if fully set forth herein.

248.   Plaintiffs seek monetary and injunctive relief on behalf of themselves and the proposed Class under Sections 4 and 16 of the Clayton Act for Defendants' violations of Section 1 of the Sherman Act.

249.   Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting Construction Equipment to Plaintiffs and the Class.

250.   Beginning no later than 2011, Defendants and their Co-Conspirators entered into and engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

251.    Through Rouse, Defendants implemented an anticompetitive scheme to fix, stabilize, and maintain Construction Equipment rental prices at artificially high levels. The conspiracy consisted of (a) a horizontal agreement among competitors to delegate pricing authority to a common decision-maker, Rouse; (b) the coordinated use of Rouse's platform as a common hub for pricing, supply, and other strategic decisions; and (c) the reciprocal exchange of competitively sensitive data to monitor and enforce adherence to Rouse price ranges.

252.    The Rouse Cartel also constitutes a hub-and-spoke conspiracy. Rouse acted as the hub, facilitating and enforcing horizontal coordination among the Rental Company Defendants— the spokes—who otherwise compete directly in the rental of Construction Equipment. Rouse designed its system to aggregate near-real-time data from competing rental companies, calculate benchmark prices, and distribute those benchmarks back to all participants, thereby serving as the conduit for coordinated price setting and monitoring. Through this structure, the spokes agreed to align their pricing and utilization behavior through the hub rather than compete independently, and Rouse knowingly used its position to implement and police adherence to the agreed-upon pricing norms.

253.    Defendants' conduct in furtherance of the unlawful scheme was undertaken, authorized, or ratified by their officers, directors, and senior managers while actively directing corporate affairs.

254.    Acts in furtherance of the conspiracy included, but were not limited to:

    a.  Rouse's creation of the RRI Price tool at the urging of certain Rental Company Defendants;

    b.  Rouse's marketing of that tool to other large Construction Equipment rental companies as a means to "bring rate discipline" and "ensure consistency in

pricing";

c.   Rental Company Defendants' agreement to provide Rouse with real-time, non-public, confidential, competitively sensitive, and detailed internal data concerning pricing, utilization, fleet mix, and revenue;

d.   Rental Company Defendants' knowing use of Rouse's platform—derived from pooled competitor data—to set or adjust their own prices, utilization, and other strategic decisions; and

e.   Rouse's provision of enforcement tools and analytics that allowed Rental Company Defendants to monitor compliance with Rouse, including reports showing how each firm and salesperson priced relative to competitors.

255.   The Rouse Cartel enabled Rental Company Defendants to raise and maintain rental rates well above competitive levels, causing Plaintiffs and the Class to pay inflated prices and suffer overcharge damages.

256.   There are no procompetitive justifications for Defendants' conduct, and any purported efficiency could have been achieved through substantially less restrictive means.

257.   The Rouse Cartel constitutes a *per se* unlawful horizontal price-fixing agreement under Section 1. In the alternative, it is unlawful under the quick-look or rule-of-reason modes of analysis.

258.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury to their business or property and will continue to suffer such injury unless Defendants' conduct is enjoined.

259.   Plaintiffs and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

260.     Plaintiffs and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

## COUNT TWO

### Information Exchange in Violation of Section 1
### of the Sherman Act, 15 U.S.C. § 1

261.     Plaintiffs repeat and reallege all previous allegations as if fully set forth herein.

262.     Plaintiffs seek monetary and injunctive relief on behalf of themselves and the proposed Class under Sections 4 and 16 of the Clayton Act for Defendants' violations of Section 1 of the Sherman Act.

263.     Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting Construction Equipment to Plaintiffs and the Class.

264.     The relevant product and geographic markets are the U.S. market for Construction Equipment rentals, as defined above. Rouse's benchmarking and analytics platform encompasses at least 60 percent of industry rental revenue, giving participants collective market power.

265.     Beginning no later than 2011, and expanding materially thereafter, Defendants and their Co-Conspirators entered into and participated in a contract, combination, or conspiracy to exchange competitively sensitive, non-public information regarding Construction Equipment pricing, utilization, fleet composition, and local demand.

266.     Rental Company Defendants agreed that each would share its current transactional data with Rouse on a nightly or near-real-time basis, that Rouse would aggregate and redistribute that data to participants, and that each would use the resulting analytics to guide its pricing and utilization decisions. This reciprocal exchange deprived the marketplace of independent centers of decision-making and eliminated reasonable price competition.

