**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: CONSTRUCTION EQUIPMENT RENTAL ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 1:25-cv-03487<br>MDL No. 3152<br><br>Hon. Sara L. Ellis |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 4

    A.    Rouse Provides Benchmark Software and Services to Equipment Owners and Lenders, Including Rouse Rental Insights. ............................................................ 4

    B.    RRI Provides Only Aggregated and Anonymized Benchmarking Information. .... 5

    C.    RRI Provides Only Time-Lagged Price-Related Benchmark Information. ............ 6

    D.    Rouse Does Not Recommend Prices. ................................................................... 7

    E.    Rental Companies Make Their Own Independent Decisions About Whether and How to Use Data Provided by RRI. .................................................................... 9

    F.    Plaintiffs Do Not Allege Communications, Much Less Agreements, Between or Among the Rental Company Defendants. ........................................................... 10

III.   LEGAL STANDARDS ..................................................................................... 11

    A.    *Twombly* Plausibility Standard ......................................................................... 11

    B.    Presumptive Rule of Reason Analysis ............................................................... 12

IV.   ARGUMENT .................................................................................................... 13

    A.    Plaintiffs Have Not Plausibly Alleged a *Per Se* Unlawful Horizontal Price-Fixing Conspiracy in Count 1. ..................................................................................... 13

    B.    Plaintiffs Have Not Plausibly Alleged a *Per Se* Unlawful Hub-and-Spoke Conspiracy in Count 1. ..................................................................................... 15

        1.    Plaintiffs Have Not Plausibly Alleged a "Rim Agreement" to Fix Prices. 16

        2.    Plaintiffs Have Not Plausibly Alleged That Rouse Operates as a "Hub" for Price-Fixing. ........................................................................................ 23

        3.    Plaintiffs Do Not Allege Any *Per Se* Unlawful Conduct. ........................ 24

    C.    Plaintiffs Have Not Plausibly Alleged a Hub-and-Spoke Conspiracy Under the Rule of Reason. .............................................................................................. 28

        1.    Plaintiffs' Failure to Plausibly Allege Either a Rim Agreement or a Facilitating Hub Also Dooms Count 1 Under the Rule of Reason. .......... 28

        2.    Plaintiffs Fail to Plausibly Allege a Nationwide Market for Construction Rentals. ................................................................................................. 29

        3.    Plaintiffs Fail to Plausibly Allege Anticompetitive Effects in the Relevant Market. ................................................................................................. 31

    D.    Plaintiffs Have Not Plausibly Alleged an Information Exchange Conspiracy Under the Rule of Reason in Count 2. ........................................................................ 34

        1.    Plaintiffs Have Not Plausibly Alleged an Information Exchange Agreement Between the Rental Company Defendants. ............................................ 34

2.      Plaintiffs' Information Exchange Claim Also Fails Because Plaintiffs Have Not Alleged a Plausible Nationwide Geographic Market. .............. 36

3.      Plaintiffs Fail to Allege Anticompetitive Effects in Support of Their Information Exchange Theory. ................................................................ 36

E.      Plaintiffs Have Not Plausibly Alleged Tolling of the Statute of Limitations. ....... 38

V.      CONCLUSION ................................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. F.T.C.*,
    1 F.4th 102 (2d Cir. 2021) ...................................................................................32

*42nd Parallel N. v. E St. Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ...............................................................................32

*A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*,
    956 F.2d 1399 (7th Cir. 1992) .............................................................................14

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
    2 F.4th 695 (7th Cir. 2021) .................................................................................12

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    No. 21-cv-00351 (GHW) (VF), 2023 WL 6006525 (S.D.N.Y. July 31, 2023)......................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................11, 12

*Maple Flooring Mfrs.' Ass'n v. United States*,
    268 U.S. 563 (1925)...............................................................................21, 25

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ...............................................................................28

*Baker v. F & F Inv.*,
    420 F.2d 1191 (7th Cir. 1970) .............................................................................39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................11, 12, 17, 28

*Bogie v. Rosenberg*,
    705 F.3d 603 (7th Cir. 2013) ...............................................................................7

*In re Broiler Chicken Antitrust Litig.*,
    702 F. Supp. 3d 635 (N.D. Ill. 2023) ...............................................18, 25, 36, 37

*In re Broiler Chicken Antitrust Litig.*,
    No. 16 C 8637, 2019 WL 1003111 (N.D. Ill. Feb. 28, 2019)...................................38

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).................................................................................33

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) ................................................................33, 34

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988)........................................................................................14

*Cal. Dental Ass'n v. F.T.C.*,
    526 U.S. 756 (1999)........................................................................................28

*Chapple v. Nat'l Starch & Chem. Co.*,
    178 F.3d 501 (7th Cir. 1999) .........................................................................39

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................21, 34

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
    No. 1:23-CV-02536-KMW-EAP, 2024 WL 4356188 (D.N.J. Sept. 30, 2024)......................18

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
    495 F.3d 46 (3d Cir. 2007)............................................................................16

*Dai v. SAS Inst. Inc.*,
    No. 24-cv-02537-JSW, 2025 WL 2078835 (N.D. Cal. July 18, 2025) ............................26, 28

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
    60 F. Supp. 3d 914 (N.D. Ill. 2014) ..............................................................16

*In re Delta Dental Antitrust Litig.*,
    No. 19 CV 6734, 2025 WL 2696575 (N.D. Ill. Sept. 22, 2025)......................................25

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*,
    No. 4:18-cv-2518-JSW-KAW, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) ......................18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)........................................................................................33

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) .........................................................................22

*In re FICO Antitrust Litig. Related Cases*,
    No. 1:20-CV-02114, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023).........................16

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) .........................................................................33

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,
    85 F. Supp. 3d 1007 (E.D. Wis. 2015)..........................................................39

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) ...................................................................................5

*In re German Auto. Mfrs. Antitrust Litig.*,
612 F. Supp. 3d 967 (N.D. Cal. 2020) ....................................................................29

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025) ..........................................................14, 17, 19, 26

*Gibson v. Cendyn Grp., LLC*,
No. 2:23-cv-00140-MMD-DJA, 2024 WL 2060260 (D. Nev. May 8, 2024) ................ *passim*

*Gibson v. MGM Resorts Int'l*,
No. 2:23-cv-00140-MMD-DJA, 2023 WL 7025996 (D. Nev. Oct. 24, 2023)............20, 26, 35

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................................18

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
No. 3:11-CV-268 JD, 2016 WL 8292207 (N.D. Ind. Mar. 18, 2016) ....................................39

*Havoco of Am., Ltd. v. Shell Oil Co.*,
626 F.2d 549 (7th Cir. 1980) ..................................................................................33

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ................................................................................29

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ..................................................................................16

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
733 F. App'x 380 (9th Cir. 2018) ...........................................................................34

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................................................................................17

*Interstate Circuit v. United States*,
306 U.S. 208 (1939)................................................................................................14

*JSW Steel (USA) Inc. v. Nucor Corp.*,
586 F. Supp. 3d 585 (S.D. Tex. 2022), *aff'd*, No. 22-20149, 2025 WL 832801
(5th Cir. Mar. 17, 2025) ..........................................................................................21

*Kraft Foods Glob., Inc. v. United Egg Prods., Inc.*,
No. 11-cv-8808, 2023 WL 6065308 (N.D. Ill. Sept. 18, 2023).............................15

*Krempel v. Martin Oil Mktg., Ltd.*,
No. 95 C 1348, 1995 WL 733439 (N.D. Ill. Dec. 8, 1995) .....................................5

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)................................................................................13, 29

*In re Loc. TV Advert. Antitrust Litig.*,
No. 18 C 6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022)....................23, 24, 37

*In re Manufactured Home Lot Rents Antitrust Litig.*,
No. 23-cv-06715, 2025 WL 3485693 (N.D. Ill. Dec. 4, 2025)....................15, 20, 30

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ...................................................................12

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
952 F.3d 832 (7th Cir. 2020) ...................................................................15

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)......................................................................16

*Mkt. Force Inc. v. Wauwatosa Realty Co.*,
906 F.2d 1167 (7th Cir. 1990) ..................................................................17

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ..................................................................29

*Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
456 F. Supp. 3d 1059 (W.D. Wis. 2020) ....................................................12

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .............................................................17, 19, 21, 33

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021)...................................................................................13

*Nucap Indus., Inc. v. Robert Bosch LLC*,
273 F. Supp. 3d 986 (N.D. Ill. 2017) ........................................................29

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)............................................................................32, 33

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
No. 19 C 8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020).................................36

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) ...................................................................37

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
767 F. Supp. 3d 681 (N.D. Ohio 2025)................................................22, 26, 28

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    MDL No. 2328, 2016 WL 3567059 (E.D. La. July 1, 2016)..................................................30

*Portillo v. Costar Grp., Inc.*,
    No. C24-229RSL, 2025 WL 2495053 (W.D. Wash. Aug. 29, 2025).........................12, 25, 35

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
    87 F. Supp. 3d 874 (N.D. Ill. 2015) ...................................................................................29

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ..............................................................................................29

*Segal v. Amadeus IT Grp., S.A.*,
    No. 24-CV-1783, 2025 WL 963751 (N.D. Ill. Mar. 31, 2025)..................................16, 18, 25

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ..............................................................................................29

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) .................................................................................39

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
    71 F.3d 119 (4th Cir. 1995) ...............................................................................................39

*Tate v. City of Chicago*,
    No. 19 C 7506, 2020 WL 6715660 (N.D. Ill. Nov. 16, 2020)..................................................7

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)........................................................................................................13, 28

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .........................................................................................12, 16

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)...........................................................................................36, 37

*U.S. Horticultural Supply v. Scotts Co.*,
    367 F. App'x 305 (3d Cir. 2010) ........................................................................................31

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974)......................................................................................................30, 31

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)......................................................................................................21, 34

*Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ..............................................................................22, 23

## I.     INTRODUCTION

Stripped of labels, conclusory assertions, and boilerplate, the core allegations of Plaintiffs' Consolidated Amended Complaint ("CAC") demonstrate simply that the Rental Company Defendants[1] independently subscribed to a third-party application, Rouse Rental Insights ("RRI"), which provides aggregated, anonymized, and historical benchmark information that the Rental Company Defendants are free to consider or ignore at their discretion. These allegations, considered holistically along with all well-pled facts in the CAC, do not state an antitrust violation under any of Plaintiffs' legal theories.

