**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: CONSTRUCTION EQUIPMENT RENTAL ANTITRUST LITIGATION | ) | No. 25 C 3487<br>MDL No. 3152<br><br>Judge Sara L. Ellis |

**OPINION AND ORDER**

This multidistrict litigation arises from an alleged price-fixing conspiracy in the construction equipment rental industry.[1] Plaintiffs Haxton Masonry, Inc., Van Horst General Contractors, LLC, Enterprise Lodging of Huntsville, LLC, IPCS Corporation, AXG Roofing, LLC, and McGinnis Construction Co. allege that Defendants RB Global, Inc. ("RB Global"), its subsidiaries Rouse Analytics LLC and Rouse Services LLC (together, "Rouse"), and the largest construction equipment rental companies in the United States—United Rentals, Inc. and United Rental (North America), Inc. (together, "United Rentals"); Sunbelt Rentals, Inc. ("Sunbelt"); HERC Rentals Inc. and HERC Holdings Inc. (together, "HERC"); H&E Equipment Services, Inc. ("H&E"); Sunstate Equipment Co., LLC ("Sunstate"); The Home Depot U.S.A., Inc. ("Home Depot"); and EquipmentShare.com, Inc. ("EquipmentShare.com") (collectively, the "Rental Company Defendants")—conspired and agreed to fix, raise, and maintain nationwide

---

[1] On August 13, 2025, the Judicial Panel on Multidistrict Litigation transferred any related, pending case to this Court for consolidated pretrial proceedings. Doc. 100.

Construction Equipment[2] rental prices using a shared data and benchmarking platform called Rouse Rental Insights ("RRI"). In the consolidated amended complaint ("CAC"), Plaintiffs assert two Sherman Act § 1 claims on behalf of a proposed class of individuals and entities that rent Construction Equipment from Defendants: Count One alleges an unlawful agreement in restraint of trade, and Count Two alleges an unlawful information-exchange agreement. Defendants jointly moved to dismiss the CAC, raising arguments common to all Defendants, and RB Global, EquipmentShare.com, Home Depot, and Sunstate separately moved to dismiss the CAC. The Court heard oral arguments on the motions on July 28, 2026.

Because Plaintiffs plausibly allege an unlawful agreement in both restraint of trade and information exchange, the Court denies Defendants' joint motion to dismiss. And because Plaintiffs have alleged sufficient facts to put EquipmentShare.com, Home Depot, and Sunstate on notice of Plaintiffs' antitrust claims, the Court denies their individual motions to dismiss. But the Court grants RB Global's motion to dismiss because Plaintiffs have not plausibly alleged any theory of liability to keep RB Global in this lawsuit.

## BACKGROUND[3]

### I. The Parties

Plaintiffs are six contracting and construction-related businesses that operate across Alabama, Arizona, California, Connecticut, Florida, Illinois, Michigan, Nevada, and New York.

---

[2] Plaintiffs define Construction Equipment as "medium-to-large machinery, such as aerial lifts (e.g., boom lifts, scissor lifts, forklifts, and telehandlers), excavators, dozers, skid steers, compaction machines, lighting towers, generators, backhoes, loaders, and others." Doc. 145 ¶ 54.

[3] The Court takes the facts in the background section from the CAC and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

All Plaintiffs regularly rent Construction Equipment directly from the Rental Company Defendants.

RB Global[4] is a publicly traded, Canada-domiciled company with its United States headquarters in Westchester, Illinois. RB Global "provides value-added insights, services, and transaction solutions for buyers and sellers of commercial assets and vehicles worldwide." Doc. 145 ¶ 25. In 2020, RB Global acquired Rouse for $275 million. RB Global wholly owns, controls, and directs Rouse's operations and profits, although RB Global's public filings treat Rouse as a distinct reporting unit. Around the time of the acquisition, RB Global's Chief Executive Officer ("CEO") stated that RB Global and Rouse's combination was "complementary" and would "accelerate both [companies'] growth efforts by providing customers more robust data." *Id.* ¶ 75.

Rouse maintains its headquarters in Beverly Hills, California. RB Global's public filings describe Rouse as the leading provider of construction equipment market intelligence, rental metrics benchmarks, and construction equipment valuations. Rouse operates RRI, which provides "Cat-Class-level comparisons of rental rates, utilization, and other key performance metrics" for Construction Equipment rental companies. *Id.* ¶ 27.

United Rentals maintains its principal place of business in Stamford, Connecticut and is the largest equipment rental company in the world, maintaining over 1,500 retail locations across North America and controlling approximately twenty percent of the Construction Equipment rental market nationwide. United Rentals has acquired multiple rental companies in the last ten years and enjoyed record-setting profits year after year. United Rentals reported $15.345 billion

---

[4] In May 2023, Ritchie Bros. changed its corporate name to RB Global. For purposes of this Opinion, the Court's use of RB Global includes any references to Ritchie Bros.

in total revenue in 2024, a 7.1 percent increase from 2023, and an annual gross profit of $6.15 billion, marking a 5.8 percent increase from 2023.

Sunbelt maintains its principal place of business in Fort Mill, North Carolina and is the second largest equipment rental company in the United States, operating 1,186 locations nationwide. Over the last six years, Sunbelt has acquired approximately 150 equipment rental companies. Sunbelt reported over $9 billion in revenue from its U.S. business in 2024 and values its U.S. fleet at over $15 billion.

HERC maintains its headquarters in Bonita Springs, Florida and has over 450 locations in the United States and Canada. HERC reported over $3 billion in revenue in both 2023 and 2024, and its fleet represents a $7 billion total original equipment cost. As a self-described market consolidator, HERC completed fifty-one acquisitions from September 2020 to September 2024. HERC recently acquired H&E.

H&E, historically one of the largest equipment rental companies in the nation, maintained 160 locations across thirty-one states before its acquisition. In 2023, H&E reported $1.47 billion total revenue, with equipment rentals comprising over half its gross profits. H&E originally intended to merge with United Rentals in early 2025, but the company terminated its agreement with United Rentals and subsequently entered into an agreement with HERC. HERC finalized its acquisition of H&E in June 2025.

Sunstate has its principal place of business in Phoenix, Arizona and is one of the ten largest rental equipment companies in the United States, operating approximately 100 branches in sixteen states. Sunstate similarly has made a series of acquisitions in recent years, consistently growing its profits and revenues.

Home Depot, one of the world's largest home improvement retailers, maintains its headquarters in Atlanta, Georgia and has over 2,300 stores across North America. Home Depot both sells and rents a vast selection of equipment, including Construction Equipment. The company has rapidly grown its Construction Equipment rental business, opening thirty-seven new rental centers in 2023 and consistently ranking in the top five Construction Equipment rental companies by revenue in the United States. In 2024, Home Depot reported an estimated $1.4 billion in rental revenues.[5]

EquipmentShare.com originated in 2015 and has since become the fastest growing equipment solutions provider in the United States. In the last decade, the company has opened over 340 locations, including sixty new locations in 2024. EquipmentShare.com reported $3.9 billion in revenue for the twelve months preceding March 31, 2025, making it the fourth largest construction equipment rental company by revenue in the country. The company's fleet represents a total original equipment cost of $7 billion.