267.     The exchanged information included detailed pricing and utilization metrics that allowed Defendants to monitor and enforce price alignment across the industry without explicit communication of prices. This continuous, near-real-time data sharing produced the same anticompetitive effects as a direct price-fixing agreement.

268.     Defendants' conduct was undertaken with knowledge that other competitors were participating in the same exchange, and it resulted in higher prices for Construction Equipment rentals nationwide. As a result, Plaintiffs and the Class have been injured in their business or property by paying inflated prices.

269.     Defendants' conduct is unlawful under either the quick-look or rule-of-reason standard because the exchange of competitively sensitive, near-current data among horizontal competitors is inherently anticompetitive, lacks valid procompetitive justification, and could not be achieved through means less restrictive of competition.

270.     Plaintiffs and the Class are entitled to treble damages, interest, reasonable attorneys' fees, costs, and appropriate injunctive relief to restore competition in the market for Construction Equipment rentals.

## XIII.   PRAYER FOR RELIEF

271.     Plaintiffs petition for the following relief:

a.  A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as class counsel;

b.  A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick-look, or rule-of-reason mode of analysis;

c.   A judgment enjoining Defendants from engaging in further unlawful conduct;

d.   An award of attorneys' fees and costs;

e.   An award of pre- and post-judgment interest on all amounts awarded; and

f.   Such other relief as the Court deems just and equitable.

## XIV.   JURY DEMAND

272.   Plaintiffs request a trial by jury of all issues so triable.

Dated: November 7, 2025             Respectfully submitted,

                                            */s/ Zachary D. Caplan*

| | |
|---|---|
| DICELLO LEVITT LLP | BERGER MONTAGUE PC |
| Gregory S. Asciolla | Eric L. Cramer |
| Alexander E. Barnett | Zachary D. Caplan |
| Jay R. Wexler | Michaela L. Wallin |
| 485 Lexington Avenue, Suite 1001 | Sarah R. Zimmerman |
| New York, NY 10017 | 1818 Market Street, Suite 3600 |
| Tel: (646) 933-1000 | Philadelphia, PA 19103 |
| gasciolla@dicellolevitt.com | Tel: (215) 875-3000 |
| abarnett@dicellolevitt.com | ecramer@bergermontague.com |
| jwexler@dicellolevitt.com | zcaplan@bergermontague.com |
| | mwallin@bergermontague.com |
| Adam J. Levitt | szimmerman@bergermontague.com |
| Ten North Dearborn Street, 6th Floor | |
| Chicago, IL 60602 | Daniel J. Walker |
| alevitt@dicellolevitt.com | 1001 G Street, NW, Suite 400 East |
| | Washington, DC 20001 |
| | dwalker@bergermontague.com |

*Interim Co-Lead Class Counsel*

| | |
|---|---|
| GARWIN GERSTEIN & FISHER LLP | FREED KANNER LONDON & MILLEN LLC |
| Deborah A. Elman | Samantha M. Gupta |
| 88 Pine Street, Suite 2810 | 100 Tri-State International Drive, Suite 128 |
| New York, NY 10005 | Lincolnshire, IL 60069 |
| delman@garwingerstein.com | sgupta@fklmlaw.com |
| | |
| GUSTAFSON GLUEK PLLC | LOCKRIDGE GRINDAL NAUEN PLLP |
| Daniel C. Hedlund | Joseph C. Bourne |
| Daniel J. Nordin | Stephen J. Teti |
| 120 South Sixth Street, Suite 2600 | 100 Washington Avenue South, Suite 2200 |
| Minneapolis, MN 55402 | Minneapolis, MN 55401 |
| dhedlund@gustafsongluek.com | jcbourne@locklaw.com |
| dnordin@gustafsongluek.com | sjteti@locklaw.com |
| | |
| CUNEO GILBERT & LADUCA, LLP | FEGAN SCOTT LLC |
| Michael J. Flannery | Elizabeth A. Fegan |
| Evelyn Y. Riley | 150 S. Wacker Dr., 24th Floor |
| 2445 M St. NW, Suite 740 | Chicago, IL 60606 |
| Washington, D.C. 20037 | beth@feganscott.com |
| mflannery@cuneolaw.com | |
| evelyn@cuneolaw.com | |

*Plaintiffs' Steering Committee*