*First*, Plaintiffs do not plausibly allege a *per se* violation of Section 1 of the Sherman Act in Count 1 under either a horizontal price-fixing or hub-and-spoke conspiracy theory. These theories are predicated on Plaintiffs' key assertion that the Rental Company Defendants have agreed with each other that they will all rent construction equipment at a supposed "Rouse Price" or "RRI Price"—misleading labels that Plaintiffs created for purposes of this litigation. That assertion is belied by Plaintiffs' own allegations, which demonstrate a wide dispersion of prices charged by Defendants to rent the same piece of equipment. *E.g.*, CAC ¶ 99, Fig. 3 (reflecting 50% variation in prices for one type of equipment); *id.* ¶ 104, Fig. 7 (245% variation in prices). This massive price dispersion is wholly inconsistent with Plaintiffs' assertion that the Rental Company Defendants agreed to "delegate" their pricing authority to Rouse. *Id.* ¶¶ 117, 184, 251. Moreover, the CAC does not allege a single fact suggesting that the Rental Company Defendants ever communicated with each other about their pricing decisions, either directly or through Rouse, much less that they entered into an *agreement* to price in a particular way.

---

[1] Using the terminology of the CAC, the "Rental Company Defendants" are Defendants United, Sunbelt, Herc, H&E, Sunstate, Home Depot, and EquipmentShare.

Plaintiffs contend they have "direct evidence" of a price-fixing conspiracy in the form of the Rental Company Defendants' contracts with Rouse, which supposedly require each company to use Rouse's "pooled benchmarks to guide its own pricing and utilization decisions." *Id.* ¶ 162. But those contracts—which are incorporated by reference into the CAC—say exactly the opposite, directing users to make their own independent decisions about whether and how to use Rouse's benchmark information. *See, e.g.*, Declaration of Johnson Do ISO Joint Motion to Dismiss ("Do Decl."), Ex. E (United contract) at 2 ("Nothing in the Reports should be construed as business, financial or legal advice, or as a recommendation for any particular action or course of action. Readers are advised to consult their own business, financial and legal advisors."). Thus, what Plaintiffs present as their most compelling evidence of price-fixing contradicts their allegations of conspiracy.

Nor do Plaintiffs have "circumstantial evidence" of a price-fixing conspiracy, which requires plausible factual allegations of: (1) parallel conduct—here, that the Rental Company Defendants are pricing in parallel with each other by consistently charging the purported "Rouse Price"; and (2) sufficient "plus factors" to infer such parallel pricing results from a conspiracy, rather than independent business decisions. Plaintiffs cannot allege parallel conduct. What they call the "Rouse Price" or "RRI Price" instead consists of broad and anonymized "*price ranges*" displayed by RRI's benchmarking dashboards. CAC ¶¶ 98-99 (emphasis added). And charts in the CAC show that the Rental Company Defendants routinely charge prices well above and below the benchmark ranges. *Id.* ¶ 99, Figs. 3 & 4. Plaintiffs' "plus factors" also falter, as Plaintiffs fail to plead that the Rental Company Defendants acted against their self-interest by signing up to receive aggregated, anonymized, and historical benchmark information from Rouse, and otherwise

advance only boilerplate arguments related to purported industry concentration, trade association meetings, and government interest—none of which speak to Defendants' conduct here.

Moreover, Plaintiffs fail to allege any conduct that could be *per se* unlawful. Courts use the "rule of reason" to analyze benchmarking conduct like what Plaintiffs challenge here given its procompetitive benefits and in recent years have consistently dismissed antitrust claims concerning third-party software that provides aggregated and anonymized market benchmarks.

***Second***, Plaintiffs fail to plausibly allege their alternative theory under Count 1: an "unlawful horizontal price-fixing agreement" under the "rule of reason." At the threshold, Plaintiffs' inability to plausibly allege direct or circumstantial evidence of an agreement precludes this legal theory as well. But Plaintiffs also cannot maintain any claim under the rule of reason without plausibly defining a relevant market. This requires Plaintiffs to plausibly identify the geographic area within which renters of "medium-to-large" construction equipment, *see id.* ¶ 54, could reasonably source the equipment they need. Plaintiffs assert that there is a single nationwide market for construction equipment, such that a builder who needed a 54-ton rough terrain crane, *see id.* ¶ 138, at its jobsite in Chicago, but found local prices unfavorable, could reasonably rent one located in Miami. That is implausible on its face. Moreover, Plaintiffs fail to allege market-wide anticompetitive effects—whether through direct evidence of supracompetitive prices or indirect evidence of market power and harm to competition.

***Third***, Count 2 should be dismissed because Plaintiffs fail to plausibly allege that Defendants engaged in an unlawful "information exchange" under the rule of reason. In addition to the defects discussed above, there is no plausible allegation that the Rental Company Defendants share any business information (confidential or otherwise) with each other—only that they independently share certain information *with Rouse*. And there is no factual allegation that Rouse

reveals any particular Rental Company Defendant's confidential information to any other Rental Company Defendant. On the contrary, Rouse aggregates and anonymizes the historical benchmark information it provides so as to avoid disclosing client-specific information. Moreover, the Rouse contracts on which Plaintiffs rely require each client "not to distribute, discuss, or share the data contained in the ROUSE Reports with any person or company not directly employed by the CLIENT." *See*, *e.g.*, Do Decl., Ex. E (United contract) at 2. In light of what the contracts actually say, Plaintiffs' bare assertion that the aggregated, anonymized, and historical market information Rouse provides to its clients "produce[s] the same anticompetitive effects as a direct price-fixing agreement," CAC ¶ 267, is implausible on its face—and is further contradicted by the wide price dispersion admitted throughout the CAC, *id.* ¶¶ 98-99 & Figs. 3-5, 7. Plaintiffs cannot plausibly allege that the purported exchange of such information would generate anticompetitive effects under the well-established criteria courts consider to analyze alleged information exchanges— including the anonymity, aggregation, and age of the information.

***Finally***, even if Plaintiffs could plausibly allege an antitrust violation, they would still fail to allege any facts to permit tolling the applicable statute of limitations.

## II. BACKGROUND

### A. Rouse Provides Benchmark Software and Services to Equipment Owners and Lenders, Including Rouse Rental Insights.

Rouse provides "rental metrics benchmarks, and construction equipment valuations to lenders, rental companies, contractors and dealers." *Id.* ¶ 27. In 2011, Rouse launched the cloud-based Software-as-a-Service ("SaaS") rental metrics benchmarking product now known as RRI that is at issue in this litigation. *Id.* ¶ 68. The Rental Company Defendants are companies that provide equipment rentals. *Id.* ¶¶ 29, 31, 35, 39, 42, 45, 47. Along with hundreds of other companies that provide equipment rentals, they began subscribing to RRI at various times since it

launched in 2011, including some only recently. *Id.* ¶¶ 10, 70, 124.

**B.      RRI Provides Only Aggregated and Anonymized Benchmarking Information.**

Rouse created RRI to help rental companies evaluate their pricing and fleet performance through two core functions. First, RRI helps a subscriber understand its own data by organizing and displaying that data in a user-friendly format. Second, RRI allows a subscriber to see how its data compares to a benchmark range for the industry.

Plaintiffs do not allege that Rouse has ever shared one Rental Company Defendant's transaction-level data with any other Rental Company Defendant. Nor do they allege that any Rental Company Defendant has ever shared its own data directly with another Rental Company Defendant. Instead, each RRI subscriber, including each Rental Company Defendant, independently shares its own data with Rouse—a third party—which Rouse uses to create aggregated and anonymized benchmarks. *Id.* ¶¶ 13, 68, 78-82, 109, 130, 133, 146, 168. RRI displays each subscriber's own data and benchmarks on a "dashboard" that is specific to that one subscriber. *Id.* ¶¶ 102-03, Figs. 5 & 6.

Rouse's contracts with its customers provide that all data in RRI will be "presented in an aggregated, de-identified and generalized manner." Do Decl., Ex. F (United contract amendment) at 2; *see also id.* Exs. B (Herc Rentals contract) at 2 ("aggregated, anonymous and generalized manner"); C (Sunbelt contract) at 2 (same); H (Home Depot contract amendment) at 2 (same); A (H&E contract) at 4 (only permitting Rouse to use client data "on an aggregated basis without attribution to or identification of CLIENT"); D (Sunstate contract) at 4 (only permitting Rouse to use client data "on an aggregated basis for historical analysis").[2]

---

[2] Plaintiffs allege that Rouse's contracts with its customers are "direct evidence" of the conspiracy, CAC ¶¶ 161-66, incorporating them into the CAC. Rule 12(b)(6) motions can rely on materials "that are critical to the complaint and referred to in it." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Krempel v. Martin Oil Mktg., Ltd.*, No. 95 C 1348, 1995 WL 733439, at *6 n.1 (N.D. Ill. Dec. 8,

### C.   RRI Provides Only Time-Lagged Price-Related Benchmark Information.

RRI provides price-related benchmarks based on data that is "at least 90 days old." CAC ¶ 83. As shown in screenshots of the RRI dashboard included in the CAC, RRI clearly labels this lagged information. Figure 9, for instance, is a dashboard accessed in January 2020 and shows a vertical dotted line between "Sep 2019" and "Oct 2019," which indicates that September 2019 is the last month for which the displayed RRI data is based on actual customer data, meaning the data was over 90 days old when viewed in January 2020. *Id.* ¶ 107, Fig. 9.



Likewise, in Figure 10, there is a vertical dotted line located between "Sep 2019" and "Oct 2019" marking the point after which RRI data is no longer based on actual customer data for that month. *Id.* ¶ 136, Fig. 10.

---

1995) (considering contract incorporated into the complaint where "a portion of [plaintiff's] claim [was] based on the existence of the agreement").