All Rental Company Defendants rent Construction Equipment to Plaintiffs and class members. And in addition to the named Defendants, other major rental companies and individuals (the "Co-Conspirators" and together with the named Defendants, the "Rouse Cartel") utilize RRI.[6]

---

[5] Plaintiffs do not specify whether this number is limited to Construction Equipment rental revenues or includes all rental revenues.

[6] In their individual motions, Home Depot and Sunstate question why Plaintiffs named them as Defendants rather than the hundreds of other RRI users. *See* Doc. 201-1 at 14; Doc. 206-1 at 14. But Plaintiffs state that they named the largest national Construction Equipment rental firms that collectively dominate the market. Doc. 145 ¶ 205. Home Depot is in the top five Construction Equipment rental companies by revenue in the United States, *id.* ¶¶ 44–45, and Sunstate is "among the ten largest rental equipment companies in the United States," *id.* ¶ 42.

## II. The Construction Equipment Rental Industry and Historical Pricing

The Construction Equipment rental industry is a core segment of the U.S. economy, giving contractors, builders, and infrastructure firms access to essential machinery without the capital and maintenance costs of ownership. Historically fragmented and price competitive, local and regional firms competed on price and service. Companies set rental rates unilaterally based on their own costs, experience, utilization goals, and anecdotal knowledge of competitors' pricing gleaned from customers or sales staff. No centralized source of competitive information existed, and prices fluctuated with market cycles.

But over the last twenty years, Construction Equipment rental companies have consolidated. For example, United Rentals has acquired more than three hundred regional competitors since its founding, Sunbelt has completed over one hundred acquisitions since 2015, and HERC and H&E merged in 2025. This consolidation has reduced competition across the industry and created conditions conducive to coordination among the remaining companies.

In 2010, former HERC President Dan Kaplan warned of "poor rate management" and urged the industry to adopt technology to "bring genuine discipline to rate management." *Id.* ¶ 63. Other rental executives also complained that the industry lacked reliable comparative information, making rate management difficult. And trade publications urged rental firms to collectively end a "race to the bottom." *Id.* ¶ 66.

## III. The Rise of RRI

In response to these complaints and urgings, major rental companies—including United Rentals, HERC, and H&E—approached Rouse seeking "an authoritative benchmark that could bring pricing discipline to an otherwise fragmented market." *Id.* ¶ 67. Rouse, then known for its used-equipment valuations and auction benchmarks and trusted as a third-party data

intermediary, partnered with the American Rental Association ("ARA") to launch a rental-benchmarking service in 2011. Rouse's product pooled invoice-level pricing and utilization data from participating companies nightly and returned standardized rate benchmarks. The ARA, crediting Kaplan's comments as inspiration, also introduced standardized "ARA Rental Market Metrics" to define key performance measures such as utilization, fleet age, and dollar utilization. The ARA publicly acknowledged HERC, Sunbelt, and United Rentals as program participants.

Rouse eventually rebranded its service as RRI, providing participants with "Rouse Rates" and "RRI Prices" through integrated dashboards and pricing tools. *Id.* ¶ 73. Essentially, participants upload their competitively sensitive data to Rouse on a nightly basis, and then Rouse uses algorithms to generate benchmark prices, known as RRI Prices, organized by each Construction Equipment category and differing geographies. Rouse then distributes the RRI Prices, expressed as high, medium, and low ranges, back to participants through online dashboards and software integrations that feed directly into participants' quoting and revenue-management systems.

By centralizing competitors' most sensitive data, including every line item of every rental invoice and nightly fleet utilization, equipment turnover, and equipment availability feeds, and then distributing uniform prices and other analytics,[7] Rouse has created a common analytics hub that has harmonized pricing decisions across the industry and eliminated independent rate variation. Participating companies, including the Rental Company Defendants, authorize Rouse to interface directly with their enterprise systems to automatically extract this data. Rouse claims that its analytics only rely on pricing data that is at least ninety days old, but industry participants

[7] According to Rouse's former senior vice president, the information that participants provide to Rouse constitutes "the most commercially sensitive data" rental companies possess, and the former senior vice president also confirmed that Rouse's platform collects nightly data feeds across all participating fleets. *Id.* ¶ 82.

recognize a workaround: a seasonally adjusted trend line that projects current market conditions from the lagged data, effectively neutralizing any delay. And the ninety-day lag does not apply to participants' underlying operational data, including information regarding utilization, fleet turnover, and pricing trends, which participants upload nightly.

Rouse's analytics also support the Rental Company Defendants' fleet management decisions. Rouse's report compares a company's physical utilization against the market benchmark, prompting companies to adjust inventory and capital expenditures to mirror its competitors' actions.

Rouse leveraged the ARA network to expand participation and data coverage.[8] The ARA hosts annual trade shows and other industry networking events that provide regular opportunities for major rental companies, including the Rental Company Defendants, to interact, collaborate, exchange industry intelligence, and coordinate strategic responses to pricing pressures. Rouse regularly presented at ARA trade shows and industry conferences, promoting its analytics hub as the "industry standard" and telling audience members that "competitors around you are using us, so you should use us too." *Id.* ¶ 81. Rouse markets its platform as a tool to "drive higher rates and profitability" and to "train salespeople not to discount," explicitly assuring clients that the company's analytics services will "ensure [their] pricing is in line with [their] competition." *Id.* ¶ 87. And one rental industry publication explained that RRI allows companies to see that "their lowest rates on a high-reach forklift [are] nearly ten percent lower than the lowest rates of any of its competitors in that market," and to "make the adjustments [they] needed." *Id.* ¶ 74.

Rouse emphasizes in its marketing materials that its clients consistently increased rates and profitability after they started using Rouse's product. For example, Rouse reported that its clients' rental rates rose seven percent over 2011, the year of its product's launch. In 2022,

---

[8] Each Rental Company Defendant is an ARA member.

ninety-three percent of respondents to an ARA poll reported raising rates. And as more companies began using Rouse's services after 2011, Construction Equipment rental rates across the United States have risen consistently, even during periods of declining utilization and stable fleet costs. A former equipment manager noted that "[b]etween 2021 and 2023, there were double-digit rate increases almost across the board." *Id.* ¶ 143. The Federal Reserve Economic Data's construction equipment rental and leasing producer price index, which measures changes in revenue by companies that rent and lease Construction Equipment, shows significant price increases over the last six years. Even during industry consolidation, stagnant or declining utilization, and the COVID-19 downturn, Rouse participants "continued to thrive." *Id.* ¶ 151. Some executives have explicitly stated their comfort with maintaining "lower utilization rather than go too low on dollar utilization," something that "wouldn't have happened 15 years ago." *Id.* ¶ 148. This behavior—accepting idle fleets to preserve collectively high rental rates—is typically irrational in a competitive marketplace.

By 2020, almost every leading national rental company had joined Rouse's benchmarking service. And by 2023, over 400 U.S. rental companies participated in Rouse's benchmark program, accounting for almost $20 billion in rental revenue. Those 400 companies account for fifty to sixty percent of North American rental companies.