Plaintiffs allege that the "trendline" RRI provides for the more recent 90 days (*i.e.*, for the months to the right of the dotted line) "neutraliz[es]" the 90-day lag. *Id.* ¶ 83. But, as detailed in the RRI demonstration from which Plaintiffs excerpted Figures 9 and 10, that trendline is based on *historical data for the previous decade*, not actual customer data from the 90-day lag period. *Using Technology to Optimize Your Fleet and Equipment Rental Business with Rouse Analytics*, YouTube (Apr. 20, 2020) ("Mause Demo"), 13:32-14:06.[3]

### D. Rouse Does Not Recommend Prices.

RRI displays a number of "standardized rate benchmarks," not specific prices. CAC ¶ 68. While Plaintiffs intersperse the terms "Rouse Price" and "RRI Price" throughout the CAC and assert that Rental Company Defendants "adopt" that "Price," *e.g.*, *id.* ¶¶ 4, 16, 89, 119, their factual

---

[3] Available at https://www.youtube.com/watch?v=BroutXTwcXE. Plaintiffs incorporated this video into the CAC by quoting it and relying on screenshots from it. CAC ¶¶ 135-38. *See supra* n.2. This incorporation by reference applies to video recordings. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("[I]t makes eminently good sense to apply [incorporation-by-reference] principles to video recordings attached to or referenced in a complaint . . . ") (citation omitted); *Tate v. City of Chicago*, No. 19 C 7506, 2020 WL 6715660, at *1 (N.D. Ill. Nov. 16, 2020) ("[T]he Seventh Circuit has held that it is proper to consider videos that are incorporated by reference in a complaint on a motion pursuant to Rule 12(b)(6).")

allegations demonstrate that Rouse does not report specific prices, much less recommend any particular price.

The CAC concedes that what Plaintiffs label the "Rouse Price" is actually a "range" of average prices based on a large swath of all available rental prices charged for that piece of construction equipment. *Id.* ¶ 86; *see also id.* ¶ 92 (RRI provides "high, medium, and low RRI Prices"). For example, Plaintiffs allege that the "Rouse Price" encompasses all prices falling within the "green and red" bands in Figures 3 and 4 of the CAC—but that is a broad range that includes more than one hundred distinct prices charged by different rental companies. *Id.* ¶ 99, Figs. 3 & 4.



As the video from which Plaintiffs sourced Figures 3 and 4 explains, the green line represents the "top quartile" of contract rates; the gray line represents the "overall average"; and the red line represents the "bottom quartile." Mause Demo, 18:25-50. Thus, in characterizing the purported "RRI Price" as everything within the green and red bands, CAC ¶ 99, what Plaintiffs really allege is that the "RRI Price" consists of every rate between the 25th and 75th percentile of all rates charged—in this example, every rate between $1,603 and $2,549. The CAC does not

explain how such a broad, dispersed range of rates could be used to "fix" prices, and any such assertion would be implausible on its face.

### E. Rental Companies Make Their Own Independent Decisions About Whether and How to Use Data Provided by RRI.

Plaintiffs acknowledge that rental companies not only can, but frequently do, set their prices outside of the average price ranges displayed by RRI. Figures 3 and 4 reflect dozens of prices charged above and below the benchmark ranges provided by Rouse—*i.e.*, prices above the 25th quartile and below the 75th quartile. *Id.* ¶ 99, Figs. 3 & 4. All Plaintiffs are able to allege is that the Rental Company Defendants often (though certainly not always) charge prices that fall within the Rouse benchmark ranges, *id.* ¶¶ 95, 98, 100, which is hardly surprising given that those ranges, by definition, include all prices between the 25th and 75th quartiles—*i.e.*, where most market activity naturally occurs.

Plaintiffs do not allege that Rouse takes any steps to control what customers do with RRI's benchmark information. On the contrary, Rouse's contracts expressly advise customers that RRI information is not "business, financial, or legal advice," nor "a recommendation for any particular course of action." *See infra* Section II.F; *see also* Do Decl., Ex. F (United contract amendment) at 2 (instructing customer to "exercise independent business judgment when reviewing and responding to the information provided" in RRI).

Further, Plaintiffs' conclusory assertions that RRI is directly integrated into its customers' quoting and revenue management systems, CAC ¶¶ 4, 12, 86, 98, are contradicted by the CAC's other factual allegations. Plaintiffs allege Rouse has a one-directional integration with the Rental Company Defendants' enterprise systems for Rouse to receive transmission of data feeds *from* the Rental Company Defendants to Rouse. *Id.* ¶¶ 189, 224 (emphasis added); *see also id.* ¶ 80 (enterprise integration is for Rouse to "*extract*" data from customers contributing to RRI)

9

(emphasis added). Plaintiffs allege that Rouse then distributes aggregated, anonymized, and historical benchmarks to customers via a different pathway: RRI's "online dashboards" featured throughout the CAC. *Id.* ¶ 86; *see id.* Figs. 3-12 (dashboard screenshots). Plaintiffs do not make a single well-pled factual allegation about Rouse delivering RRI outputs into the Rental Company Defendants' quoting or revenue management systems.

### F. Plaintiffs Do Not Allege Communications, Much Less Agreements, Between or Among the Rental Company Defendants.

The CAC does not allege a single communication or interaction between or among any Rental Company Defendants about any topic whatsoever. Plaintiffs point to purported "public admissions" as direct evidence of a conspiracy. *Id.* ¶¶ 167, 172, 178. But these statements do nothing to suggest the existence of a price-fixing agreement among the Rental Company Defendants. The statements describe Rouse's general marketing of RRI features and benefits, *id.* ¶¶ 168-70, Rouse's attendance at industry events, *id.* ¶ 171, and some Rental Company Defendants' descriptions of the marketplace and the fact that they find RRI helpful, *id.* ¶¶ 165, 173-77. Nowhere in any of these statements is any suggestion that Rental Company Defendants ever communicated with one another about how to use RRI's benchmark information. And one of the quoted statements Plaintiffs attribute to Defendant Herc Rentals (formerly Hertz Equipment) in 2010, *id.* ¶ 165, was made *thirteen years* after the quoted individual had retired from Herc Rentals, while he was working as an "independent consultant."[4]

Plaintiffs also assert that Rouse's vertical contracts with the Rental Company Defendants to subscribe to RRI constitute "direct evidence" of an agreement among the Rental Company

---

[4] CAC ¶ 165 (quoting from Dan Kaplan, *The Clock Is Ticking on Rate Discipline*, RER (Sept. 1, 2010), available at https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline).

Defendants to fix prices and exchange confidential information. *Id*. ¶¶ 161-66. Instead, those contracts expressly contradict Plaintiffs' assertion.

*First*, signatories to Rouse's RRI contracts agree that "[n]othing in the Reports should be construed as business, financial or legal advice, or as a recommendation for any particular action or course of action." Do Decl., Ex. E (United contract) at 2; *see also id.* Exs. F (United contract amendment) at 2; B (Herc Rentals contract) at 2 (same); C (Sunbelt contract) at 2 (same); H (Home Depot contract addendum) at 2-3 (same). The CAC offers no facts to suggest that the Rental Company Defendants conspired about how to use Rouse's benchmark information, beyond the conclusory assertion that they somehow coordinate "through Rouse." CAC ¶¶ 96, 117-18.

*Second*, signatories to Rouse's RRI contracts agree to maintain the confidentiality of data and "not share or discuss results with any other participants or use the rental insights service in furtherance of anticompetitive behavior." Do Decl., Ex. F (United contract amendment) at 2; *see also id.* Exs. B (Herc Rentals contract) at 2 (similar); C (Sunbelt contract) at 2 (similar); H (Home Depot contract addendum) at 2 (similar). The contracts further state that the "distribut[ion], discuss[ion], or shar[ing] [of] the data contained in the ROUSE Reports with any person or company not directly employed by the CLIENT" is a "breach" of the agreement. *Id.* Ex. E (United contract) at 2; A (H&E contract) at 3 (similar); B (Herc Rentals contract) at 2-3 (similar); C (Sunbelt contract) at 2 (similar); D (Sunstate contract) at 3 (similar); G (2022 Home Depot contract) at 2.

## III.  LEGAL STANDARDS

### A.  *Twombly* Plausibility Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A plaintiff cannot side-step this requirement with "linguistic stretches," labels, boilerplate, or conclusory assertions, and all such non-factual material must be ignored in ruling on a motion to dismiss. *Portillo v. Costar Grp., Inc.*, No. C24-229RSL, 2025 WL 2495053, at *5 (W.D. Wash. Aug. 29, 2025); *see also Iqbal*, 556 U.S. at 678.

Rigorous enforcement of this standard is critical in antitrust cases, where its "misappl[ication] . . . create[s] irrevocable as well as unjustifiable harm to [] defendant[s]" due to "the expense of responding to bulky, burdensome discovery." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 625-26 (7th Cir. 2010) (cleaned up); *see also Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 456 F. Supp. 3d 1059, 1072 (W.D. Wis. 2020) (explaining, in addressing antitrust claims, that "[t]he required level of factual specificity rises with the complexity of the claim . . . in part because of the added burdens associated with defending a complex claim") (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011)).

## B.     Presumptive Rule of Reason Analysis

To state a plausible claim under Section 1 of the Sherman Act, Plaintiffs must plausibly allege "the existence of an agreement . . . through allegations of fact." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021). After all, "the crucial question" in a Section 1 case "is whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Twombly*, 550 U.S. at 553. Allegations that "could just as easily reflect innocent conduct or rational self-interest" are insufficient to survive a motion to dismiss. *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co*., 29 F.4th 337, 351 (7th Cir. 2022). The analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Antitrust claims under Section 1 of the Sherman Act are presumptively analyzed under the "rule of reason," which requires the plaintiff to plausibly allege anticompetitive conduct that

harmed competition within a cognizable relevant market. *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021) (citation omitted); *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("[T]his Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful.") (citations omitted). Only in rare cases does an antitrust plaintiff rebut this presumption by plausibly alleging facts that fall within one of the narrow categories of conduct that has been deemed *per se* unlawful under the antitrust laws: indeed, "the *per se* rule is appropriate only . . . if courts can predict with confidence that [the conduct alleged] would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (cleaned up); *see also Texaco*, 547 U.S. at 5 ("*Per se* liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.") (cleaned up).

## IV. ARGUMENT

Plaintiffs cast their claims under four different legal theories, all of which arise under Section 1 of the Sherman Act: (1) a *per se* "unlawful horizontal price-fixing agreement," CAC ¶¶ 250-51, 257 (Count 1); (2) a *per se* unlawful hub-and-spoke conspiracy, *id.* ¶¶ 252, 257 (Count 1); (3) a "horizontal price-fixing agreement" that violates the rule of reason, *id.* ¶ 257 (Count 1); and (4) an unlawful "information exchange" agreement that violates the rule of reason, *id.* ¶¶ 265, 269 (Count 2). Each of these theories fails.