## IV. The Rental Company Defendants' RRI Use

The Rental Company Defendants use the RRI Price as the primary reference point for setting and adjusting their rental rates nationwide. For example, United Rentals' sales executives access a database pre-populated with Rouse's high, medium, and low RRI Prices. HERC's managers use RRI Prices as its standard operating procedure in daily pricing decisions, using Rouse's data to compare its prices to its competitors' prices. And Sunbelt's sales analytics vice

president stated that the company uses Rouse's services to "understand where [Sunbelt] sit[s] in the marketplace" and "make adjustments" as needed. *Id.* ¶ 94. Companies rarely discount below the RRI Price. In fact, the Rental Company Defendants price within the RRI Price's range approximately ninety percent of the time. The Rental Company Defendants' employees claim that Rouse provides the "market rate" and its services ensure that rental companies price their equipment at that rate. *Id.* ¶ 95.

The Rental Company Defendants' executives have publicly credited Rouse for instilling "pricing discipline" and stabilizing rental rates. *Id.* ¶ 84. In a 2022 earnings call, H&E's CEO stated, "We use a lot of information that's supported by Rouse . . . our pricing is well aligned . . . the amount of discipline we continue to see is very encouraging." *Id.* ¶ 90. HERC's CEO described Rouse as "a key tool that we use to help us price in the marketplace," *id.*, and HERC's Chief Financial Officer ("CFO") attributed "the discipline in the overall marketplace" to the high percentage of "rental companies reporting into Rouse," *id.* ¶ 153. A Sunbelt executive similarly referred to Rouse as a "pricing discipline tool." *Id.* ¶ 90.

**V. RRI Pricing Enforcement and Effects**

Rouse provides multiple tools and oversight mechanisms to ensure pricing adherence. For example, Rouse integrates its product directly with more than forty enterprise software systems used by rental companies, offering "plug-and-play" data feeds that effortlessly synchronize pricing and utilization information. *Id.* ¶ 98. This integration allows the Rental Company Defendants to pre-populate Rouse's benchmark ranges into their internal pricing systems. The system also automatically flags or prevents any rate a salesperson attempts to enter below the Rouse-approved floor. And Rouse's interface uses visual prompts to reinforce pricing compliance, displaying green zones for prices at or above the benchmark and red zones for lower

rates. Rouse additionally reinforces compliance through alerts, dashboards, and individualized performance reports. A rental company using Rouse's product can view various performance dashboards that show where that company is "below the market on rental rates" and clearly categorizes its "discounts." *Id.* ¶¶ 102–04. Rouse generates monthly reports identifying sales employees whose average rates fall below Rouse's analytics and conducts ongoing trainings and meetings with clients—including the Rental Company Defendants—to discuss pricing strategies and train their salespeople "not to listen to customers." *Id.* ¶ 108; *see also id.* ¶¶ 135–38. Finally, because Rouse continuously aggregates participants' sensitive data, it can detect and display discounting, effectively enabling cross-firm monitoring that deters such behavior. Even if Rouse does not identify specific companies by name, other participants can infer the identity of a particular discounter through Rouse's localized data and pressure a return to the benchmark. For example, when EquipmentShare.com first started using Rouse, multiple other Rental Company Defendants complained that EquipmentShare.com brought down prices. Then EquipmentShare.com's pricing quickly fell in line with the Rouse Cartel.

These same mechanisms allow the Rouse Cartel to punish noncompliance. Rouse can terminate access to the RRI benchmark database for companies that withhold data or underreport transactions. Such termination excludes that company from the information flow on which its competitors rely. And Rouse regularly publicizes its subscriber count to signal the breadth of industry participation and pressure non-participants to join.

The Rental Company Defendants also enforce pricing discipline through internal policies and approval systems. For example, United Rentals' policy limits sales representatives' ability to deviate from RRI Prices. United Rentals' sales representatives must obtain multiple managerial approvals to quote below Rouse's low rate, and managers almost always deny these

requests. HERC and Sunbelt have similar policies and approval systems. At HERC, salespeople generally do not have the authority to quote a customer below RRI Prices. And Sunbelt requires its salespeople to adhere to Rouse's benchmarks, using RRI Prices as its pricing guidebook. One Sunbelt employee stated that ninety percent of the company's rentals stay within Rouse's RRI Prices, with most at the high or medium levels. The Rental Company Defendants also use Rouse's individualized performance reports to influence employee's commissions, compensation, and bonuses, often tying commissions and bonuses to adherence with Rouse's targets. In short, the Rental Company Defendants hold employees "accountable for not being above the Rouse rates." *Id.* ¶ 105.

The Rental Company Defendants have experienced record profits. United Rentals' rental revenue rose 9.7 percent from 2023 to 2024. During that same period, Sunbelt's rental revenue grew by 11 percent, and HERC's grew by 12 percent. Before H&E combined with HERC, the company reported a 9.8% rental revenue increase in 2024. EquipmentShare.com's rental revenue grew from $1.09 billion to $1.9 billion, or over 74 percent, in 2023. And Home Depot's rental revenue increased nearly 40 percent between 2020 and 2024.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Sufficiency of Section 1 Allegations

Plaintiffs bring two antitrust claims under § 1 of the Sherman Act. To state a § 1 claim, Plaintiffs must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (alteration in original) (quoting *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)). Stating a § 1 claim requires a complaint to include "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

#### A. Count One: Agreement in Restraint of Trade

In Count One, Plaintiffs allege that Defendants "implemented an anticompetitive scheme to fix, stabilize, and maintain Construction Equipment rental prices at artificially high levels" using Rouse's product. Doc. 145 ¶ 251.

Plausible allegations of an agreement "usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Always Towing*, 2 F.4th at 703 (quoting *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019)). "Where the plaintiffs allege that participants in a market at different levels of the

distribution chain entered into a conspiracy, the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with [the entity at the different distribution level], but also with each other." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 345 (7th Cir. 2022). One way of doing so is to allege a "hub-and-spokes conspiracy," in which the competitors use "a central coordinating party (the 'hub')" to facilitate an agreement among the competitors (the "spokes"). *Id.* Plaintiffs argue their allegations sufficiently plead both a horizontal and a horizontal hub-and-spokes agreement through at least three theories: direct evidence, invitation and acceptance, and circumstantial evidence. But because Plaintiffs pleaded these theories in the alternative, the Court needs only to address one. *See In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 635 (N.D. Ill. 2025) (addressing only two of five alternatively pleaded theories for how the defendants unreasonably restrained trade in violation of the Sherman Act). At oral arguments, the Court asked Plaintiffs which theory best fits their alleged facts. Plaintiffs pointed to their circumstantial evidence theory, and so the Court begins there. *See* Doc. 291 at 55:9–22.

Circumstantial evidence requires allegations of "parallel conduct . . . placed in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. But "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Instead, a plaintiff must identify "plus factors," or "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Greco v. Mallouk*, No. 22 C 2661, 2024 WL 4119169, at *6 (N.D. Ill. Sept. 9, 2024) (citation omitted). Court have recognized "plus factors" to include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm

communications." *Id.* (citation omitted). In reviewing the allegations for a plausible agreement, the Court "views the circumstances as a whole." *In re MultiPlan Health Ins. Provider Litig.*, No. 24 C 6795, 2025 WL 1567835, at *15 (N.D. Ill. June 3, 2025). "If the allegations are as consistent with a wide range of lawful and independent business conduct as they are with an anticompetitive agreement, then the first element of § 1 is not satisfied." *Mirage Wine + Spirit's, Inc. v. Apple Inc.*, No. 23 C 3942, 2025 WL 1896006, at *3 (S.D. Ill. July 9, 2025); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022) ("*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest."). With the legal standard in hand, the Court next considers whether Plaintiffs have sufficiently alleged parallel conduct and plus factors.