### A. Plaintiffs Have Not Plausibly Alleged a *Per Se* Unlawful Horizontal Price-Fixing Conspiracy in Count 1.

Plaintiffs make it sound as if they have alleged two different types of a *per se* unlawful price-fixing conspiracy: a "horizontal cartel" and a "hub-and-spoke conspiracy." *See, e.g.*, *id.* ¶¶ 180, 205-06, 257. In reality, Plaintiffs only seriously attempt to allege the latter.

13

A "horizontal cartel" requires an alleged agreement solely between a group of horizontal competitors. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) (horizontal restraints are "imposed by agreement between competitors" while vertical restraints occur "by agreement between firms at different levels of distribution"); *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1402-03 (7th Cir. 1992) (same). But the CAC affirmatively alleges that Rouse and the Rental Company Defendants are *not* horizontal competitors. CAC ¶¶ 25-27, 28-48, 54 (alleging that Rouse provides data analytics services and the Rental Company Defendants rent construction equipment); *see Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1084 (9th Cir. 2025) ("*Gibson III*") (provider of revenue management software was not horizontal competitor with hotel clients). Moreover, even if Rouse was excluded from the alleged conspiracy, Plaintiffs fail to allege a single communication between any of the Rental Company Defendants about anything, much less that they all entered into a price-fixing agreement. *See supra* Section II.F; *infra* Section IV.B.1.

Plaintiffs obfuscate whether they are relying on an invitation-and-acceptance theory to allege a Section 1 violation, but this theory fails in any event. To the extent the allegations that Rouse "invited" clients to submit their data to Rouse and "explicitly invited" collective action to raise prices, CAC ¶¶ 123, 125, were intended to invoke this theory, they are lacking. In the paradigmatic invitation-and-acceptance case, *Interstate Circuit v. United States*, 306 U.S. 208 (1939), a movie theatre company sent (a) the same letter, (b) on the same day, (c) to eight film distribution companies that were all explicitly named in the letter as recipients, (d) asking them to impose minimum prices. 306 U.S. at 215-17, 222-23. Here, the only "invitation" is that Rouse provided RRI subscriptions over the course of many years, CAC ¶ 125, and asked customers to provide their data, *id.* ¶ 123, so that Rouse, a third-party, could use that data to create anonymized,

aggregated, and historical market benchmarks, *supra* Section II.B. *See In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-cv-06715, 2025 WL 3485693, at *5 (N.D. Ill. Dec. 4, 2025) (invitation-and-acceptance theory failed where plaintiffs only alleged provision of competitive information to data provider and did not allege acceptance of an invitation to charge certain prices, or that the defendants "communicated among themselves"). Plaintiffs never allege that Rouse invited the Rental Company Defendants to charge the same prices or to price within any suggested range, and the CAC evidences the opposite: RRI users can and do charge any price they wish—whether within the benchmark range, above it, or below it. *See supra* Section II.E.

In sum, notwithstanding Plaintiffs' cursory assertions, the proper way to construe Plaintiffs' allegations of a *per se* unlawful price-fixing conspiracy is under a "hub-and-spoke" theory, where Rouse is the supposed "hub" and the Rental Company Defendants are the supposed "spokes." *See Kraft Foods Glob., Inc. v. United Egg Prods., Inc*., No. 11-cv-8808, 2023 WL 6065308, at *11-12 (N.D. Ill. Sept. 18, 2023) (in a hub-and-spoke agreement, "a core conspirator" (the "hub") directs "the functions of the conspiracy" with each spoke, while an "agreement to further a single design or purpose" (the "rim") connects the spokes); *see also* CAC ¶¶ 161, 166, 180-90 (alleging a mixture of horizontal agreements (*i.e.*, supposed agreements between the Rental Company Defendants) and vertical agreements (*i.e.*, licensing agreements between the Rental Company Defendants and Rouse)). This theory fails for the many reasons discussed *infra*.

### B. Plaintiffs Have Not Plausibly Alleged a *Per Se* Unlawful Hub-and-Spoke Conspiracy in Count 1.

To plead a hub-and spoke conspiracy, Plaintiffs must allege "that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir.

2020). This latter requirement is typically referred to as the "rim agreement." The CAC fails to allege any direct or circumstantial evidence suggesting that the Rental Company Defendants ever reached a rim agreement among themselves to fix prices for construction equipment rentals (or to do anything else), and also fails to plausibly allege that Rouse operated as a hub to facilitate price-fixing. *See Segal v. Amadeus IT Grp., S.A.*, No. 24-CV-1783, 2025 WL 963751, at *5 (N.D. Ill. Mar. 31, 2025) (no hub-and-spoke conspiracy without "any allegations that the hotel defendants, the 'spokes,' made agreements with one another sufficient to form a 'rim'"); *In re FICO Antitrust Litig. Related Cases*, No. 1:20-CV-02114, 2023 WL 6388247, at *7 (N.D. Ill. Sept. 28, 2023) (no hub-and-spoke conspiracy where plaintiffs did not make direct allegations of a rim and their circumstantial evidence failed to suggest coordinated action). Plaintiffs' hub-and spoke conspiracy theory fails for the many reasons discussed below.

    1.    <u>Plaintiffs Have Not Plausibly Alleged a "Rim Agreement" to Fix Prices</u>.

        *a.    Plaintiffs Fail To Allege Direct Evidence of a Rim Agreement.*

Direct evidence of an agreement must be explicit and require no inferential step—it must be "tantamount to an acknowledgment of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661-62 (7th Cir. 2002); *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014). Examples include an explicit admission that competitors agreed on prices, a memorandum memorializing collusive terms, or a recorded telephone call on which competitors fixed prices. *See, e.g.*, *Text Messaging*, 630 F.3d at 628 (employee admission); *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (recorded phone call); *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007) (memorandum detailing collusive meeting). Plaintiffs do not come close to alleging such facts.

*First*, Plaintiffs argue the contracts between Rouse and each Rental Company Defendant are direct evidence of price-fixing. CAC ¶¶ 161-66. But Rouse's individual subscription contracts

for RRI cannot possibly be evidence of a price-fixing agreement *among* the Rental Company Defendants. *See Gibson III*, 148 F.4th at 1082-84 (licensing agreements between software provider and individual hotels were "ordinary sales contract[s]" that do "not restrain trade"); *In re Amazon.com, Inc. eBook Antitrust Litig.*, No. 21-cv-00351 (GHW) (VF), 2023 WL 6006525, at *21 (S.D.N.Y. July 31, 2023) (agreements with platform are not direct evidence of horizontal conspiracy); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326-28 (3d Cir. 2010) (common dealings with intermediary were insufficient to show agreement). Moreover, the substance of Rouse's contracts expressly contradicts Plaintiffs' assertions of price-fixing because those contracts prohibit customers from sharing RRI data with each other, and instruct customers to make their own independent decisions about whether and how to use aggregated, anonymized, and historical data that they separately receive from Rouse. *See supra* Sections II.B-F.

*Second*, the generalized communications Plaintiffs cite are not admissions of collusion. Those statements are merely: Rouse's marketing of RRI's features and benefits, CAC ¶¶ 168-70; Rouse's attendance at industry events, *id.* ¶ 171; and some Rental Company Defendants' descriptions of the marketplace and acknowledgments that they find RRI helpful, *id.* ¶¶ 165, 173-77. None of these statements is an admission, or even a suggestion, that the Rental Company Defendants ever communicated with each other, much less reached an agreement to fix prices.

> b. *Plaintiffs Fail to Allege Circumstantial Evidence of a Rim Agreement.*

Lacking direct evidence, Plaintiffs must plead parallel conduct and "plus factors" that place the alleged parallel pricing in a context that suggests an improper agreement rather than independent decision-making. *Twombly*, 550 U.S. at 556-57; *Mkt. Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1172 (7th Cir. 1990); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193-98 (9th Cir. 2015). Plaintiffs fail to satisfy these requirements.

17

i.        <u>Plaintiffs Fail to Allege Parallel Conduct</u>.

Parallel conduct requires non-conclusory factual allegations that competitors acted similarly or in lockstep in a way probative of agreement—for example, uniform pricing, coordinated price announcements, or synchronized changes in pricing rules. *See, e.g.*, *Gibson v. Cendyn Grp., LLC*, No. 2:23-cv-00140-MMD-DJA, 2024 WL 2060260, at *3 (D. Nev. May 8, 2024) ("*Gibson II*") (no allegations that defendants "all agreed to charge the same prices"); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Litig.*, No. 4:18-cv-2518-JSW-KAW, 2020 WL 8459279, at *5 (N.D. Cal. Nov. 24, 2020) (parallel conduct requires allegations that defendants "undertook some action simultaneously"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (requiring allegations of "unusual, lockstep pricing behavior"). Plaintiffs allege two trends that purportedly constitute parallel conduct: "[t]he rapid, industry-wide adoption of Rouse" and an "abrupt shift in pricing behavior and market outcomes." CAC ¶ 185. Even if those allegations were true, neither constitutes parallel conduct.

*First*, common adoption of a new industry technology or vendor is not parallel conduct sufficient to allege a price-fixing conspiracy. Courts reject an inference of conspiracy from independent adoption of the same commercial tool. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 674 (N.D. Ill. 2023) ("[N]ot even Plaintiffs argue that participating in [a benchmarking service] alone is sufficient to establish an intent to conspire."); *Cornish-Adebiyi v. Caesars Ent., Inc.*, No. 1:23-CV-02536-KMW-EAP, 2024 WL 4356188, at *5-7 (D.N.J. Sept. 30, 2024) (common adoption of pricing software insufficient); *Segal*, 2025 WL 963751, at *5-7 (granting dismissal where plaintiffs alleged that hotel operators used a common hotel occupancy data platform without "any basis to conclude" that defendants coordinated among themselves to use that software). As the Ninth Circuit recently held, antitrust law does not require "businesses

to decline to take advantage of a service because its competitors already use that service," and obtaining information from a common source "does not reduce the incentive to compete." *Gibson III*, 148 F.4th at 1083-84. There are obvious commercial reasons why firms would independently choose to use RRI absent an unlawful agreement. For example, one of RRI's core functions is to organize and display a customer's own data and benchmarks on a "dashboard" in a user-friendly format—a function that is plainly in each Defendant's self-interest to utilize. *See* CAC ¶¶ 102-03, Figs. 5 & 6. And Plaintiffs concede that Rouse was uniquely situated to provide the first and most trusted benchmarking service for construction equipment rentals. *See id*. ¶¶ 64, 67.