**1. Parallel Conduct**

Plaintiffs' allegations of parallel conduct include (1) persistent increases in rental Construction Equipment prices from 2021 onward, and (2) the Rental Company Defendants' rapid adoption and use of RRI. The CAC asserts that Defendants continually increased Construction Equipment rental prices from 2021 to at least early 2025, even during the COVID-19 downturn. Doc. 145 ¶ 151. Plaintiffs specifically allege that the four largest rental companies—United Rentals, Sunbelt, HERC, and H&E—each reported annual rental rate increases between five and ten percent during this period, *id.* ¶ 188, and an industry insider observed "double-digit rate increases almost across the board" between 2021 and 2023, *id.* ¶ 143. The CAC states that these rate increases coincided with the rapid, industry-wide adoption of RRI, *id.* ¶ 185, and record profits for each Rental Company Defendant, *id.* ¶ 150. Plaintiffs also allege that all Rental Company Defendants departed from their individual pricing methodology

to submit competitively sensitive, contemporaneous information to Rouse on a nightly basis, *id.* ¶¶ 79, 82–83, 123, 186, received pricing recommendations based on all RRI participants' information that they incorporated into their quoting systems, *id.* ¶¶ 86–88, and monitored and enforced compliance with the higher RRI Price, despite declining utilization rates, *id.* ¶¶ 90–110, 183, 186. These allegations suffice to plausibly allege parallel conduct. *See Cornish-Adebiyi v. Caesars Ent., Inc.*, 184 F.4th 172, 186 (3d Cir. 2026) ("The alleged contemporaneous use of Cendyn's software and the synchrony of the casino-hotels' alleged upward pricing and downward room occupancy—a large departure from their traditional practice and under economic circumstances that should typically lead to competitive price-cutting—are sufficient to show conscious parallel conduct."); *In re MultiPlan*, 789 F. Supp. 3d at 637 (finding plaintiffs' allegation that the defendants all switched from using traditional benchmarks to a singular rate calculation and negotiation service sufficient for parallel conduct); *In re RealPage Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 506–08 (M.D. Tenn. 2023) (finding the plaintiffs plausibly alleged parallel conduct when the defendant-property owners and managers switched from the traditional method of prioritizing occupancy when determining rental rates to using a third-party algorithm).

Contrary to Defendants' argument, the Rental Company Defendants and their Co-Conspirators need not have contracted simultaneously with Rouse because "concurrent adoption of a price-fixing scheme is not required to prove parallel conduct." *In re MultiPlan*, 789 F. Supp. 3d at 637; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) ("[T]he Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct."). Furthermore, the CAC "relies upon the continuous parallel conduct of the [Rental Company Defendants] during the relevant period of the alleged

conspiracy," namely, the Rental Company Defendants' persistent price increases and their continuous use of Rouse's pricing agent, not the date on which each Rental Company Defendant contracted with Rouse. *Cornish-Adebiyi*, 184 F.4th at 187. Similarly, the fact that the Rental Company Defendants may not have used the RRI Prices in the same way does not necessarily defeat a finding of parallel conduct. *See In re MultiPlan*, 789 F. Supp. 3d at 637–38 ("If competitors agree to abide by a third-party algorithm that guarantees a below market price, it would not matter if every price the algorithm recommended differed for each competitor based on each of the competitor's preferred settings. An agreement to fix prices within a below-market range through use of an algorithm is no different for antitrust purposes than an agreement to fix prices to a single point."); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that Defendants restricted supply in an identical manner.").

Additionally, Plaintiffs state that even if the Rental Company Defendants technically had the ability to deviate from the RRI Price, such deviation rarely occurred, Doc. 145 ¶¶ 14, 95, 134, because Rouse's platform and Defendants' policies and practices prevented deviation from the RRI price, *id.* ¶¶ 90–111. *See In re MultiPlan*, 789 F. Supp. 3d at 638 (noting that "third-party payors' theoretical ability to deviate from a MultiPlan-calculated rate does not mean payors actually reject Multiplan's recommendations in practice"). Although Defendants argue that Rouse's rates are mere benchmark recommendations, the Court must presume the truth of Plaintiffs' factual allegations at this stage. And the allegations included in Plaintiffs' CAC plausibly allege that Rouse's platform operates as an obligation rather than a suggestion, particularly because Plaintiffs allege that the Rental Company Defendants "price within the range of RRI Prices approximately ninety percent of the time." Doc. 145 ¶¶ 14, 95; *see Cornish-Adebiyi*, 184 F.4th at 186 ("A key allegation is that during the relevant class period, all of the

casino-hotel Defendants were delegating their pricing decisions to Cendyn by accepting Rainmaker's pricing recommendations 90% of the time. This alleged parallel behavior among casino-hotel Defendants after 2017 purportedly replaced a 'historically independent room pricing system' with an 'interdependent, collusive one.'"). The Court, therefore, concludes that Plaintiffs have plausibly alleged parallel conduct among the Rental Company Defendants.

**2. Plus Factors**

Because allegations of parallel conduct alone are insufficient to plead an antitrust violation, Plaintiffs allege the following plus factors: (1) exchange of competitively sensitive information; (2) actions against self-interest; and (3) market structure, opportunity, and motive to conspire.

First, "[i]t is well-settled that the exchange of price information among competitors is indicative of anticompetitive agreement." *In re Broiler Chicken Antitrust Litig.*, No. 16 8637, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978) ("[T]he exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions."). Plaintiffs allege that Rouse facilitates the exchange of competitively sensitive pricing information through the RRI algorithm itself by "pooling" participants' data to generate the RRI Price, which "clearly [would] not be in any individual Defendant's economic self-interest to contribute its data [ ] without knowing that it would benefit from its horizontal competitors doing the same." *In re RealPage*, 709 F. Supp. 3d at 510; *see also Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1292–93 (W.D. Wash. 2024) ("Yardi's system works as advertised, however, only if each lessor client divulges its confidential and commercially sensitive pricing, inventory, and market data, allows Yardi to determine the price

of each new and renewal lease, and adopts that price with very little, if any, second guessing. Plaintiffs also allege, based on analyses performed by plaintiffs and Yardi, that the system worked as intended, resulting in above-market pricing for units using RENTmaximizer." (citations omitted)). Similarly here, Plaintiffs claim that Rouse's participants shared their proprietary information with Rouse daily, Rouse generated RRI Prices, the participants almost always adopted the RRI Prices, and that as the scheme reached critical mass, with virtually every major national competitor submitting nightly transaction data to Rouse, prices remained elevated despite declining utilization. Further, Plaintiffs allege that competitors can infer the name of a participant that begins discounting rates, explaining that when EquipmentShare.com first began using Rouse, multiple other Rental Company Defendants complained that EquipmentShare.com brought down prices and forced the company to fall into line. Doc. 145 ¶ 109.