Moreover, Plaintiffs' attempt to cast the supposedly "rapid" adoption of RRI as evidence of parallel conduct is undermined by their own allegations showing staggered adoption over a 14-year period: three customers in 2011; roughly forty by 2015; and "over 400" by 2024. *See id.* ¶¶ 10, 70, 117, 185. That arc is irreconcilable with a preexisting agreement. *See Musical Instruments*, 798 F.3d at 1195-96 ("[S]low adoption of similar policies does not raise the specter of collusion."); *Gibson II*, 2024 WL 2060260, at *4 (no "specter of collusion" where hotels began licensing software "at different times over an approximately 10-year period").

*Second*, Plaintiffs' allegations that the Rental Company Defendants changed their pricing methodology to eliminate discounts and implement parallel rate increases, CAC ¶¶ 186-88, are at odds with other facts alleged in the CAC, which demonstrate that the Rental Company Defendants compete vigorously on price. As is clear from the CAC, there is not a discrete "RRI Price." Instead, the Rental Company Defendants offer a wide range of competing prices for the same rental equipment. *Id.* ¶¶ 98-99. Figures 3 through 8 of the CAC show that Rouse customers price equipment both above and below the RRI benchmark range, and that discounting occurs frequently. *Id.* ¶¶ 99, 102-04, 106. That is the antithesis of parallel pricing.

19

Plaintiffs do not even allege that the Rental Company Defendants adopted common pricing strategies, or used RRI in a coordinated manner. *See Gibson II*, 2024 WL 2060260, at *7 (noting that plaintiffs did "not allege that [the] [d]efendants" used the software in the same way because some hotels "accepted the pricing recommendations sometimes" while others "overr[o]de pricing recommendations"). And while Plaintiffs claim without facts that the Rental Company Defendants adopted the "RRI Price" 90% of the time, that merely refers to an incredibly broad benchmark range of prices that encompasses every transaction rate between the bottom and top quartiles. The CAC's cited examples reflect a wide dispersion of prices: prices span $1,250 to $3,415 dollars in one example, CAC ¶ 99, Fig. 3, and $1,900 to $4,661 in another, *id.* ¶ 104, Fig. 7—indicating that some customers are paying $2,761, or **245%**, more per month than other customers for the same type of equipment. Plaintiffs' examples also reflect many transactions above and below Rouse's benchmark range. *E.g.*, *id.* ¶ 99 & Figs. 3-4; *id.* ¶ 104 & Fig. 7. This price variation is inconsistent with an agreement among the Rental Company Defendants to fix prices. *Manufactured Home*, 2025 WL 3485693, at *13 (plaintiffs did not plausibly plead a conspiracy where there was significant variation in rent increases). At a minimum, the 14-year timespan between when Plaintiffs allege that United first subscribed to Rouse's product in 2011 and Rouse's addition of hundreds of users over the course of the next decade, makes it very unlikely that the Rental Company Defendants entered an agreement. CAC ¶¶ 72, 129; *Hansen*, 2025 WL 2731378, at *9.

In short, Plaintiffs allege staggered adoption and independent use of RRI over a 14-year period and price variation that can best be described as extreme. That is not parallel conduct.

ii. <u>Plaintiffs Fail to Allege "Plus Factors" Implying Conspiratorial Conduct</u>.

"[W]ithout plausible allegations of parallel conduct, Plaintiffs' alleged plus factors are not relevant." *Gibson v. MGM Resorts Int'l*, No. 2:23-cv-00140-MMD-DJA, 2023 WL 7025996, at

*4 (D. Nev. Oct. 24, 2023) ("*Gibson I*"). Even if the CAC plausibly alleged parallel conduct, the plus factors alleged in the CAC fail to suggest that Defendants' actions were "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194.

**Actions Against Self-Interest.** Whether Defendants took action against their "independent self-interest absent an agreement is generally considered the most important 'plus factor.'" *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 596 (S.D. Tex. 2022) (citation omitted), *aff'd*, No. 22-20149, 2025 WL 832801 (5th Cir. Mar. 17, 2025).

*First*, contrary to Plaintiffs' conclusory assertions, the Rental Company Defendants do not share their competitively sensitive data with one another through Rouse. As explained, the facts pled in the CAC illustrate that Rouse returns aggregated, anonymized, and historical information, not competitor-specific transactional data. Courts consistently acknowledge that benchmarking against aggregated market information is rational and procompetitive. *See, e.g.*, *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582-83 (1925) ("gathering and dissemination" of market-level data leads to efficiency and transparency); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (information exchanges can increase efficiency and competition); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) (distribution of "aggregate statistics" "served the legitimate purpose of informing members of worldwide citric acid conditions").

*Second*, Plaintiffs' assertions relating to Defendants' supposed refusal to offer discounts or concessions, even when demand and utilization allegedly declined, also fail. The facts pled in the CAC show that the Rental Company Defendants offer a wide range of competing prices for the same rental equipment. Plaintiffs accuse Defendants of desiring "pricing discipline" or higher prices, but courts hold that a profit motive is universal and consistent with lawful interdependence.

*See Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 717-19 (N.D. Ohio 2025).

*Finally*, Plaintiffs' assertion that the Rental Company Defendants delegated pricing authority to Rouse lacks any factual basis, and is directly contradicted by other allegations in the CAC demonstrating that the Rental Company Defendants retain full pricing autonomy, which they used to compete with one another on prices.

***Market Structure.*** Plaintiffs allege that the market structure for construction equipment rentals is a plus factor because it is allegedly susceptible to collusion. CAC ¶¶ 196-204. Plaintiffs' market structure allegations "are simply descriptions of the market, not allegations of anything that the defendants did" and cannot, on their own, "give rise to an inference of an unlawful agreement." *Erie Cnty., Ohio*, 702 F.3d at 870; *see also Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018) ("[I]ndustry structure alone cannot get [a] complaint across the finish line."). In addition, several of the purported market characteristics are inconsistent with facts alleged in the CAC. For example, Plaintiffs allege the market is concentrated and has high barriers to entry, CAC ¶¶ 197, 200, but acknowledge that EquipmentShare began operations in 2015—years after the alleged conspiracy began—and yet it is the "fastest growing equipment solutions provider" in the country, *id.* ¶ 47. Plaintiffs also recognize the large number of firms that rent out construction equipment—just counting RRI subscribers, which account for only 60% of the industry according to Plaintiffs, there are more than 400 such companies in the United States. *Id.* ¶¶ 200, 220.

***Trade Associations.*** Plaintiffs make a weak attempt to suggest that Defendants' attendance at trade shows and industry conferences constitutes a plus-factor. *E.g.*, *id.* ¶¶ 71, 81, 203. Plaintiffs never allege that the Rental Company Defendants communicated with each other

at such events about RRI or rental rates, much less that they reached an agreement before, during or after these events. Trade shows and industry conferences are present "in virtually every industry," and thus "fail to move the needle." *Washington Cnty. Health Care Auth., Inc.*, 328 F. Supp. 3d at 843.

      ***Government Interest.*** Plaintiffs advert to antitrust enforcement agencies' concerns about information exchanges as a plus-factor. CAC ¶¶ 191-95. Generalized interest regarding technology that is prevalent across many industries is not indicative of whether the specific conduct alleged supports a conspiracy. Further, governmental concerns with algorithmic pricing programs that allegedly mandate specific prices to maximize profit, *see id.* ¶¶ 194-95, are a far cry from Rouse's reporting of aggregated and anonymous industry metrics that customers can use or ignore as they please.

      2.    <u>Plaintiffs Have Not Plausibly Alleged That Rouse Operates as a "Hub" for Price-Fixing</u>.

      Courts reject allegations that an entity acted as a "hub" for price-fixing where there are no facts suggesting the entity assumed pricing authority on behalf of the alleged spokes or assisted the alleged spokes in enforcing a price-fixing agreement. *E.g.*, *Gibson II*, 2024 WL 2060260, at *5-6 (rejecting delegation theory where hotels were "not required to and often did not accept" recommendations); *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2022 WL 3716202, at *7 (N.D. Ill. Aug. 29, 2022) (hub allegations failed because plaintiffs did not plausibly allege that the hub channeled deanonymized data between spokes).

      Here, the CAC does not allege that Rouse recommended, set, or enforced any prices such that the Rental Company Defendants could be said to have delegated pricing authority to Rouse. Rouse's pricing outputs are anonymized, aggregated, and time-lagged benchmark information that comes in broad ranges; Rouse does not report specific prices, much less recommend them to or set

23

them on behalf of its customers. *See supra* Section II.E. Plaintiffs rely on allegations that Rouse uses red and green shading to highlight interquartile price ranges and allows its customers to compare their own performance to Rouse's aggregated metrics. CAC ¶¶ 99, 101-07. Those are not allegations that Rouse exercises any form of pricing authority. *Cf. Gibson II*, 2024 WL 2060260, at *8 (finding defendants retained pricing authority despite user interface systems that allegedly were "set up to encourage customers to accept GuestRev's pricing recommendations").

Nor do Plaintiffs plausibly allege that Rouse helps enforce or coordinate a price-fixing conspiracy among the Rental Company Defendants. Plaintiffs again rely on allegations that RRI allows customers to monitor their *own* performance against industry metrics, CAC ¶¶ 98, 100-05, but do not allege that RRI contains any features allowing customers to monitor their *competitors'* performance, which would be necessary to police adherence to a supposed price-fixing conspiracy. *Loc. TV*, 2022 WL 3716202, at *3-8 (plaintiffs could not plausibly allege that hub "facilitated underlying misconduct as a conduit of communication" where analytics provided were not specific enough to enable spokes to police the alleged conspiracy). On the contrary, Plaintiffs concede that Rouse anonymizes, aggregates, and time-lags all the pricing data RRI provides to prevent customers from learning the behavior of specific competitors. In short, there are no allegations suggesting that Rouse acts as a "hub" for price-fixing, which dooms Plaintiffs' claim of a hub-and-spoke conspiracy.