Second, Plaintiffs allege that Defendants took actions against their self-interest, including allowing Rouse to pre-populate its RRI Prices into the Rental Company Defendants' quoting systems, implementing policies and practices that enforce salespeople's compliance with the RRI Prices, and raising rental prices despite declining utilization. *See In re RealPage*, 709 F. Supp. 3d at 512–13 (analyzing Plaintiffs' alleged plus factors and finding persuasive the allegation that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data"); *Duffy*, 758 F. Supp. 3d at 1293 (finding that the plaintiffs plausibly alleged a conspiracy where the defendants "generally adopted Yardi's pricing recommendations" and "engaged in conduct to facilitate and enforce implementation of the pricing recommendations" to "generate above-market prices using a system that required adoption of its recommendations for success"); *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *9 (N.D.

Ill. Nov. 6, 2020) ("Raising prices in the face of lower demand could be against Defendants' self-interest in the absence of collusion. While there may be explanations for the price increase other than collusion, Plaintiffs only have to allege what is plausible at this stage.").

Finally, "Plaintiffs allegations related to plus factors like opportunities to collude, a motive to collude, and the market structure, all support an inference of price fixing." *In re Loc. TV Advert.*, 2020 WL 6557665, at *9. Plaintiffs allege that the Construction Equipment rental market has become dominated by a smaller number of firms, Doc. 145 ¶ 57, has high entry and exit barriers because of the significant upfront capital investment, specialized staff, geographic coverage, and continuity concerns, *id.* ¶¶ 197–98, and features inelastic demand of fungible products, *id.* ¶¶ 199, 201. For motive, Plaintiffs allege that Rouse created its RRI platform because rental company executives complained of pricing pain and poor rate management. *Id.* ¶¶ 5, 62–63, 121. And Plaintiffs plead that Defendants have opportunities to conspire at industry and ARA events. *Id.* ¶¶ 71, 81, 203. While Defendants attempt to isolate certain allegations, the Court must read the CAC as a whole. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010) (analyzing factors as a whole); *In re Broiler Chicken*, 290 F. Supp. 3d at 790 (considering allegations of parallel conduct and plus factors in tandem); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition that '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'" (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962))).

Defendants cite a list of cases where courts dismissed antitrust complaints based on the provision of aggregated and anonymized benchmarks to support their arguments for dismissal. *See* Doc. 204-1 at 25–26. But the Court finds these cases distinguishable. *See Segal v. Amadeus IT Grp., S.A.*, No. 24-CV-1783, 2025 WL 963751 (N.D. Ill. Mar. 31, 2025) (dismissing hub-and-spoke claim where plaintiff "abandoned any hub-and-spoke conspiracy theory alleged in the [Second Amended Complaint]" because plaintiff alleged "only that the respective hotel defendants began using Demand360 at various times knowing that they would receive access to forward-looking data of their competitors without establishing any basis to conclude that hotel defendants recognized that they were a 'part of the greater arrangement' and 'coordinated or otherwise carried out [their] duties as part of the broader group'"); *Portillo v. Costar Grp., Inc.*, No. C24-229RSL, 2025 WL 2495053 (W.D. Wash. Aug. 29, 2025) (finding fatal the fact that the product's terms and conditions do not require participants to share hotel rooms' most recent charged or quoted prices because if hotel room prices are not an input to the program, then they are similarly not an output to its hotel operator clients); *Gibson v. MGM Resorts Int'l*, No. 23-CV-00140, 2023 WL 7025996 (D. Nev. Oct. 24, 2023) (dismissing hub-and-spoke claim where plaintiffs did not clearly allege whether each hotel operator's generated pricing recommendation includes non-public information fed into the program by other hotel operators); *Gibson v. Cendyn Grp., LLC*, No. 23-CV-00140, 2024 WL 2060260 (D. Nev. May 8, 2024) (dismissing plaintiffs' amended complaint because it did not allege that defendants agreed to be bound by the program's pricing recommendation and, in fact, defendants often rejected such recommendations), *aff'd*, 148 F.4th 1069 (9th Cir. 2025); *Dai v. SAS Inst. Inc.*, No. 24-CV-02537, 2025 WL 2078835 (N.D. Cal. July 18, 2025) (dismissing case where plaintiffs failed to allege any facts about when defendants began outsourcing their pricing decisions or when they

started to make unprecedented changes to their room prices); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681 (N.D. Ohio 2025) (dismissing Section 1 claims based on insufficient allegations to show collusion because, in part, plaintiffs did not offer any explanation of how the defendants' exchange of unspecified non-public information could be useful in policing co-conspirators' presumably public prices). Unlike these cases, Plaintiffs here have alleged several facts explaining: the non-public pricing and other information that the Rental Company Defendants upload to RRI; how RRI uses that information to produce RRI Prices; and how enforcement mechanisms and the Rental Company Defendants' high acceptance rate of the RRI Prices indicate that RRI is a pricing obligation, not just a pricing benchmark.

Perhaps the reason for Defendants' insistence that RRI provides only "aggregated, anonymized, and historical benchmark information that the Rental Company Defendants are free to consider or ignore at their discretion" will reveal itself in discovery, Doc. 145 at 1, but at the pleading stage, the Court must accept as true Plaintiffs' allegations. And taking Plaintiffs' allegations holistically, Plaintiffs allege parallel conduct and several plus factors that, when considered together, give rise to an inference of a price-fixing conspiracy sufficient to state a claim and proceed to discovery.

**B. Count Two: Information Exchange**

Count Two of the CAC alleges an unlawful information exchange. Exchange of information is not illegal per se, but courts can find it unlawful under a "rule of reason" analysis, which considers "a number of factors including most prominently the structure of the industry involved and the nature of the information exchanged." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *U.S. Gypsum Co.*, 438 U.S. at 441 n.16). Under a rule of reason analysis, the plaintiff carries the burden to show that the defendants entered into an agreement or contract

that has an anticompetitive effect on a given market within a given geographical area. *Agnew*, 683 F.3d at 335 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006)). Plaintiffs also have the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). Where the plaintiff carries its initial burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. *Id.* If the defendant satisfies that burden, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.*

The Court could perform a "quick look" analysis, by which the Court asks whether "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). But because the parties have fully briefed the rule of reason analysis, the Court will apply it here, even though some courts within this Circuit have determined that the Court need not resolve which antitrust analysis applies at the motion to dismiss stage. *See Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753–54 (N.D. Ill. 2019) (finding that the court did not need to determine which mode of antitrust analysis should apply because the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct after discovery).

**1. Agreement**

As discussed above, Plaintiffs have alleged sufficient circumstantial evidence of an agreement among Defendants to share anticompetitive information. *See In re Loc. TV Advert.*, 2020 WL 6557665, at *11 (analyzing an information exchange claim and referring to the court's

analysis regarding the plaintiffs' price-fixing claim). As such, the Court does not address this requirement further.

**2. Market Definition**

To establish a relevant market for a rule of reason analysis, Plaintiffs must define both a geographic market and a product market. *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004)). Plaintiffs define the relevant market as the rental market for Construction Equipment in the United States. Doc. 145 ¶ 207.