### 3. Plaintiffs Do Not Allege Any *Per Se* Unlawful Conduct.

At most, the CAC alleges that RRI supplies benchmark information that the Rental Company Defendants may decide to use to gauge their pricing and fleet utilization performance against the construction equipment rental market *generally*—not against individual competitors. *See, e.g.*, CAC ¶¶ 13-15, 79-80, 86, 162, 219. Courts analyze such benchmarking allegations under the rule of reason. *See, e.g.*, *In re Delta Dental Antitrust Litig.*, No. 19 CV 6734, 2025 WL

2696575, at *6 (N.D. Ill. Sept. 22, 2025) (*per se* standard did not apply where Delta Dental merely "provides benchmarks for [companies] to use" when making pricing determinations, not "a list of the rates and prices that [companies] are required to pay"). After all, it is widely accepted that the use of industry benchmarking reports and services can be pro-competitive. *See Maple Flooring*, 268 U.S. at 582-83 (the "gathering and dissemination" of market-level data leads to efficiency and transparency); *Broiler Chicken*, 702 F. Supp. 3d at 674 (rejecting argument that subscribing to a benchmarking service was irrational absent a conspiracy and instead holding that "what is irrational is to refrain from participation in [the benchmarking service] when all your competitors are doing so").

Consistent with the procompetitive aspects of benchmarking, courts in this District and elsewhere have continued to dismiss antitrust complaints based on the provision of aggregated and anonymized benchmarks:

- *Segal*, 2025 WL 963751, at *5: Dismissing hub-and-spoke claim where plaintiff alleged that hotel defendants used a common software provider, without any basis to suggest an agreement among them to use that software as "part of [a] greater arrangement."

- *Portillo*, 2025 WL 2495053, at *5-6: Dismissing hub-and-spoke claim where plaintiffs failed to plead "that either the alleged hub or the alleged spokes are receiving any hotel room pricing information from, or giving any hotel room pricing information to, each other," or that the challenged benchmarking reports made pricing recommendations.

Courts have likewise consistently dismissed purported "algorithmic price-fixing" cases involving revenue management software that, unlike RRI here, allegedly provides price recommendations:

- *Gibson I*, 2023 WL 7025996, at \*5-6:  Dismissing hub-and-spoke claim where plaintiffs alleged that "confidential information is fed in" to algorithms by defendant hotel operators, "but less clearly out," making it implausible that competitors "exchange nonpublic information *with each other* through their use of that same software" (emphasis added).

- *Gibson II*, 2024 WL 2060260, at \*3, \*8, *aff'd*, *Gibson III*, 148 F.4th 1069:  Concluding that it was "too implausible to infer that each Hotel Defendant was signing up for a price fixing conspiracy when it agreed to license and use" a common software service, where plaintiffs failed to allege any direct exchange of confidential information between hotel defendants or that they "were required to accept [the software operator's] pricing recommendations."

- *Dai v. SAS Inst. Inc.*, No. 24-cv-02537-JSW, 2025 WL 2078835, at \*5 (N.D. Cal. July 18, 2025):  Dismissing where plaintiffs failed to allege when hotel defendants began outsourcing pricing decisions to a common software provider or that they made changes to their pricing strategy based on the common usage of that software, and pled "no facts to make it reasonable to infer the competitor pricing is based on non-public information."

- *In re Passenger Vehicle Replacement Tires*, 767 F. Supp. 3d at 716:  Dismissing Section 1 claims based on tire manufacturers' use of common revenue management software and consultancy firm where plaintiffs failed to "offer any explanation of how the exchange of unspecified non-public information could be useful in policing" the alleged conspiracy.

Meanwhile, courts in only three cases have allowed a claim of "algorithmic price-fixing" to survive dismissal—just two under a *per se* theory—and none bears any resemblance to the facts alleged in the CAC.  In *In re MultiPlan Health Ins. Provider Litigation*, the court held that plaintiffs plausibly alleged that health insurance payors agreed to *delegate their price-setting authority* for

out-of-network healthcare to a third party, which in turn used algorithmic tools to set prices for the entire industry. 789 F. Supp. 3d 614, 638 (N.D. Ill. June 3, 2025) (allowing *per se* claim to proceed after crediting allegations that MultiPlan made specific out-of-network healthcare service pricing recommendations that were "akin to mandates" to allegedly conspiring payor defendants).

Similarly, in *Duffy v. Yardi Systems., Inc*., the court allowed *per se* claims to proceed based on allegations that a third-party provider of revenue management software was making specific pricing recommendations to a group of competitors—recommendations to which the competitors "intended to and, for the most part, did adhere." 758 F. Supp. 3d 1283, 1292-94 (W.D. Wash. 2024). A third case, *In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, involved allegations similar to *Yardi*—including that RealPage made specific pricing recommendations to a group of competitors, which they routinely adopted. But even with those allegations, the court rejected the plaintiffs' *per se* antitrust theory, holding that the case should be analyzed under the rule of reason. 709 F. Supp. 3d 478, 510, 517, 520 (M.D. Tenn. 2023) (reasoning that algorithmic pricing recommendations is a form of conduct that has not been "tested or studied by economists to conclusively determine that these types of conspiracies are *per se* anticompetitive").

None of the critical operative facts alleged in *MultiPlan*, *Yardi*, or even *RealPage* are present here. As explained, Plaintiffs do not plausibly allege that the Rental Company Defendants delegated any pricing authority to Rouse. Indeed, Plaintiffs do not and cannot plausibly allege that Rouse provides pricing recommendations, or even that it reports specific prices. Nor do Plaintiffs allege that the Rental Company Defendants routinely adhere to any particular prices gleaned from RRI; instead, they allege that a broad range of prices are charged to rent the same type of construction equipment, across RRI's broad benchmark ranges, and even above and below those ranges.

Finally, Plaintiffs' half-hearted alternative argument that the Court should apply "quick-look" analysis—an abbreviated form of rule of reason analysis—fails for the same reasons.  CAC ¶ 257.  A "quick-look" analysis is appropriate only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999).  When "*per se* liability is unwarranted," like here, defendants "cannot be held liable under the quick look doctrine."  *Texaco*, 547 U.S. at 7 n.3; *see also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc*., 9 F.4th 1102, 1113 n.6 (9th Cir. 2021) ("Because *per se* liability is unwarranted here, the quick-look standard is also inapplicable.") (citation omitted).

## C. Plaintiffs Have Not Plausibly Alleged a Hub-and-Spoke Conspiracy Under the Rule of Reason.

### 1. Plaintiffs' Failure to Plausibly Allege Either a Rim Agreement or a Facilitating Hub Also Dooms Count 1 Under the Rule of Reason.

In addition to their deficient *per se* antitrust theory under Count 1, Plaintiffs "alternatively" allege Count 1 under the rule of reason.  CAC ¶ 257.  But the threshold pleading requirement for a *per se* and rule of reason claim is exactly the same:  Plaintiffs must plausibly allege an unlawful agreement between the Defendants.  *Twombly*, 550 U.S. at 553, 556-57.  For purposes of Count 1, that means Plaintiffs must plausibly allege a "horizontal price-fixing agreement."  As explained above, Plaintiffs have not come close to alleging such an agreement.  This failure dooms Plaintiffs' Count 1 under a rule of reason theory, just as it does under a *per se* theory.  Indeed, courts confronting materially similar allegations have dismissed rule-of-reason hub-and-spoke claims on precisely these grounds.  *E.g.*, *Gibson II*, 2024 WL 2060260, at *5-9; *Dai*, 2025 WL 2078835, at *4-6; *Passenger Vehicle Replacement Tires*, 767 F. Supp. 3d at 742-44.  And as explained below, both of Plaintiffs' rule of reason claims also fail for additional reasons.

2. Plaintiffs Fail to Plausibly Allege a Nationwide Market for Construction Rentals.

To state either of their claims under the rule of reason, Plaintiffs must plausibly define the relevant market in terms of both products and geography. *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017). Without a plausible antitrust market, a factfinder is incapable of assessing whether the plaintiff's allegations amount to an unreasonable restraint on market-wide competition. *Leegin*, 551 U.S. at 885. Accordingly, "failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim." *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015); *accord Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 979 (N.D. Cal. 2020).

In an antitrust case, the relevant geographic market is the area within which "buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (citation omitted); *see also In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) ("Outlining a geographic market entails mapping an area within which . . . customers . . . can practicably turn to alternative suppliers if the defendant were to raise its prices or restrict its output.") (citation omitted). Thus, if buyers in one geographic area could not reasonably purchase from suppliers located in a second geographic area, the two areas are not part of the same relevant market. *See, e.g.*, *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (noting a "properly defined" geographic market "excludes other potential suppliers . . . whose product is . . . too far away" to be a reasonable substitute for consumers (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (4th ed. 2019))); *see also United States v. Conn.*

29

*Nat'l Bank*, 418 U.S. 656, 668 (1974) (the geographic market "must be delineated in a way that takes into account the local nature of the demand").

Accordingly, courts in this District and elsewhere have dismissed antitrust complaints when they allege overbroad geographic markets that fail to account for customers' localized demand for the products in question. *See, e.g., Manufactured Home*, 2025 WL 3485693, at *15 ("[I]n order for there to be a national market, in the event that a [mobile home] renter in one state was priced out of a community, that renter would consider renting [a mobile home] anywhere in the country as a substitute. The Court agrees that this is implausible."); *RealPage*, 709 F. Supp. 3d at 529 (dismissing student housing complaint and finding that plaintiffs' proposed geographic market "confounds" the reality that students "need to live near the school campus").

Here, Plaintiffs' proposed geographic market is similarly implausible. Plaintiffs assert that the geographic market for construction equipment rentals is the entire United States. CAC ¶ 219. But Plaintiffs do not explain how it is plausible that builders of "homes, commercial centers, and public infrastructure" can practicably source the "medium-to-large machinery" they need from anywhere in the country, including places that are hundreds or even thousands of miles away from their jobsites. *Id.* ¶ 3 (alleging that the equipment at issue includes "aerial work platforms, forklifts, telehandlers, trailers, dozers, excavators, skid steers, compaction machines, lighting towers, generators, backhoes, and loaders"); *see In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2016 WL 3567059, at *6 (E.D. La. July 1, 2016) (rejecting nationwide geographic market and holding that "it makes sense that bulky items like pool equipment would entail transportation costs that significantly limit the distances over which dealers would be willing to pay shipping costs").