The failure to allege the existence of a relevant commercial market is fatal to a Sherman Act claim, regardless of whether the Court applies a per se analysis, quick-look review, or rule-of-reason analysis. *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019) (citing *Agnew*, 683 F.3d 328, 337 ("It is the existence of a commercial market that implicates the Sherman Act in the first instance.")). Of course, the Court does not "blindly accept a market definition proposed in a complaint" and an antitrust claim lacks merit when a plaintiff "fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 CV 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (citation omitted) (internal quotation marks omitted). The Court should dismiss a claim when the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fails even to attempt a plausible explanation as to why a market should be limited in a particular way. *Id.* (citing *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)). Courts generally hesitate to dismiss Sherman Act claims for failure to allege a relevant market

"[b]ecause market definition is a deeply fact-intensive inquiry." *Id.* (citing *Todd*, 275 F.3d at 199–200).

**a. Geographic Market**

Defendants jointly challenge Plaintiffs' relevant geographic market, which Plaintiffs define as the United States. Doc. 145 ¶ 219. "There is nothing facially invalid about alleging a nationwide market—a market 'can be as large as the globe' as long as a plaintiff plausibly alleges facts to support such breadth." *In re MultiPlan*, 789 F. Supp. 3d at 633 (quoting *Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 468–69 (7th Cir. 2016)). Defendants argue that Plaintiffs' allegations supporting a nationwide market focus solely on the seller, such as Defendants' branch locations and inventory decisions, and that the CAC repeatedly discusses regional demands, therefore undermining any plausible nationwide market. Plaintiffs contend that the national scope of Defendants' operations, the nationwide mobility of the Construction Equipment rental supply, and Rouse's national character support a nationwide geographic market.

The CAC alleges that each Rental Company Defendant operates a nationwide branch network with dozens of locations serving customers across the country. Doc. 145 ¶¶ 29, 31, 36, 39, 42, 45, 47. A HERC executive stated that the company moves its fleet "freely to where the demand is, both geographically and by industry." *Id.* ¶ 222. United Rentals has described a similar ability. *Id.* (describing United Rentals' ability to reposition fungible assets and move those assets to meet customer needs). Defendants' alleged nationwide services support a nationwide market at this stage. *See In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641 (N.D. Ill. 2020) (denying a motion to dismiss in a case involving an alleged nationwide market when the plaintiffs "claim[ed] that defendants insure patients across the country"). Further,

Plaintiffs state that the Construction Equipment rental firms "redeploy equipment nationally in response to economic cycles and external shocks," including federal infrastructure projects and natural disasters. Doc. 145 ¶ 223. Finally, Rouse's platform produces national, regional, and local benchmarks, presupposing a nationwide competitive arena. *Id.* ¶ 224. With these facts, Plaintiffs have plausibly alleged a nationwide market. *See In re MultiPlan*, 789 F. Supp. 3d 614, 633 (finding that the plaintiffs alleged facts to support a nationwide market where they claimed "patients utilize out-of-network services because of frequent travel, patients from anywhere in the United States can and do obtain out-of-network services across the nation, and third-party payors purchase out-of-network services from healthcare providers nationwide").

**b. Product Market**

The Court now turns to whether Plaintiffs allege a plausible product market. Although Defendants do not jointly raise this argument in their brief, Home Depot challenges Plaintiffs' product market in its individual motion to dismiss. *See* Doc. 201 at 14–17.

A product market is generally "composed of products that have reasonable interchangeability for the purposes for which they are produced." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Courts therefore must consider several other factors when determining how to properly define the relevant product market, including "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to

dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199–200 (citing cases).

Home Depot contends that Plaintiffs' alleged product market is inconsistent with commercial realities. The CAC alleges a nationwide market of "medium-to-large machinery, such as aerial lifts (e.g., boom lifts, scissor lifts, forklifts, and telehandlers), excavators, dozers, skid steers, compaction machines, lighting towers, generators, backhoes, loaders, and others." Doc. 145 ¶ 54. Plaintiffs distinguish these machines from "small hand tools or light equipment that could fit in a car, as they may require special transport, maintenance, and capital management." *Id.* Home Depot contends that Plaintiffs stretched the alleged product market definition to specifically include the products that only Home Depot rents. Resultingly, Home Depot argues, the alleged product market definition does not reflect "commercial realities" because it conflates two distinct product clusters that establish separate objects of consumer demand. *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

But a "cluster of products can comprise a relevant product market 'if the cluster is itself an object of consumer demand.'" *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) (citation omitted). The Supreme Court "see[s] no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *Grinnell Corp.*, 384 U.S. at 572. To explain how its combination of medium-to-large machinery and exclusion of small hand tools and light equipment reflects commercial realities, Plaintiffs allege that the market encompasses "industrial-grade machinery used in commercial, industrial, and infrastructure construction," Doc. 145 ¶ 54, and note that the "ARA, Rouse Analytics, and *Rental Equipment Register ("RER")*, an industry publication, all treat 'construction and industrial equipment rentals' as a district sector separate from light-tool or

homeowner rentals," *Id.* ¶ 54. At this stage, the Court finds Plaintiffs' allegations sufficient to "make plausible the existence of a relevant market." *Carbone*, 621 F. Supp. 3d at 899; *see also In re Delta Dental*, 484 F. Supp. 3d at 640 (finding the plaintiffs plausibly alleged a market for "dental goods and services sold by plaintiffs to insurers").

**3. Anticompetitive Effects**

Plaintiffs can show proof of anticompetitive effects either directly or indirectly. Direct evidence of anticompetitive effects would be "proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express Co.*, 585 U.S. at 542 (citations omitted). "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted).

Plaintiffs allege that Defendants' information exchange resulted in higher rental equipment prices, which is an anticompetitive effect. *See Toys "R" US, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (explaining that "coordination of action among competitors" that prevents them "from having to lower . . . prices" is "proof of actual anticompetitive effects"). In particular, Plaintiffs plead that the Rental Company Defendants each gave Rouse their proprietary information so that Rouse could produce RRI Prices that integrated directly into the Rental Company Defendants' pricing systems. Plaintiffs also allege that Rouse and the Rental Company Defendants prevented salespeople from deviating below RRI Prices, removing uncertainty about each Rental Company Defendants' Construction Equipment pricing, and allowing the Rental Company Defendants to keep their prices artificially high as a result of this information exchange. These allegations suffice to state a claim for Count Two and allow it to proceed to discovery. *See In re Loc. TV Advert.*, 2020 WL 6557665, at *13 (N.D. Ill. Nov. 6,

2020) (finding plaintiffs' alleged facts create an anticompetitive effect because plaintiffs' pleadings "clearly connect the dots between the alleged information exchange and the rise in price").