Instead, Plaintiffs try to sidestep the standard for defining a geographic market focusing exclusively on where *sellers* of construction equipment rentals operate. Specifically, Plaintiffs allege that the operations of certain Rental Company Defendants have a "national scope" and that Rouse provides them with national benchmarks in addition to regional and local benchmarks. CAC ¶¶ 219-25. But these allegations about seller-side behavior are irrelevant to defining a geographic market. *See U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x 305, 311 (3d Cir. 2010) ("[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product. The evidence of the geographic market presented by the party claiming a Section 1 violation must therefore speak to *buyer behavior*.") (cleaned up and emphasis added).

If anything, Plaintiffs undermine their own market definition by underscoring "the local nature of the demand" for construction equipment rentals. *Conn. Nat'l Bank*, 418 U.S. at 668. Plaintiffs allege that certain Rental Company Defendants make strategic decisions about where to store their inventory "across regions to match demand." CAC ¶¶ 222-23. But this does not show that renters of construction equipment can practicably shop nationwide for construction equipment rentals. It shows the opposite: that demand is regional, and therefore sellers must make region-specific decisions about where to amass inventory. Indeed, Plaintiffs reference a purported "New Orleans-Baton Rouge market." *Id.* ¶ 137.

Because Plaintiffs fail to plausibly define a relevant geographic market, both of Plaintiffs' rule of reason claims—the alternative rule of reason claim under Count 1, *id.* ¶ 257, and Count 2 in its entirety—must be dismissed.

> 3. <u>Plaintiffs Fail to Plausibly Allege Anticompetitive Effects in the Relevant Market</u>.

In addition to a plausible relevant market, the rule of reason requires Plaintiffs to plausibly

31

allege direct or indirect evidence of anticompetitive effects throughout the alleged market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). Plaintiffs allege neither.

> a. *Plaintiffs Fail to Plausibly Allege Direct Evidence of Anticompetitive Effects.*

Plaintiffs fail to allege any direct evidence of anticompetitive effects in any alleged relevant market—evidence of "reduced output, increased prices, or decreased quality in the relevant market" "caused" by the allegedly anticompetitive conduct. *Id.* Plaintiffs offer no such evidence. Instead, Plaintiffs claim that "[s]ince the adoption of Rouse's platform, rental rates for Construction Equipment have risen persistently and in lockstep, even during periods of declining utilization." CAC ¶ 227. Plaintiffs themselves contradict that allegation, and it is insufficient in any event. The Federal Reserve Producer Price Index that Plaintiffs invoke suggests that prices were flat (at points even declining) prior to January 2022, *id.* ¶ 145, Fig. 14, undermining any inference that purported increases post-dating January 2022 were attributable to a conspiracy that supposedly began a decade earlier.[5] But even if average prices increased over the 14-year period, Plaintiffs do not allege that those prices were "above a competitive level." *Am. Express Co.*, 585 U.S. at 549 (courts "infer competitive injury" only if prices are "above a competitive level"); *see also 1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 118 (2d Cir. 2021) ("When an antitrust plaintiff advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented.").

---

[5] Moreover, Plaintiffs' assertion that "rental prices climbed sharply year over year" between 2021 and 2024, *see* CAC ¶ 152, is contradicted by the Federal Reserve Producer Price Index, which shows flat or declining prices from 2023 through 2024, and ignores obvious alternative explanations for alleged post-2021 price increases: COVID-related supply shocks and recent, record-high U.S. inflation. *See 42nd Parallel N. v. E St. Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) ("In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality.") (citation omitted).

Plaintiffs also fail to provide any means of assessing whether prices are supracompetitive. For instance, Plaintiffs do not provide a before-and-after analysis of the market. *See Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 557 (7th Cir. 1980) ("The . . . test of anticompetitive effects . . . consider[s] the . . . [business's] condition before and after the restraint was imposed[.]"). Nor do Plaintiffs allege or provide any data that would suggest that the Rental Company Defendants charge supracompetitive prices as compared to companies that do not subscribe to RRI. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (the mere "occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing"); *Musical Instruments*, 798 F.3d at 1197 (allegations that prices rose while sales dropped were insufficient because plaintiffs relied on "average retail price of *all* guitars and guitar amplifiers sold" rather than "the average retail price of guitars and amplifiers manufactured *by defendants*" and thus failed to "allege any facts connecting the purported price increase to an illegal agreement among competitors") (original emphases).

> b. *Plaintiffs Fail to Plausibly Allege Indirect Evidence of Anticompetitive Effects.*

Plaintiffs also fail to allege indirect evidence of anticompetitive effects. Indirect evidence requires, at a minimum, factual allegations of "a predominant share of the market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464-65 (1992); *see also Am. Express Co.*, 585 U.S. at 542 ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition."); *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022) (defining "market power" as "the power to control prices or exclude competition"). Because Plaintiffs fail to plausibly define a relevant market to begin with, they necessarily cannot allege indirect evidence of anticompetitive effects in the relevant market. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1315-16 (10th Cir. 2017)

("[E]ven if [plaintiff] had established a relevant market . . . it has not shown Defendants possessed market power *there*.") (emphasis added); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) ("To allege market power circumstantially, the plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share *of that market* . . . ") (emphasis added).

> ### D. Plaintiffs Have Not Plausibly Alleged an Information Exchange Conspiracy Under the Rule of Reason in Count 2.

Plaintiffs assert as Count 2 a rule of reason claim based on an alleged "information sharing agreement." CAC ¶¶ 261-70. Yet information exchanges, including industry benchmarking, are often procompetitive and have the potential to "increase economic efficiency and render markets more, rather than less, competitive." *Gypsum*, 438 U.S. at 441 n.16; *see also Citric Acid*, 191 F.3d at 1098 (distribution of "aggregate statistics . . . served the legitimate purpose of informing members of worldwide citric acid conditions" and was "wholly legal"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2111 (2025) ("Industrywide provision and dissemination of information about price and output is often important to individual firm planning.").

To plead a viable claim that an information exchange is unlawful under the rule of reason, Plaintiffs must plausibly define a relevant market and plausibly allege an exercise of market power within that market. Thus, Count 2 fails for the same reasons discussed in Section IV.C above. In addition, Count 2 fails because Plaintiffs have not alleged: (1) that the Rental Company Defendants share price information with one another, either directly or through RRI, much less that they have an agreement to do so; or (2) the additional elements required to show anticompetitive effects in "information exchange" claims.

> ### 1. Plaintiffs Have Not Plausibly Alleged an Information Exchange Agreement Between the Rental Company Defendants.

Plaintiffs allege a three-pronged unlawful information exchange agreement: "Rental

Company Defendants agreed [1] that each would share its current transactional data with Rouse on a nightly or near-real-time basis, [2] that Rouse would aggregate and redistribute that data to participants, and [3] that each would use the resulting analytics to guide its pricing and utilization decisions." CAC ¶ 266. The alleged information exchange agreement mirrors Plaintiffs' allegations of an unlawful price-fixing agreement. *See id.* ¶ 162 (asserting direct evidence of a three-pronged agreement to transmit data to Rouse, receive RRI benchmarks from Rouse, and use that data to guide their decisions). As with their price-fixing claim, Plaintiffs fail to plausibly allege an agreement here.

As an initial matter, Plaintiffs do not "explicitly say that one [Rental Company Defendant] ever receives confidential information belonging to another [Rental Company Defendant]." *Gibson I*, 2023 WL 7025996, at *5. Plaintiffs only allege that each Rental Company Defendant shares its data with Rouse, which aggregates and anonymizes that data before providing generalized benchmarking information. CAC ¶¶ 13, 78-80, 82, 109, 130, 146, 168; *supra* Sections II.B-C (discussing RRI's built-in protections that protect anonymity and preclude disclosure of confidential information). Like the plaintiffs in *Gibson I*, Plaintiffs only allege that "confidential information is fed in, but less clearly out" of RRI. 2023 WL 7025996, at *5. Conflating RRI's inputs with its outputs does not state a claim. *See Portillo*, 2025 WL 2495053, at *5 (recognizing distinction between "input from the defendant hotel operators to STR [benchmarking company]" and "output from STR back to the defendant hotel operators via STR's benchmarking reports" in dismissing complaint).

Furthermore, the allegation that each Rental Company Defendant agreed to "*use the resulting analytics to guide its pricing and utilization decisions*" is utterly unsupported. CAC ¶ 266 (emphasis added). According to Plaintiffs' own allegations, RRI customers—including the

Rental Company Defendants—can and do rent the same type of construction equipment across wide benchmark ranges, as well as above and below those ranges. *Supra* Section II.E. The Rental Company Defendants' contracts with Rouse contain no requirement that they use RRI benchmark information in a particular way, and instead affirmatively disclaim that such information constitutes a recommendation to undertake any course of conduct. *See supra* Section II.F. And Plaintiffs allege no communications among the Rental Company Defendants from which an information exchange agreement could be inferred. *Supra id.* The CAC provides no support for the assertion that each Rental Company Defendant subscribed to RRI as part of an agreement to exchange information, as opposed to making a unilateral business decision to obtain aggregated and anonymized benchmarking information that could factor into its own, independent pricing decisions. *Cf. Broiler Chicken*, 702 F. Supp. 3d at 674-65 ("[W]hat is irrational is to refrain from participation in Agri Stats when all your competitors are doing so.").

2.  Plaintiffs' Information Exchange Claim Also Fails Because Plaintiffs Have Not Alleged a Plausible Nationwide Geographic Market.

For the same reasons discussed in Section IV.C.2 above, Plaintiffs fail to allege a plausible relevant geographic market, which is necessary to allege harm to competition from a Section 1 information exchange violation. *See Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, No. 19 C 8318, 2020 WL 6134982, at *5 (N.D. Ill. Oct. 19, 2020) ("The rule of reason also requires Plaintiffs to plead that the [information] exchange had an anti-competitive effect on a given market in a given geographical area.").