**II. Timeliness**

Even though the Court has found that Plaintiffs have stated antitrust claims, Defendants argue the Court should nonetheless dismiss the claims because the statute of limitations has run. Federal antitrust claims are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. "An antitrust cause of action accrues and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business." *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022) (citation omitted). But Plaintiffs only seek damages for the Class Period beginning April 1, 2021, which falls within four years of the first-filed action and makes their claims timely. Doc. 145 ¶ 240.[9]

**III. RB Global's Liability**

RB Global asserts that Plaintiffs improperly seek to hold it liable as the parent company of Rouse. Normally, "a parent company cannot be held liable for the acts of its subsidiaries." *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022). But courts find an exception to this rule when "the parent directly involves itself in the subsidiary's wrongful activities or where the conditions for piercing the corporate veil are satisfied." *Id.* In cases where a parent directs the subsidiary to engage in anticompetitive conduct, or engages in such conduct itself, that is sufficient to show direct involvement by the parent. *In re Dealer*

[9] Plaintiffs contend that even if they choose to seek damages from before the Class Period, the continuing violation doctrine would apply "because Plaintiffs allege the conspiracy persisted into the Class Period, during which they rented Construction Equipment from the Rental Company Defendants and paid inflated prices." Doc. 229 at 47. But because Plaintiffs do not currently seek such relief, the Court does not address the soundness of this argument.

*Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2018 WL 6629250, at *7 (N.D. Ill. Oct. 22, 2018). Plaintiffs here argue that RB Global is liable because of its own direct participation in the alleged conspiracy, including its approval and ratification of Rouse's anticompetitive acts, and because RB Global and Rouse are integrated enterprises.[10]

### A. Direct Participation

Plaintiffs argue that RB Global directly participates in the alleged conspiracy. First, Plaintiffs ask this Court to infer that RB Global strategically and knowingly acquired Rouse as the instrumentality of the conspiracy. But RB Global could have acquired Rouse for a myriad of reasons, and Plaintiffs allege nothing to support its proposed inference. *Cf. In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670, 2022 WL 836951, *5 (S.D. Cal. Mar. 21, 2022) (noting that the defendant private equity firm allegedly "learned prior to completing the acquisition that [the subsidiary's] profits were the product of pricing actions which would be untenable in a competitive market and were in fact the product of anticompetitive agreements," but proceeded to acquire the subsidiary anyway). It is just as likely that RB Global acquired Rouse for lawful economic reasons, as demonstrated by RB Global's CEO's public comments complimenting the transaction and acknowledging both companies' growth efforts. Doc. 145 ¶ 75 ("Around the time of the acquisition, [RB Global] CEO Ann Fandozzi said the combination was 'complementary' and acknowledged it would 'accelerate both of our growth efforts by providing customers more robust data.'").

---

[10] While RB Global includes veil-piercing arguments in its motion, Plaintiffs state that RB Global's "veil-piercing arguments are irrelevant" because "Plaintiffs' claims against RB Global do not depend on piercing the corporate veil" and instead depend on RB Global's separate liability for its own direct participation in the conspiracy and for operating as a single enterprise with Rouse. Doc. 223 at 13–14. Because Plaintiffs state that they do not rely on a corporate veil theory of liability, the Court does not address the parties' arguments on that theory.

Next, Plaintiffs claim that RB Global provides data that drives the conspiracy. Plaintiffs allege in the CAC that RB Global's data-services "supercharge[d]" Rouse's RRI program. *Id.* ¶ 76. But Plaintiffs never explain how RB Global inputs its data into Rouse's RRI or influences RRI Prices. Plaintiffs' allegations instead focus on the Rental Company Defendants' nightly pooling of their sensitive data to generate the RRI Prices. *See, e.g.*, *id.* ¶¶ 80, 189, 224, 266.

And Plaintiffs make only the following additional allegations concerning RB Global, none of which demonstrate direct participation in the alleged conspiracy: RB Global is a public company traded on the Toronto and New York Stock Exchanges and legally domiciled in Canada with its U.S. headquarters in Illinois, *id.* ¶ 25; RB Global describes itself as "a leading global marketplace that provides value-added insights, services, and transaction solutions for buyers and sellers of commercial assets and vehicles worldwide," *id.*; in 2020, RB Global acquired Rouse for roughly $275 million in cash and stock, assuming "direct control over [Rouse's] analytics platform through which the Rouse Cartel's coordination" allegedly operates; *id.* ¶ 26; at that time, RB Global was the world's largest equipment auction company, *id.* ¶ 75; RB Global's CEO said the combination was "complementary" and acknowledged that it would "accelerate both of our growth efforts by providing customers more robust data," *id.*; the acquisition allowed Rouse to "integrate its advanced data-analytics capabilities into RB Global's existing global reach and asset-management expertise, *id.* ¶ 76; RB Global stated in a May 2022 presentation to investors that it "has essentially become one of Rouse's largest data providers," *id.*; also in 2022, RB Global reported $6 billion in gross transactional value, *id.* ¶ 25; and RB Global now "wholly owns, controls, and directs Rouse's operations and profits from its shared pricing and analytics business" and has "benefited from the unlawful collection and redistribution of competitors' confidential data and the resulting coordination of rental

equipment pricing," *id.* ¶ 26. While the CAC states that RB Global "controls[ ] and directs Rouse's operations and profits from its shared pricing and analytics business," *id.*, Plaintiffs do not provide any further explanation or description of RB Global's alleged control and direction. Without more than these conclusory and boilerplate allegations, Plaintiffs have failed to sufficiently outline RB Global's direct participation. *See Bright v. Roadway Servs.*, 846 F. Supp. 693, 700 (N.D. Ill. 1994) (rejecting conclusory allegation that parent company "owns and controls" subsidiary as "insufficient as a matter of law" to state a claim against parent company).

For this same reason, the Court rejects Plaintiffs' argument that RB Global knowingly approved and ratified Rouse's anticompetitive acts. Just as Plaintiffs do not allege sufficient facts to describe RB Global's control and direction over Rouse, Plaintiffs similarly do not provide any details in the CAC that plausibly suggest that RB Global knowingly approved and ratified any anticompetitive acts. *See Vertex Ref., NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 374 F. Supp. 3d 754 (N.D. Ill. 2019) ("Ratification requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction.").

And even considering any allegation against "Defendants" to include RB Global, these additional allegations do not substantively add to the allegations against RB Global in any non-conclusory way. Compared to the Rental Company Defendants, as discussed below, Plaintiffs fail to include allegations that distinguish how RB Global acted in furtherance of the alleged conspiracy. And "[d]etails about who did what are not merely nice-to-have features of an otherwise-valid complaint; to pass muster under Rule 8 of the Federal Rules of Civil Procedure, a claim to relief must include such particulars." *Atkins v. Hasan*, No. 15 CV 203, 2015 WL

3862724, at *2 (N.D. Ill. June 22, 2015).[11] Plaintiffs, therefore, do not sufficiently allege RB Global's direct participation in the conspiracy.

**B. Integrated Enterprise**

Alternatively, courts may hold a parent company liable for its subsidiary's antitrust violations where it "participated in the conspiracy beyond 'mere ownership.'" *In re RealPage Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 469, 474 (M.D. Tenn. 2023) (citation omitted). Plaintiffs contend that RB Global and Rouse operate as one integrated enterprise, meaning the Court may impute Rouse's anticompetitive actions onto RB Global. To support their integrated enterprise theory, Plaintiffs point to: RB Global's public filings describing Rouse as one of its integrated brands; Rouse employees using RB Global email addresses; RB Global posting Rouse job listings on its own careers website; RB Global's code of conduct applying to all of its directors, officers, and employees; RB Global's share incentive plan extending to employees of any subsidiary, including Rouse; and Rouse's former managing director now serving as a RB Global entity's executive vice president, overseeing Rouse in North America. But Plaintiffs undermine their own argument by alleging in the CAC that: (1) Rouse and RB Global operate from separate headquarters, *id.* ¶¶ 25, 27; (2) RB Global's public filings treat Rouse as a "distinct reporting unit," *id.* ¶ 26; and (3) Rouse and RB Global maintain separate websites, *id.* ¶¶ 26, 27.