3.  Plaintiffs Fail to Allege Anticompetitive Effects in Support of Their Information Exchange Theory.

Finally, the CAC fails to plausibly allege that any information exchange agreement had anticompetitive effects, *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *Gypsum*, 438 U.S. at 441 n.16), either through direct or indirect evidence, as discussed in Section IV.C.3.

Plaintiffs fail under the "well-established criteria" that courts apply in information exchange claims to assess the information exchanged. *Id.* at 211.

The first factor is the "time frame of the data," with time-lagged price data being preferred to current price data, and with future price data being the most concerning. *Id.* Here, RRI only provides benchmark information based on time-lagged price data—specifically, price data that is at least 90 days old. CAC ¶ 83. Other price information provided by RRI, such as "trendline" information, is based on historical data that is even older, going back 10 years. *Supra* Section II.C.

The second factor is the "specificity of the information" exchanged. *Todd*, 275 F.3d at 212. Dissemination of information that would "identify particular parties, transactions, and prices" is seen as potentially anticompetitive. *Id.* Dissemination of "*aggregated* information which 'avoids transactional specificity'" on the other hand, is not. *Loc. TV*, 2022 WL 3716202, at *3 (original emphasis) (citing *Todd*, 275 F.3d at 212). Numerous courts have held that "data exchanged in the form of industry averages" avoids the specificity that can give rise to antitrust concerns. *Id.* at *3; *see also Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709, 720 (7th Cir. 2011) (sharing "only . . . generalized and averaged high-level pricing data" was not alone "demonstrative of anticompetitive behavior"); *Broiler Chicken*, 702 F. Supp. 3d at 679 (exchanging data showing "difference between [a subscriber's] net price for the reported product and the industry average net price" could not establish anticompetitive effects). Here, Plaintiffs allege nothing more than the type of information exchange that courts have consistently blessed. Rouse safeguards the anonymity of its customers' data, including through aggregation and anonymization. *Supra* Section II.B. The CAC "lacks any well-pled allegation that this practice secretly served to channel Defendant Company A's . . . data to Defendant Company B." *Loc. TV*, 2022 WL 3716202, at *7.

Where information is aggregated and anonymized, as it is in RRI, there must be "concrete" allegations that defendants compromised the "ostensible anonymity" of that information in order to allege anticompetitive effects. *Id.* at *6. For instance, allegations that a data provider "anonymized its market reports in only the most superficial fashion, which effectively enabled the co-conspirators to 'decipher the data pertaining to each producer'" could meet that threshold. *Id.* at *5 (citing *Olean*, 2020 WL 6134982, at *1, *6). Similarly, public concessions that market reports were "so detailed that the ostensible anonymity of the information [was] breached, and [defendants] were able to use [them] to communicate their . . . production intentions" have plausibly alleged a violation. *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2019 WL 1003111, at *1-2 (N.D. Ill. Feb. 28, 2019). Here, Plaintiffs' conclusory allegation that aggregation and anonymization somehow do not matter "in this market," CAC ¶ 13, fall far short of this standard. Plaintiffs also speculate that it is possible for a subscriber to "infer" an individual competitor's data from RRI, *id.* ¶ 109, without any explanation of how a Rental Company Defendant might go about that, much less an allegation that any Rental Company Defendant ever even attempted to do so.

### E. Plaintiffs Have Not Plausibly Alleged Tolling of the Statute of Limitations.

Plaintiffs assert that the limitations period for their Sherman Act claims should be tolled (1) under the fraudulent concealment doctrine; (2) because Plaintiffs have alleged a "self-concealing conspiracy"; and (3) because the alleged conspiracy is a "continuing violation." CAC ¶¶ 236-39. Plaintiffs fail to plausibly allege any of these theories, and all of their claims should be dismissed to the extent they seek to challenge conduct beyond the four-year statute of limitations applicable to their claims.

*First,* to plead fraudulent concealment, Plaintiffs must allege that Defendants took "*affirmative steps* after the original wrongdoing to divert attention, mislead, or prevent discovery"

of their alleged misconduct, *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 854 (N.D. Ill. 2010) (emphasis added), which must be pled with particularity under Rule 9(b). *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, 85 F. Supp. 3d 1007, 1012 (E.D. Wis. 2015) (plaintiff must plead "the who, what, when, where, and how of the allegedly fraudulent act"); *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 507 (7th Cir. 1999) (silence is not enough). Here, Plaintiffs do not plead a single affirmative act of fraudulent concealment, much less with particularity. Instead, Plaintiffs contradict their assertions of fraudulent concealment by repeatedly relying on public promotional materials and public statements as supposed evidence of their asserted conspiracy. CAC ¶¶ 8-11, 113-14, 141, 147-48, 153-54.

*Second*, Plaintiffs have not alleged a "self-concealing conspiracy." Plaintiffs' only attempt to articulate such a theory consists of a single sentence of boilerplate. *Id.* ¶ 238. Indeed, this doctrine "is only even arguably proper when deception or concealment is a necessary element of the antitrust violation," which is not true here because "price-fixing is not *by its very nature* concealed." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 123 (4th Cir. 1995) (original emphasis); *accord Baker v. F & F Inv.*, 420 F.2d 1191, 1198-99 (7th Cir. 1970).

*Finally*, Plaintiffs' passing reference to the "continuing violation" doctrine does not extend the limitations period here. "Even in the case of a continuing conspiracy or violation," Plaintiffs are still "limited to damages for the four years immediately preceding the filing of their lawsuit." *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 8292207, at *10 (N.D. Ind. Mar. 18, 2016) (citation omitted).

## V. CONCLUSION

For all of these reasons, Defendants respectfully submit that Plaintiffs' CAC should be dismissed in its entirety.

Dated: January 9, 2026

Respectfully submitted,

By */s/ Michael W. Scarborough*
Michael W. Scarborough (*pro hac vice*)
Dylan I. Ballard (*pro hac vice*)
**VINSON & ELKINS LLP**
555 Mission Street
Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6900
Fax: (415) 651-8786
mscarborough@velaw.com
dballard@velaw.com

Stephen M. Medlock
**VINSON & ELKINS LLP**
2200 Pennsylvania Ave., N.W.
Suite 500 W
Washington, D.C. 20037
Tel: (202) 639-6500
Fax: (202) 639-6604
smedlock@velaw.com

Nicole L. Castle (*pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 237-0000
Fax: (212) 237-0100
ncastle@velaw.com

*Counsel For Defendants*
*RB Global, Inc., Rouse Services, LLC,*
*and Rouse Analytics, LLC*

By */s/ Corey W. Roush*
Corey W. Roush
**SIDLEY AUSTIN LLP**
1501 K Street NW
Washington, DC 20005
Tel.: (202) 736-8624
corey.roush@sidley.com

Tom Paskowitz
Taylor N. Randleman
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, NY 10019
Tel.: (212) 839-5832
tpaskowitz@sidley.com
taylor.randleman@sidley.com

*Counsel for Defendants HERC Holdings Inc., HERC Rentals Inc., and H&E Equipment Services, Inc.*

By */s/ Steven L. Holley*
Steven L. Holley
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Tel.: (212) 558-4000
holleys@sullcrom.com

Adam S. Paris
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Suite 2100
Los Angeles, CA 90067
Tel.: (310) 712-6663
parisa@sullcrom.com

James F. Herbison
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Tel.: (312) 558-5909
jherbiso@winston.com

*Counsel for Defendants United Rentals, Inc. and United Rentals (North America), Inc.*

By */s/ Ryan Phair*
Ryan Phair
Christopher C. Brewer
Michael F. Murray
Terence A. Parker
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
Tel.: (202) 551-1700
ryanphair@paulhastings.com
chrisbrewer@paulhastings.com
michaelmurray@paulhastings.com
terenceparker@paulhastings.com

*Counsel for Defendant Sunbelt Rentals, Inc.*

By */s/  Kenneth M. Kliebard*
Kenneth M. Kliebard
**MORGAN, LEWIS & BOCKIUS LLP**
110 North Wacker Drive, Suite 2800
Chicago, IL 60606-1511
(312) 324-1000
kenneth.kliebard@morganlewis.com

Zachary M. Johns (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103-3007
(215) 963-5000
zachary.johns@morganlewis.com

Rishi P. Satia (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
(415) 442-1000
rishi.satia@morganlewis.com

J. Clayton Everett, Jr. (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 739-3000
clay.everett@morganlewis.com

*Counsel for Defendant*
*EquipmentShare.com Inc.*

By */s/  Matthew M. Martino*
Matthew M. Martino (*pro hac vice*)
Karen Hoffman Lent (*pro hac vice*)
Michael H. Menitove (*pro hac vice*)
Michael A. Lanci (*pro hac vice*)
Elizabeth R. Peled (*pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001-8602
Tel.: 212-735- 2402
matthew.martino@skadden.com
karen.lent@skadden.com
michael.menitove@skadden.com
michael.lanci@skadden.com
elizabeth.peled@skadden.com

Amy L. Van Gelder
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
320 South Canal Street
Chicago, Illinois 60606
Tel.: 312-407-0903
amy.vangelder@skadden.com

*Counsel for Defendant*
*Sunstate Equipment Co., LLC*

By */s/  David C. Kiernan*
David C. Kiernan
**JONES DAY**
555 California Street, 26th Floor
San Francisco, CA 94104
Tel.: (415) 626-3939
dkiernan@jonesday.com

Caroline Van Wagoner
**JONES DAY**
4655 Executive Drive, Suite 1500
San Diego, CA 92121-3134
Tel.: 858-314-1200
cvanwagoner@jonesday.com

Erica E. Duff
**JONES DAY**

110 N. Wacker Dr., Suite 4800
Chicago, IL 60606
Tel.: (312) 269-1511
eduff@jonesday.com

Ronan P. Doherty
Ben W. Thorpe
**BONDURANT MIXSON & ELMORE LLP**
1201 West Peachtree Street NW Suite 3900
Atlanta, GA 30309
T: (404) 881-4100
doherty@bmelaw.com
bthorpe@bmelaw.com

William P. Barnette (admitted pro hac vice)
Peter E. Diaz (admitted pro hac vice)
**KING & SPALDING LLP**
1180 Peachtree St., Suite 1600
Atlanta, GA 30309
Tel: (404) 572-4729
wbarnette@kslaw.com
pdiaz@kslaw.com

*Counsel for Defendant The Home Depot
U.S.A., Inc.*