Further, as discussed above, Plaintiffs do not plead any non-conclusory allegations suggesting that RB Global "directed, controlled, or encouraged its subsidiary's participation in the scheme." *Outpatient*, 630 F. Supp. 3d at 991. And RB Global's public statements regarding Rouse and RB Global's successes post-acquisition, Doc. 145 ¶¶ 75–76, do not suggest any

---

[11] As explained below, the Court does not consider Rouse and RB Global to be one integrated enterprise, and therefore it rejects Plaintiffs' suggestion that every allegation naming Rouse includes RB Global.

agreement to conspire. *See United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2019 WL 1331830, at *38 (S.D.N.Y. Mar. 25, 2019) (allegations that owner regarded company as a "valuable asset" due to supracompetitive prices stemming from allegedly anticompetitive agreements did not support inference that owner independently participated in alleged misconduct).

Plaintiffs cite *In re Dealer Management Systems Antitrust Litigation*, No. 18-CV-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018), to support its integrated enterprise arguments. But in that case, plaintiffs included far more detailed allegations about the parent company's control over the subsidiary. *Id.* at *5–6 (alleging that the parent: owns 80 percent of the subsidiary, controls the subsidiary's board of directors, informs investors that it holds a controlling financial and management interest in the subsidiary, treats the subsidiary as a division rather than a separate company, controls the subsidiary's budget and capital investments, makes hiring and firing decisions of the subsidiary's employees, houses the subsidiary's offices within its headquarters, dictates where the subsidiary should focus its marketing and sales efforts, and makes the subsidiary's general manager report directly to its vice president). Plaintiffs also cite *Off. Cantonal des Faillites de la Republique et du Canton de Geneve v. Expedia, Inc.*, No. 23-CV-983, 2024 WL 381181 (W.D. Wash. Feb. 1, 2024) to support their integrated enterprise argument. But this case never explicitly mentions an "integrated enterprise" liability theory and instead finds the plaintiff's allegations barely sufficient to survive dismissal where the plaintiff

described how the parent company effected its anticompetitive behavior—control over its competitors' ability to advertise rates to their customers—through its subsidiary. *Id.* at *3–5. In comparison, Plaintiffs do not describe how RB Global accomplished any anticompetitive behavior through its ownership of Rouse. The Court finds Plaintiffs' last cited case, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010), unpersuasive for similar reasons. *Id.* at 1021 (finding that the plaintiffs' complaints sufficiently detail the parent companies' dominance and control over their subsidiaries' alleged antitrust violations, highlighting allegations that specifically describe the parent companies' behavior, such as the parents' participation in price, output restrictions, and customer and market allocation meetings and dominance over their subsidiaries' finances, policies, and affairs).

Plaintiffs' minimal allegations do not compare to the facts alleged in their cited cases, and so cannot suggest an integrated enterprise involving RB Global and Rouse.

The Court therefore grants RB Global's motion to dismiss and turns to the remaining individual motions to dismiss from EquipmentShare.com, Home Depot, and Sunstate.

## IV. Group Pleading

The Court first addresses EquipmentShare.com, Home Depot, and Sunstate's argument that Plaintiffs have failed to adequately plead facts specifically connecting these Defendants to the claims against them. Under Rule 8 of the Federal Rules of Civil Procedure, a plaintiff need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "There is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively." *In re MultiPlan*, 789 F. Supp. 3d at 647 (citation omitted). "Rule 8 only requires a complaint provide sufficient detail to put defendants on notice of the claims." *Id.* (citation omitted); *see also Bank of Am. v. Knight*, 725 F.3d 815,

818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful.").

Plaintiffs have alleged sufficient facts to put EquipmentShare.com, Home Depot, and Sunstate on notice of Plaintiffs' antitrust claims. Plaintiffs allege that Construction Equipment rental companies, including EquipmentShare.com, Home Depot, and Sunstate, all contracted with Rouse to transmit competitively sensitive data and gain access to its RRI product. Doc. 145 ¶¶ 161–162. These three Defendants do not deny that these agreements exist. And as discussed above, these agreements to use Rouse's pricing services implicate EquipmentShare.com, Home Depot, and Sunstate as co-conspirators in a conspiracy to share information and increase rental prices.[12] EquipmentShare.com, Home Depot, and Sunstate, therefore, know what actions they took that Plaintiffs assert are wrongful, as required by Rule 8. *See In re MultiPlan*, 789 F. Supp. 3d at 647 (rejecting three defendants' argument that the plaintiffs failed to adequately plead facts specifically connecting them to their antitrust claims because the plaintiffs alleged that the three defendants contracted to use MultiPlan's algorithm, thus putting the three defendants on notice of their alleged wrongful actions); *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 887 (N.D. Ill. 2022) ("The plaintiffs are not required to cite evidence specific to each defendant in their complaint.").

Additionally, although Plaintiffs often refer to EquipmentShare.com, Home Depot, and Sunstate as a collective in the CAC, they individually identify each Rental Company Defendant, their corporate headquarters, the number of branches owned/operated by each Rental Company Defendant, and the geographical breadth of their operations. *See Duffy*, 758 F. Supp. 3d at 1290

[12] Although Home Depot suggests an alternate reason for its rental-revenue increase, "[a] court's role when evaluating pleadings is to decide whether the plaintiff's allegations are plausible—not which side's version is more probable." *Hughes v. Nw. Univ.*, 63 F.4th 615, 630 (7th Cir. 2023); *see also In re MultiPlan*, 789 F. Supp. 3d at 644 ("Although an 'obvious alternative explanation' can indicate that an alleged agreement is not plausible, it cannot override a plausibly alleged agreement." (citation omitted)).

(noting that the plaintiffs alleged each lessor defendants' name, headquarters, the year in which they began using Yardi's revenue management software, the numbers of units owned/operated by the lessor defendants, and the geographical breadth of their operations and concluding that "when the allegation is that all of the lessor defendants engaged in the same anti-competitive scheme, namely entering into express agreements with Yardi with the understanding that their collective actions would allow them to restrain trade . . . there is no need to provide defendant-specific allegations beyond those that raise a plausible inference that they each joined the anti-competitive scheme"). It is irrelevant that Plaintiffs included only select Rental Equipment Defendants' executives' "public statements regarding aspects of the coordinated plan . . . in the [CAC]" because Plaintiffs still sufficiently included allegations related to the other Rental Equipment Defendants. *Id.*

Accordingly, the Court denies EquipmentShare.com's, Home Depot's, and Sunstate's motions to dismiss.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' joint motion to dismiss [204], denies EquipmentShare.com's motion to dismiss [199], Home Depot's motion to dismiss [201], and Sunstate's motion to dismiss [206]. The Court grants RB Global's motion to dismiss [197] and dismisses Plaintiffs' claims against RB Global without prejudice.

Dated: September 28, 2026

SARA L. ELLIS
United States District Judge